**Nos. 21-1355, -1356, -1390, -1391**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

APPLE INC.,

*Appellant,*

v.

MPH TECHNOLOGIES OY,

*Cross-Appellant.*

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board, Case Nos. IPR2019-00819, -00820

## APPLE INC.'S OPENING BRIEF

BITA RAHEBI
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017

RICHARD HUNG
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

JOSEPH R. PALMORE
BRIAN R. MATSUI
SETH W. LLOYD
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Telephone:  202.887.6940
JPalmore@mofo.com

*Counsel for Appellant Apple Inc.*

MAY 21, 2021

# U.S. Patent No. 7,620,810 Claims 1 and 7

**1.** A method for ensuring secure forwarding of a message in a telecommunication network, having at least one mobile terminal and another terminal and a security gateway therebetween, the method comprising:

a) establishing a secure connection between a first address of the mobile terminal and an address of the security gateway, the secure connection defined by at least the addresses of the mobile terminal and the security gateway,

b) the mobile terminal changing from the first address to a second address,

c) while at the second address, the mobile terminal sending a request message to the address of the security gateway to request the security gateway to change the secure connection to be defined between the second address and the address of the security gateway,

in response to the request message from the mobile terminal, the security gateway changing an address definition of the secure connection from the first address to the second address, the mobile terminal sending a secure message in the secure connection from the second address of the mobile terminal to the other terminal via the security gateway,

the secure connection being established by forming a Security Association (SA) using IPSec protocols, and the request message and/or a reply message being encrypted and/or authenticated by using the same SA already established.

**7.** A method for ensuring secure forwarding of a message in a telecommunication network, having at least one mobile terminal and another terminal and a security gateway therebetween, the method comprising:

a) establishing a secure connection between a first address of the mobile terminal and an address of the security gateway,

the secure connection defined by at least the addresses of the mobile terminal and the security gateway,

b) the mobile terminal moving from the first address to a second address,

c) while at the second address, the mobile terminal sending a request message to the address of the security gateway to request the security gateway to change the secure connection to be defined between the second address and the address of the security gateway,

the security gateway changing an address definition of the secure connection from the first address to the second address, and

the other terminal sending a secure message in the secure connection to the second address of the mobile terminal via the security gateway.

## U.S. Patent No. 7,937,581 Claims 1 and 4-8

**1.** A method for ensuring secure forwarding of a message in a telecommunication network, having at least one mobile terminal and another terminal and a security gateway therebetween, the method comprising:

a) establishing a secure connection having a first address of the mobile terminal as a first end-point and a gateway address of the security gateway as a second end-point,

b) the mobile terminal changing from the first address to a second address,

c) while at the second address, the mobile terminal sending a request message to the gateway address of the security gateway to request the security gateway to change the secure connection to be defined between the second address and the gateway address of the security gateway,

in response to the request message from the mobile terminal, the security gateway changing an address definition of the secure connection from the first address to the second address, and

the mobile terminal sending a secure message in the secure connection from the second address of the mobile terminal to the other terminal via the security gateway.

**4.** The method of claim **1**, wherein the request message and/or a reply message is encrypted and/or authenticated.

**5.** The method of claim **1** wherein the method further comprises the security gateway sending back a reply message to the mobile terminal at the second address to confirm the address change.

**6.** The method of claim **5**, wherein the mobile terminal and the other terminal form an end-to-end connection whereby the securre connection is an IPSec transport connection or IPSec tunnel connection.

**7.** The method of claim **5**, wherein a tunneling protocol is used for the secure connection between the mobile terminal and the security gateway.

**8.** The method of claim **5**, wherein the other terminal is a mobile terminal.

# CERTIFICATE OF INTEREST

Counsel for Apple Inc. certify under Federal Circuit Rule 47.4 that the following information is accurate and complete to the best of their knowledge:

1.     **Represented Entities.**  Provide the full names of all entities represented by undersigned counsel in this case.

Apple Inc.

2.     **Real Party in Interest.**  Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

None.

3.     **Parent Corporations and Stockholders.**  Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None.

4.     **Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.:  Michael D. Specht, Daniel S. Block, Timothy L. Tang.

5.     **Related Cases.**  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not include the originating case number(s) for this case.

*MPH Technologies Oy v. Apple Inc.*, No. 4:18-cv-05935-PJH (N.D. Cal.)

6.     **Organizational Victims and Bankruptcy Cases.**  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).

Not applicable.

Dated:  May 21, 2021                                  /s/ Joseph R. Palmore
                                                        _____

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................ i

TABLE OF AUTHORITIES ................................................................v

STATEMENT OF RELATED CASES ................................................ vii

JURISDICTIONAL STATEMENT ................................................... vii

INTRODUCTION ............................................................................1

STATEMENT OF ISSUES .................................................................3

STATEMENT OF THE CASE.............................................................3

     A.    Before Either Patent's Filing, The Prior Art Adopted Straightforward Solutions For Securing Mobile Communications ........................................................................4

     B.    MPH Claimed A Prior-Art Solution To Securing Mobile Communications.....................................................................9

     C.    The Board Found Some Claims Unpatentable But Upheld Others By *Sua Sponte* Adopting A New Claim Construction And Upholding Dependent Claims Based On An Invalid Parent Claim ..................................................................................12

          1.    The Board upheld the patentability of '810 patent claims 1-6 and '581 patent claim 4 based on a new, *sua sponte* construction of an "encrypted" request message .....................12

          2.    The Board upheld the patentability of '581 patent claims 6-8 based solely on the limitations those claims share with claim 5, which the Board itself found unpatentable .................14

SUMMARY OF ARGUMENT ...........................................................15

ARGUMENT ................................................................................18

I.    THE BOARD'S DECISION ON '810 PATENT CLAIMS 1-6 AND '581 PATENT CLAIM 4 IS SUBSTANTIVELY AND PROCEDURALLY FLAWED.................................................18

A. The Board's Erroneous Construction Excluding Request Messages With Unencrypted Address Information Contradicts Intrinsic And Extrinsic Evidence ....................................................... 19

    1. Intrinsic evidence and MPH's own expert's testimony show an encrypted message in this field not only may but must include unencrypted address information in an outer IP header ................................................................................. 19

        a. Intrinsic evidence confirms that encrypting a payload is enough ........................................................ 19

        b. Undisputed extrinsic evidence confirms the Board's claim construction error ................................................. 24

        c. The Board's encapsulation theory has no support in the record and would wrongly exclude embodiments ................................................................. 26

    2. The Court should reverse outright because there is no dispute that Ishiyama discloses an encrypted request message when correctly construed ........................................... 28

B. At Least A Remand Is Required Because The Board Violated The Administrative Procedure Act When It Adopted A New Construction *Sua Sponte* In Its Final Written Decision ..................... 29

    1. Without notice or an adequate opportunity to respond, the Board construed a term whose meaning no party disputed ...... 29

    2. The Board's error was prejudicial because it deprived Apple of the chance to present rebuttal argument and evidence, which would, or at least could, have led to a different result ......................................................................... 34

II. THE BOARD ERRED BECAUSE IT UPHELD '581 PATENT CLAIMS 6-8 BASED ON THE LIMITATION THEY SHARE WITH CLAIM 5 EVEN THOUGH IT FOUND CLAIM 5 OBVIOUS ................. 37

A. Apple Showed, And MPH Hardly Disputed, That The Limitations Added By Claims 6-8 Could Not Be A Basis For Patentability ......................................................................... 38

B. The Board's Contrary Reasoning Ignores Governing Law ............... 41

1.    No statute or regulation required the Board to ignore Apple's arguments about claim 5's unpatentability when addressing dependent claims 6-8's unpatentability .................41

2.    Precedent required the Board to address the petition on the petition's terms.........................................................................44

3.    The Board's flawed approach should be rejected because it serves no purpose.................................................................46

CONCLUSION ........................................................................................47

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*3M Innovative Props. Co. v. Tredegar Corp.*,
  725 F.3d 1315 (Fed. Cir. 2013) .........................................................................20

*Baxalta Inc. v. Genentech, Inc.*,
  972 F.3d 1341 (Fed. Cir. 2020) .........................................................................19

*Belden Inc. v. Berk-Tek LLC*,
  805 F.3d 1064 (Fed. Cir. 2015) ....................................................................30, 37

*In re Bennett*,
  766 F.2d 524 (Fed. Cir. 1985) ...........................................................................46

*Dell Inc. v. Acceleron*,
  818 F.3d 1293 (Fed. Cir. 2016) ....................................................................33, 34

*Genzyme Therapeutic Prods. v. Biomarin Pharm.*,
  825 F.3d 1360 (Fed. Cir. 2016) .........................................................................46

*In re Hiniker Co.*,
  150 F.3d 1362 (Fed. Cir. 1998) .........................................................................20

*Koninklijke Philips N.V. v. Google LLC*,
  948 F.3d 1330 (Fed. Cir. 2020) ....................................................................15, 44

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007).............................................................................................37

*MaxLinear, Inc. v. CF CRESPE LLC*,
  880 F.3d 1373 (Fed. Cir. 2018) ....................................................................38, 39

*In re NuVasive, Inc.*,
  841 F. 3d 966 (Fed. Cir. 2016) ..........................................................................29

*Ormco Corp. v. Align Tech., Inc.*,
  498 F.3d 1307 (Fed. Cir. 2007) ....................................................................38, 39

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ..........................................................19, 20, 30

*SAS Inst., Inc. v. ComplementSoft, LLC,*
   825 F.3d 1341 (Fed. Cir. 2016) ...................................................30, 33

*SAS Inst. Inc. v. Iancu,*
   138 S. Ct. 1348 (2018).............................................15, 30, 42, 44

*Soverain Software LLC v. NewEgg Inc.,*
   728 F.3d 1332 (Fed. Cir. 2013) .........................................................41

*Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt.,*
   778 F.3d 1311 (Fed. Cir. 2015) .........................................................39

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.,*
   853 F.3d 1272 (Fed. Cir. 2017) .........................................................27

**Statutes and Regulations**

5 U.S.C. § 554 ....................................................................................33

5 U.S.C. § 556(d) ...............................................................................33

28 U.S.C. § 1295(a)(4)(A) ................................................................ vii

35 U.S.C. § 6(b)(4)............................................................................ vii

35 U.S.C. § 103 ..................................................................................42

35 U.S.C. § 141 ................................................................................. vii

35 U.S.C. § 311 ................................................................................. vii

35 U.S.C. § 312(a)(3)..........................................................................42

35 U.S.C. § 318 ................................................................................. vii

37 C.F.R. § 42.104(b) ..................................................................42, 43

## STATEMENT OF RELATED CASES

No appeal from these proceedings on U.S. Patent Nos. 7,620,810 ('810 patent) and 7,937,581 ('581 patent) owned by MPH Technologies Oy has previously been before this Court or any other court. MPH has asserted claims of the same patents in *MPH Technologies Oy v. Apple Inc.*, No. 4:18-cv-05935-PJH (N.D. Cal.). Counsel for Apple know of no other case pending in this Court or any other court that will directly affect or be affected by this Court's decision in these appeals.

## JURISDICTIONAL STATEMENT

The Patent Trial and Appeal Board had jurisdiction over these *inter partes* reviews under 35 U.S.C. §§ 6(b)(4) and 311. The Board issued its final written decisions under 35 U.S.C. § 318 on September 24, 2020. Apple timely filed notices of appeal from each decision on November 23, 2020. 21-1355, ECF No. 1; 21-1356, ECF No. 1. This Court has jurisdiction under 35 U.S.C. § 141 and 28 U.S.C. § 1295(a)(4)(A).

# INTRODUCTION

The Board's decisions violated basic claim construction principles that require reversal on claims 1-6 of the '810 patent and claim 4 of the '581 patent. Both patents address securing mobile communications. Their claims cover sending a request message "encrypted" with common internet security protocols. The Board misread that text to exclude encrypted messages with unencrypted outer header address information—information that must be unencrypted to route messages through the internet. Not surprisingly, no evidence, intrinsic or extrinsic, supports reading the claims to require encrypting such information. Instead, the patents contradict the Board's construction because they make clear that every internet communication must include such unencrypted address information to allow routing messages from sender to receiver. And MPH's own expert testimony shows that, like the address information on a letter, the outer header address information must be unencrypted for routing, even if the contents of the message (or the letter) are encrypted. It thus is no surprise that the patents refer to messages as encrypted even though address information is unencrypted.

The Board committed this error of its own volition. No party argued that the claims required encrypting a message's outer header address information. MPH instead primarily focused on other issues or wrongly argued no part of the alleged request message was encrypted—a proposition the Board rejected. Because the

Board decided to go its own way without notice or an adequate opportunity to respond, at least a remand is required on these claims.

Reversal or a remand is also required on '581 patent claims 6-8 given another simple error. Those claims each recite a single limitation and depend from claim 5, which the Board found unpatentable for obviousness. Apple showed why each added limitation of claims 6-8 provided no independent basis for patentability over claim 5. MPH mostly responded by pointing only to the shared limitations of claim 5. Given that MPH hardly defended claims 6-8 based on the limitations those dependent claims add, the Board's finding that claim 5 was unpatentable should have required it to hold claims 6-8 unpatentable as well. After all, this Court has repeatedly explained that whether a dependent claim survives a parent's invalidation turns on the limitations added by the dependent claim.

Yet the Board never even addressed the limitations added by claims 6-8. It upheld those claims based only on the limitations those claims share with claim 5—even though it found claim 5 unpatentable in the very same order. The Board said it was compelled to do so because of how Apple grouped claims in its petition—Apple grouped claims 6 and 7 as part of Ground 1, claim 8 as part of Ground 3, and parent claim 5 as part of Ground 2. The Board thought that grouping meant Apple had to show independently that the shared limitations of claim 5 were unpatentable

under Grounds 1 and 3 rather than rely on its showing from Ground 2.  Nothing in this Court's precedent, the Board's rules, or logic required such rote repetition.

The Board's decisions should be reversed or at least vacated.

## STATEMENT OF ISSUES

1.    Whether to reverse or at least vacate and remand the Board's holding of nonobviousness on claims 1-6 of the '810 patent and claim 4 of the '581 patent because of the Board's claim construction error, adopted without notice or opportunity to respond.

2.    Whether to reverse or at least vacate and remand the Board's nonobviousness holding on claims 6-8 of the '810 patent because the Board upheld those claims based solely on parent claim 5, which it had found unpatentable for obviousness.

## STATEMENT OF THE CASE

After MPH sued Apple alleging infringement of the '810 and '581 patents, Apple petitioned for *inter partes* reviews of all claims of those patents.  Appx2-3; Appx59-60.  The Board instituted reviews and found claim 7 of the '810 patent and claims 1-3, 5, and 9 of the '581 patent unpatentable.  Appx54-55; Appx125.  But the

Board refused to hold similarly that claims 1-6 of the '810 patent and claims 4 and 6-8 of the '581 patent are also unpatentable.  Appx54-55; Appx125.[1]

### A. Before Either Patent's Filing, The Prior Art Adopted Straightforward Solutions For Securing Mobile Communications

Long before MPH's patents, those of ordinary skill in the field of secure internet communications recognized that mobile devices posed a potential challenge. Appx830-833, Appx809-897.  Ordinary artisans knew that initiating a new secure connection over the internet can involve significant computational overhead and delay.  Appx830-833.  That made it inefficient for a mobile device—such as a laptop that changes from one network to another with a different network address each time—to have to repeat that process every time it changed networks.  Appx830-833; Appx1347, Appx1345-1358.  The prior art thus developed several straightforward solutions to that problem.

Secure internet communications themselves were nothing new at the time. Appx821-822.  The industry had developed detailed protocols, like the IP Security (IPSec) protocol, to "provide[] the capability to secure communications between arbitrary hosts" across networks.  Appx134 (col.1:57-58); Appx825.  For example,

---

[1] The '581 patent issued on a continuation of the application that led to the '810 patent and shares a written description with that patent.  Appx140.  Unless noted, this brief cites only the '810 patent when discussing the shared description.

the prior-art reference Murakawa[2] describes the common use of IPSec to create a "Virtual Private Network (VPN)" to "allow a personal computer outside a local area network (LAN) to" communicate securely with computers within the local area network:



Murakawa, FIG. 5 (annotated).

Appx1267, Appx1272 (markup added); Appx843.  In this common configuration, a mobile "terminal," like computer 101, communicates with terminals on the local area network, like computers 106 and 107, using secure VPN connection 108 and security gateway 103.  Appx1272, Appx1276 (col.1:23-col.2:42); Appx843-844. The mobile terminal and security gateway exchange information to create one or more "Security Association[s] (SA[s])" for engaging in secure communications.

---

[2] U.S. Patent No. 7,028,337 to Murakawa.  Appx1267-1280.

Appx1276 (col.1:23-col.2:42); Appx821-822.  Using the security associations, the mobile terminal can, for example, send an encrypted communication to security gateway 103 that is intended for computer 106; security gateway 103 will likewise use a security association to process and decrypt the communication before forwarding to computer 106.  Appx1276 (col.1:23-col.2:42); Appx826-828.

The well-known challenge for mobile devices was that IPSec protocols were based on computers having fixed IP addresses—the addresses used for routing information through the internet.  Appx821.  The information in the security associations that allowed computers to communicate securely was tied to "static addresses."  Appx821-822, Appx826; Appx135 (col.4:47-58).  As a result, when a mobile device changed addresses, such as upon moving networks, previous security associations tied to a prior address would no longer work.  Appx830-831.  Resuming secure communications could require "full re-negotiation" of security association information, "lead[ing] to inefficiencies and computationally expensive calculations."  Appx831.

Prior-art reference Ahonen[3] discloses one solution to that problem.  Ahonen describes pre-creating multiple security associations between, for example, a mobile

---

[3] U.S. Patent No. 6,976,177 to Ahonen.  Appx1281-1292.  This Ahonen is different from the Ahonen international patent application at issue in companion appeal No. 21-1387.

device and a security gateway.  Appx1287-1290 (col.3:57-col.9:5); Appx832-833.

When the mobile device changes networks, it communicates its new IP address to

the security gateway.  Appx1290 (col.9:6-col.10:20).  The security gateway, in turn,

modifies as needed a pre-created security association to register an active secure

connection based on the mobile device's new IP address.  Appx1290 (col.9:6-

col.10:20); Appx832-833; Appx2329-2331 (176:3-178:18).

Several other prior-art references describe a different solution that reuses a

single security association (or a single pair of security associations) when a mobile

devices changes addresses.  Appx833-834;  Appx1247-1266.  Ishiyama,[4] for

example, discloses a "mobile communication scheme" that "enables easy change of

a connected location of a mobile computer on the IP network when the mobile

computer leaves its home network."  Appx1247 (abstract).  If a mobile device

changes network locations after establishing a secure connection with a

"correspondent host," the mobile device can "notify[] a change of the current

location address of the mobile computer."  Appx1257-1258 (col.2:48-col.3:14).

Annotated Figure 4 from Ishiyama depicts this setup below:

---

[4] U.S. Patent No. 6,904,466 to Ishiyama and Inoue.  Appx1247-1266.



Appx1250 (markup added).

When a mobile device like mobile computer 2 moves, it sends a "[r]equest for changing the security association to the correspondent," also called a "SA Gateway Update." Appx1262 (col.11:39-40); Appx834-841. The request identifies the mobile device's new address (shown as CoA2 in yellow) and is itself encrypted and transmitted using the existing secure connection. Appx1260-1261 (col.8:55-col.9:10); Appx2463-2464 (Apple's expert explaining same), Appx2429-2470; Appx2328-2329 (175:19-176:2) (similar from MPH's expert), Appx2154-2428. In response, the correspondent host "updat[es] the current location address" information of the relevant security association, as shown below:



Appx1253, Appx1257-1258 (col.2:67-col.3:14).     The mobile device and correspondent can then continue communicating securely without a full re-negotiation of security information.  Appx1257-1258 (col.2:67-col.3:14).

### B.     MPH Claimed A Prior-Art Solution To Securing Mobile Communications

Despite the prior art's advanced development, MPH filed two patents claiming methods for secure mobile communications that require sending a request message to update a secure connection.  Appx127; Appx140.  In a lengthy background section, the patents admit they are based on well-known internet technology, like the IPSec protocol and its use of security associations.  Appx134 (col.1:57-col.2:51).  They admit, for example, that IPSec could be used in a "tunnel mode" where secure communications were sent between a remote device and a local device via a "security gateway."     Appx135 (col.3:10-col.4:26).     And they acknowledge what is common knowledge in this field—IPSec protocols require, even when applying encryption, that outer header address information remain

unencrypted.  Appx135 (col.3:44-59).  That unencrypted information is needed so "intermediate routers" between a message's sender and receive can "examin[e]" the "outer IP header," including the "source IP address" and "destination address," to route the message.  Appx135 (col.3:44-59).

The patents explain that "IPSec is intended to work with static network topology," leading to a known "problem" for mobile devices.  Appx135 (col.4:9-54) (recognizing that "[t]he problem has been discussed" in a "standardization forum").  To overcome that "problem," the patents explain that, when a mobile device changes addresses, the mobile device sends "a request" so that an existing secure connection "is changed" to reflect the new address.  Appx136 (col.6:54-64).

Claim 1 of the '810 patent recites some of these basic claimed steps.  It reads:

> A method for ensuring secure forwarding of a message in a telecommunication network, having at least one mobile terminal and another terminal and a security gateway therebetween, the method comprising:
>
> a) establishing a secure connection between a first address of the mobile terminal and an address of the security gateway, the secure connection defined by at least the addresses of the mobile terminal and the security gateway,
>
> b) the mobile terminal changing from the first address to a second address,
>
> c) while at the second address, the mobile terminal sending a request message to the address of the security gateway to request the security gateway to change the secure connection to be defined between

the second address and the address of the security gateway,

in response to the request message from the mobile terminal, the security gateway changing an address definition of the secure connection from the first address to the second address, the mobile terminal sending a secure message in the secure connection from the second address of the mobile terminal to the other terminal via the security gateway,

the secure connection being established by forming a Security Association (SA) using IPSec protocols, and *the request message and/or a reply message being encrypted* and/or authenticated by using the same SA already established.

Appx138-139 (col.10:48-col.11:8) (emphasis added).

As shown, claim 1 requires a standard configuration of a "mobile terminal" and "another terminal" with a "security gateway therebetween." Appx138-139 (col.10:48-col.11:8). Using that configuration, the claim requires: establishment of "a secure connection between a first address of the mobile terminal" and the gateway "by forming a Security Association (SA) using IPSec protocols"; the mobile terminal "chang[es] from the first address to a second address" and "send[s] a request message" to the security gateway "to change the secure connection to be defined between the second address" and the gateway; in response, the security gateway "chang[es] an address definition of the secure connection from the first address to the second." Appx138-139 (col.10:48-col.11:8). '810 patent claims 1-6 and '581 patent claim 4 recite the request message being "encrypted and/or

11

authenticated," which is the focus of Part I of Apple's appeal.   Appx138-139;
Appx151.  '810 patent claim 7 and '581 patent claim 1 omit that language.  Appx139
(col.12:1-22); Appx150 (col.10:50-col.11:3).

### C.   The Board Found Some Claims Unpatentable But Upheld Others By *Sua Sponte* Adopting A New Claim Construction And Upholding Dependent Claims Based On An Invalid Parent Claim

In two separate *inter partes* reviews (one on each patent), the Board found
that Apple proved claim 7 of the '810 patent and claims 1-2 and 9 of the '581 patent
unpatentable for obviousness based on the combination of Ishiyama and Murakawa.
Appx54-55; Appx125.  It also found that Apple proved claims 3 and 5 of the '581
patent unpatentable for obviousness based on the combination of Ishiyama,
Murakawa, and Ahonen.  Appx54-55; Appx125.  But the Board refused to hold the
remaining claims unpatentable.

#### 1.   The Board upheld the patentability of '810 patent claims 1-6 and '581 patent claim 4 based on a new, sua sponte construction of an "encrypted" request message

For '810 patent claims 1-6 and '581 patent claim 4, the Board based its
decision solely on the claims' recitation of a request message "being encrypted"; that
limitation was the only material difference between those claims and other claims
the Board found unpatentable.  Appx16-23, Appx53; Appx102-106.  The Board
agreed with Apple that Ishiyama teaches sending a request message that triggers the
recipient to update a security association with a new address.  Appx16-18.   It

recognized that Ishiyama does so by sending an "'inner'" packet "encapsulated" within an "outer" packet. Appx19-20. And it recognized, as MPH's expert admitted, that Ishiyama teaches encrypting the entire inner packet, the "payload." Appx19-20 (citing Appx2328-2329 (175:19-176:2)).

Despite finding the payload of Ishiyama's request message encrypted, the Board held that the claims require more. Appx19-23. In reaching that result, the Board departed from both parties' arguments. MPH recognized that Ishiyama discloses an encrypted, encapsulated inner packet with an unencrypted outer header but argued only that Apple never identified that disclosure as the claimed request message. Appx498. MPH instead argued that Ishiyama's request message was only the unencrypted outer packet header and thus that no part of the request message was encrypted. Appx496-498; Appx660-662. The Board rejected that argument. Appx16-18.

But the Board held that, even though Ishiyama discloses a message with an encrypted payload, the claims also require "that the request message's outer packet's source address is encrypted." Appx20. The Board noted that the "plain words of the claim" dictated that conclusion because they "state that the message is encrypted—not that a portion of the message is encrypted." Appx20. The Board also cited a passage of the specification that states that a "signal" can "be encrypted" instead of stating that "only a portion of" the signal is encrypted. Appx20-21

13

(brackets omitted).    And the Board faulted Apple's papers for purportedly "provid[ing] no basis to allow for a portion of the request message to be unencrypted," although the Board cited no part of either party's papers raising this issue or suggesting a controversy over the scope of an "encrypted" request message. Appx21-22.  The Board cited instead discussions from the oral hearing in which the Board *sua sponte* questioned claim scope for the first time.  Appx21-22.

### 2.    *The Board upheld the patentability of '581 patent claims 6-8 based solely on the limitations those claims share with claim 5, which the Board itself found unpatentable*

On '581 patent claims 6-8, the Board focused on those claims' relationship to claim 5.  Appx106-112, Appx123-124.  Each of those claims adds a single limitation to parent claim 5, which itself adds a single limitation to independent claim 1.  The Board found that Apple proved that the combination of Ishiyama and Murakawa discloses every limitation of claim 1 and that persons of ordinary skill in the art would and could have combined those limitations as claimed, repeatedly rejecting MPH's counter-arguments on the facts.  Appx72-101.  The Board also found that Apple showed the combination of Ishiyama, Murakawa, and Ahonen discloses claim 5's single added limitation—sending a confirmatory reply message—and that skilled artisans again would and could have combined the prior art's disclosures to arrive at the claimed invention.  Appx119-123.

Despite finding claims 1 and 5 would have been obvious, the Board upheld claims 6-8 because the petition purportedly did not address claim 5's confirmatory reply message requirement.  Appx106-112, Appx123-124.  Although the petition addressed that requirement when it proved claim 5 unpatentable, the Board held that analysis was part of a different ground and could not be considered in addressing claims 6-8.  Appx106-107, Appx123-124.  The Board disagreed that was a "'form-over-substance argument,'" stating it was bound by Federal Circuit and Supreme Court precedent to ignore the portions of the petition addressing claim 5 when determining the patentability of dependent claims 6-8.  Appx107-108, Appx123-124 (citing *SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348 (2018); *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330 (Fed. Cir. 2020)).  Nor did the Board think it relevant that there was no dispute that the petition gave MPH sufficient notice that Apple was relying on the petition's showing of claim 5's unpatentability in proving dependent claims 6-8 unpatentable.  Appx108.  In the Board's view, the petition's grouping of grounds was dispositive.  Appx108.

## SUMMARY OF ARGUMENT

I.A.   On '810 patent claims 1-6 and '581 patent claim 4, the Board's construction of a request message "being encrypted" wrongly departed from the ordinary meaning of that phrase, as confirmed by intrinsic and undisputed extrinsic evidence.  A request message with an encrypted payload and unencrypted outer

15

header address information is an "encrypted" message.  The patents confirm that outer header address information *must* be unencrypted so "intermediate routers" between a message's sender and receiver can "examin[e]" the "outer IP header," including "source IP address" and "destination address," to route the message through the internet.  Appx135 (col.3:44-59).  Some claims also require, and all permit with the transition "comprising," encrypting the request message using "IPSec protocols."  Appx138-139.  Yet the patents explain that both relevant IPSec protocols leave outer header address information unencrypted.  Appx135 (col.3:60-64).  And the patents distinguish between authentication, which may apply to outer header information, and encryption, which does not.  Appx135 (col.3:28-64).  Plus, MPH's expert admitted that IPSec encryption always leaves outer header address information unencrypted, in part because that information is needed to decrypt the message

The only part of the patents' description the Board cited shows the patents refer to internet communications as "encrypted" despite outer header addresses being unencrypted.  The patents state that a request signal "can be encrypted" using IPSec protocols.  But before that statement, the patents explain that IPSec protocols leave outer header address information unencrypted.  The Board also suggested the claims required encrypting outer header address information because in IPSec tunnel mode an inner packet can be encapsulated within an outer packet and the inner

packet's header can be encrypted.  But encapsulation still requires an unencrypted outer header, again contradicting the Board's claim interpretation.  And regardless, the claims make clear that they cover both tunnel mode *and* transport mode, yet the Board's flawed encapsulation theory would limit the claims to tunnel mode.

B.    The Board independently erred because it adopted its "encrypted" message construction without proper procedures.  At institution, the Board said claim terms would carry their ordinary and customary meaning.  During the trial, no party disputed the ordinary meaning of an "encrypted" message, and no party argued that a message with an encrypted payload and unencrypted outer header address information would fall outside the claims' scope.  Yet the Board's final written decision turned the claims' scope into a moving target, changing the claims' meaning and then applying that meaning to uphold the claims without notice or opportunity to present evidence or argument.  The Board's procedural error thus requires at least vacatur and a remand.

II.    On '581 patent claims 6-8, the Board's final decision is illogical and contrary to settled law.  Those claims depend from claim 5, which in turn depends from claim 1.  The Board found that Apple proved both claims 1 and 5 invalid for obviousness.  Yet the Board upheld claims 6-8 based solely on the limitation those claims share with claim 5.  The Board thought it was compelled to reach that result because Apple's petition grouped claim 5 in a different ground from claims 6-8.  But

the Board misread clear law.  When a parent claim is invalid, dependent claims can survive only if the limitations they add support patentability.  That is the exact approach Apple followed.  It showed why specific references disclose every one of claim 1's limitations and why ordinarily skilled artisans would and could have combined those disclosures to arrive at the claimed invention.  It did the same for claim 5, focusing on the single limitation claim 5 adds to claim 1 and showing why that added limitation could not support patentability.  So too with claims 6-8, where Apple again focused on the single limitations each of those claims adds to claim 5 and showed why none of those limitations supports patentability.  And Apple's showings for claims 6-8 were essentially unrebutted—MPH argued for those claims' patentability based almost exclusively on claim 5.  Given settled law and MPH's arguments, the Board's holding that claim 5 was unpatentable for obviousness also required it to hold claims 6-8 unpatentable.

## ARGUMENT

### I.    THE BOARD'S DECISION ON '810 PATENT CLAIMS 1-6 AND '581 PATENT CLAIM 4 IS SUBSTANTIVELY AND PROCEDURALLY FLAWED

The Board correctly found that the prior art taught the same method of sending request messages to update an existing secure connection that MPH claimed as its invention.  Yet the Board refused to hold obvious the subset of claims that cover sending an "encrypted" request message.  The Board held that a request message

with an encrypted payload and an unencrypted outer header address was not an encrypted message.  But as both patents show, outer header address information must be unencrypted; just as the postal service must be able to read address information on a letter, the internet routing system must be able to parse outer header address information.  Because the Board's construction is contrary to how persons of skill in the art would understand the plain claim language and was adopted without proper procedure, the Court should reverse or at least vacate and remand for further proceedings.

### A.    The Board's Erroneous Construction Excluding Request Messages With Unencrypted Address Information Contradicts Intrinsic And Extrinsic Evidence

Claim construction is a question of law that this Court reviews de novo when, as here, the construction does not depend on any disputed factual issues.  *Baxalta Inc. v. Genentech, Inc.*, 972 F.3d 1341, 1345 (Fed. Cir. 2020).  For the proceedings here, the Board interprets claims according to the same standards used in federal courts.  Appx9-10; Appx66-67.

#### 1.    *Intrinsic evidence and MPH's own expert's testimony show an encrypted message in this field not only may but must include unencrypted address information in an outer IP header*

##### a.    *Intrinsic evidence confirms that encrypting a payload is enough*

The default rule is that claim words carry "their ordinary and customary meaning."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en

banc) (citation omitted).  That meaning is the one "the term would have to a person of ordinary skill in the art in question."  *Id.*  And "[i]t is axiomatic that [the Court] will not narrow a claim term beyond its plain and ordinary meaning unless there is support for the limitation in the words of the claim, the specification, or the prosecution history."  *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1333 (Fed. Cir. 2013).

The Board violated these basic claim-construction principles.  The Board wrongly held that, in addition to the contents of a message, the outer header address information of that message must be encrypted because "the plain words of the claim" never state that only "a portion of the message is encrypted."  Appx20-21 (citing *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)).  But the plain claim language here imposes no such requirement.  It recites a "request message and/or a reply message being encrypted" with a security association formed "using IPSec protocols."  Appx139 (col.11:4-6); Appx151 (col.11:9-10) (similar).  And the patents themselves provide the necessary context for how persons of ordinary skill in the art would understand that text.  They explain that internet protocols— including IPSec protocols—*require* outer header address information to remain unencrypted:  "intermediate routers" between a message's sender and receiver must be able to "examin[e]" the "outer IP header," including the "source IP address" and "destination address," to route the message.  Appx135 (col.3:44-59).  Given that

context and the claims' silence about encrypting outer header address information, persons of ordinary skill in the art would understand that a message with an encrypted payload and unencrypted outer header address information is a "message being encrypted."

Consistent with the admitted background about unencrypted outer headers, the claims repeatedly refer to address information without suggesting that address information must be encrypted. Appx135 (col.3:44-59), Appx138-139 (col.10:48-col.11:8). For example, the claims recite a mobile terminal "while at the second address" sends "a request message to the address of the security gateway." Appx138-139 (col.10:48-col.11:8). They never state that address information must be encrypted.

Other claim language that the Board ignored is equally clear and refutes the Board's construction. Claims 1-6 of the '810 patent require the request message "be[] encrypted" using "IPSec protocols," and claim 4 of the '581 patent at least covers the same. Appx138-139 (col.10:48-col.11:8); Appx151 (col.11:9-10, 16-19). Yet the patents explain that IPSec protocols leave outer header address information unencrypted. They explain that IPSec includes two protocols "to provide security": an "authentication protocol" called "Authentication Header (AH)" that authenticates certain information, and "a combined encryption/authentication protocol" called

"Encapsulating Security Payload (ESP)." Appx134 (col.2:11-20). But they show that neither protocol encrypts outer IP header address information.

The first—AH—provides no encryption at all. Appx135 (col.3:60-64); Appx2177 (24:7-21) (MPH expert explaining AH "only provides authentication, not encryption"); *see* Appx135 (col.4:47-49) (distinguishing authentication from encryption). According to the patents, AH "authenticates the entire inner IP packet" plus "selected portions of the outer IP header." Appx135 (col.3:60-64). The second—ESP—provides encryption. But ESP encrypts *only* "the entire inner IP packet," also called the payload. Appx135 (col.3:60-64).

Because some claims expressly incorporate encryption using IPSec protocols and the patents teach that these protocols never encrypt outer header address information, persons of ordinary skill in the art would understand that a message is "encrypted" without encrypting such information. Appx138-139 (col.10:48-col.11:8). Indeed, the claims contemplate that the request message may be "encrypted *and/or* authenticated." Appx139 (col.11:4-8) (emphasis added); Appx151 (col.11:9-10). Yet the patents describe only authentication (using AH) as "protect[ing] parts of the outer header." Appx135 (col.3:28-64). The claim text thus makes clear that authentication is available as an alternative when outer header information requires security protection. The Board's flawed construction ignores

that claim language and the specifications' clear demarcation of the difference between authentication and encryption.

Consistent with that common understanding, the patents identify a goal of the invention as providing "confidentiality (protecting *the contents* of data from being read)." Appx134 (col.1:41-56) (emphasis added). Such confidentiality differs from the types of protection related to address information, such as "authentication (obtaining assurance about the actual sender of data)." Appx134 (col.1:41-56); *see* Appx2178-2179 (25:9-26:7) (MPH expert distinguishing confidentiality achieved through encryption from other kinds of protection). Indeed, although the patents also refer to "identity protection (keeping the identities of parties exchanging data secret from outsiders)," they acknowledge that "identity protection is not completely handled by IPSec." Appx134 (col.1:41-56).

Other parts of the patents' specifications are equally clear and contrary to the Board's understanding. The Board mustered just one citation to the intrinsic evidence beyond the "being encrypted" language—that the patents say "signal **10***a*," which is "a request for registration," "can be encrypted." Appx20 (quoting Appx138 (col.9:63-col.10:8)). Because the patents never say "a portion" of the signal is encrypted, the Board assumed this passage supported the Board's reading because it meant all of signal **10***a* is encrypted. Appx20-21 (quoting Appx138 (col.9:63-col.10:8)). But the Board stopped its analysis short. The passage continues that the

23

signal encryption "is preferably performed by using IPSec." Appx138 (col.10:4-8). Because, as explained *supra* pp. 20-21, the patents recognize that IPSec protocols leave outer header address information unencrypted, the Board's cited passage compels the opposite conclusion from the one the Board drew. Appx135 (col.3:60-64). That the passage describes the signal as "encrypted" rather than saying only a portion is encrypted confirms that the patents refer to communications as "encrypted" even when outer header address information is unencrypted.

### b. Undisputed extrinsic evidence confirms the Board's claim construction error

The intrinsic record alone demonstrates the Board's error. But there is more. The extrinsic evidence also points in only one direction: persons of ordinary skill in this field would understand a request as "being encrypted" even though the message includes unencrypted address information in an outer IP header. MPH's own expert analogized an encrypted message to "a sealed letter" in which the sender "does not expect that *the contents* of the letter will be read by a third party while the letter is en route." Appx2658 (emphasis added), Appx2640-2739. That is, just like a letter, encrypting a message using IPSec protects its contents rather than its routing information, akin to a letter's addressing information. Appx2662; Appx2178 (25:9-16) (MPH expert: "if someone submits a message and the message is encrypted, then no one can read *the contents* of the message" (emphasis added)).

MPH's expert also described how IPSec allows two connection modes, "transport mode and tunnel mode," both of which send messages with unencrypted address information in an outer IP header. Appx2662. "Transport mode protection protects the IP packet payload, not the entire IP packet including header information." Appx2662; Appx2248 (95:16-22) (similar). Tunnel mode "creat[es] an outer packet" for encapsulating an "original" or inner packet. Appx2662. But, again, only the inner packet "payload" is encrypted, with "the IP header of the outer packet" providing the unencrypted information needed for routing. Appx2662; Appx2250 (97:6-10), Appx2259-2260 (106:22-107:2) (similar). Thus, regardless of the mode, MPH's expert confirmed that skilled artisans would understand that any message "encrypted" with IPSec would include unencrypted address information in an outer IP header. *See* Appx139 (claim 4) (making clear both tunnel and transport modes apply to claims).

MPH's expert identified another reason why persons of skill in the art would understand that an encrypted message must, in fact, include unencrypted address information in an outer IP header—that address information is required *before* performing "IPSec processing," like decryption of the message. Appx2699-2700. He explained that when a recipient "receives a packet to which IPSec has been applied" it uses the destination address "dst" in the outer header of the message "to determine the relevant SA," or security association. Appx2699-2700. Only once

the recipient identifies the security association can it "carry out IPSec processing of the packet"; an "unrecognized destination" address would mean "IPSec processing of that message cannot be performed." Appx2699-2700. That explanation matches the patents' description, which explains that IPSec security associations are uniquely identifiable by specific parameters that may be "carried in AH and ESP headers to enable the receiving system to select the SA [security association] under which a received packet will be processed"; one IPSec parameter is the "IP destination address." Appx134 (col.2:41-51).

Thus, like the intrinsic evidence, extrinsic evidence from MPH's own expert contradicts the Board and requires holding that a message is "encrypted" regardless of whether outer header address information is unencrypted.

### c.    The Board's encapsulation theory has no support in the record and would wrongly exclude embodiments

In adopting its construction, the Board also suggested Apple had failed to "account for" a "request message that is contained wholly within" the inner portion of an "encrypted encapsulated packet." Appx22. But as shown in the previous discussion of "tunnel mode," such encapsulation is consistent with the ordinary meaning of a request message "being encrypted," because even when an inner encapsulated packet is encrypted, the outer header address information is not. *Supra* pp. 25. Thus, any construction that excludes an otherwise encrypted request message from the claims' scope merely because of such unencrypted outer header

address information is inconsistent with the claim language and undisputed extrinsic evidence. *Supra* pp. 19-25.

Regardless, the Board's encapsulation theory—which it propounded with no record support, Appx22—fails for independent reasons. For one, reading the claims to require an encapsulated request message, as the Board did, would contradict the patents' clear disclaimer of any such restrictive meaning: "request and reply are used in the generic sense." Appx137 (col.7:7-10).

Making matters worse, the Board's speculation about encapsulation would exclude a preferred embodiment. Yet claim terms are generally construed broadly to cover all embodiments "absent a clear disavowal or alternative lexicography by a patentee." *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1281-82 (Fed. Cir. 2017). Both patents describe encapsulation only in the context of IPSec "tunnel mode": "the entire original, or inner, packet travels through a tunnel from one point of an IP network to another [and] no routers along the way are able to examine the inner IP packet." Appx135 (col.3:31-36). The patents contrast the tunnel mode approach using encapsulation with IPSec's "transport mode," which in the words of MPH's expert "protects the IP packet payload, not the entire IP packet including header information." Appx2662; *see* Appx135 (col.3:10-27); Appx2254 (101:15-21), Appx2258-2260 (105:4-107:2). But the claims contemplate using either IPSec transport *or* tunnel mode—'810 patent claim 4, which depends

indirectly from claim 1, recites that "the secure connection is an IPSec transport connection or IPSec tunnel connection." Appx139 (col.11:16-19). And the patents repeatedly state the invention can be used with either transport or tunnel mode. Appx137-138 (col.8:65-col.9:11, col.10:27-30). The Board's unsupported encapsulation theory would thus wrongly limit the claims to only tunnel mode.

*  *  *

Because the Board's construction contradicts both the intrinsic and extrinsic record, the Court should set aside that construction. Correctly construed, the claims cover a request message with an encrypted inner payload and unencrypted address information in an outer IP header.

### 2. The Court should reverse outright because there is no dispute that Ishiyama discloses an encrypted request message when correctly construed

Once the Board's flawed construction is corrected, the Court should reverse the Board's nonobviousness decisions on '810 patent claims 1-6 and '581 patent claim 4. The Board's sole basis for holding '810 patent claims 1-3 and '581 patent claim 4 nonobvious was the encrypted request message limitation. Appx16-23, Appx53; Appx102-106. That is clear from the Board's findings that the otherwise materially identical claim 7 of the '810 patent and claims 1-3, 5, and 9 of the '581 patent would have been obvious. Appx23-53 & n.9; Appx72-102, Appx113, Appx119-123. And for '810 patent claims 4-6, the only other basis for patentability

that MPH alleged was the flawed argument addressed in Part II, *infra*. Appx499, Appx508.

Here, the undisputed record demonstrates that Ishiyama discloses an encrypted request message under the proper construction. The testimony of MPH's expert is dispositive. He admitted Ishiyama teaches that a mobile host, after moving to a new address, will send a message that triggers a "correspondent host" to update an IPSec secure connection and that "the packet that the correspondent host receives that it used to determine that an address change has occurred, the payload of that packet was encrypted." Appx2324-2329 (171:5-176:2) ("So, yes, the payload of that packet is encrypted"); Appx1250; Appx2463-2464 (Apple expert explaining same).

Because there is no dispute that Ishiyama discloses an encrypted request message with an encrypted payload, the Court should reverse outright.

### B.    At Least A Remand Is Required Because The Board Violated The Administrative Procedure Act When It Adopted A New Construction *Sua Sponte* In Its Final Written Decision

The Board's compliance with the procedural requirements of the Administrative Procedure Act is a question of law that this Court reviews de novo. *In re NuVasive, Inc.*, 841 F. 3d 966, 970 (Fed. Cir. 2016).

#### 1.    *Without notice or an adequate opportunity to respond, the Board construed a term whose meaning no party disputed*

The Board independently erred when it adopted its construction of a request message "being encrypted" without proper procedure. "IPR proceedings are formal

administrative adjudications subject to the procedural requirements of the Administrative Procedure Act ('APA')." *SAS Inst., Inc. v. ComplementSoft, LLC* ("*SAS I*"), 825 F.3d 1341, 1351 (Fed. Cir. 2016), *abrogated on other grounds sub nom.*, *SAS Inst. Inc. v. Iancu* ("*SAS II*"), 138 S. Ct. 1348 (2018). In *inter partes* reviews, those procedural requirements prohibit the Board from "chang[ing] theories in midstream without giving [parties] reasonable notice of the change and the opportunity to present argument under the new theory." *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1080 (Fed. Cir. 2015) (cleaned up); *SAS I*, 825 F.3d at 1351-52 (applying those protections to petitioners). In *SAS I*, this Court thus vacated the Board's decision for turning the claims into a "moving target"; the Board's final written decision adopted a new construction that differed from both parties' positions and the Board's own interpretation at institution. 825 F.3d at 1351-52.

The Board committed the same error here. At institution, the Board indicated that claim terms would carry "their 'ordinary and customary meaning'" under *Phillips*. Appx347. It indicated that no explicit construction of any term was needed to resolve the parties' disputes. Appx347, Appx329-369. Throughout the proceeding, no party suggested disagreement with the Board's institution understanding about the scope of a request message "being encrypted"—the only claim construction dispute was about a different term (security gateway). Appx9-11.

30

Nor did either party implicitly present a claim construction dispute about what was required for an encrypted request message or ever suggest the construction the Board adopted.  At institution, MPH argued that the prior art failed to disclose sending an encrypted request message to a security gateway because, in its view, the art disclosed no security gateway at all.  Appx318.  MPH made no independent argument about an encrypted request message, let alone about the meaning of that term.  Appx318.

MPH's post-institution papers similarly did not question the meaning of an encrypted request message or suggest the Board's adopted construction. Appx496-498; Appx662.  Rather, MPH's Patent Owner Response argued that Ishiyama disclosed no encryption of any part of a request message, an argument the Board's final written decision rejected.  Appx496-498; Appx22-23.  That argument was based on MPH's mistaken view that Apple had never identified Ishiyama's "transmission of an encapsulated packet with the mobile node's updated address CoA2 in the outer packet" as the claimed request message, an argument the Board rejected.  Appx498; Appx16-18.  Yet despite recognizing that Ishiyama disclosed such a message with an encrypted, encapsulated inner packet and an unencrypted outer header, MPH never argued such a message was not encrypted within the claim's meaning.  Appx496-498.

MPH's later sur-reply was more of the same. It continued to argue that "[t]he alleged request message in Ishiyama" is "the outer header containing the new source address information," rather than Ishiyama's encrypted, encapsulated inner packet with unencrypted outer header. Appx660. Based on its position that the request message was only an unencrypted header, MPH insisted that "Petitioner has not demonstrated that the alleged request message is encrypted" because no part of "the New Source Address Outer Header" was encrypted. Appx660-662. Once again, MPH never argued that Ishiyama's disclosure of an encrypted, encapsulated inner packet with an unencrypted outer header would not meet the claim requirement of "being encrypted" if the Board concluded, as it did (Appx16-18), that disclosure was the claimed request message. Appx660-662. In the end, nowhere, not once, did MPH disagree that the claims covered a request message made of an encrypted payload with unencrypted address information in an outer header. Appx496-498; Appx660-662.

The Board's decisions confirm that the Board adopted a new construction without notice or an adequate opportunity to respond. Throughout its decisions, the Board was consistent in identifying the party-raised issues it was addressing by citing the relevant pages of the parties' papers. Appx1-126. Yet in the sections adopting its new construction, the Board repeatedly cited not party papers but discussions prompted by Board questions at the hearing. Appx20-23; Appx103-106.

The Board never cited any portion of MPH's papers raising this issue or suggesting a claim construction dispute; it cited MPH's papers only to reject a different argument MPH made about Ishiyama "not specifying a format (including as to whether there is encryption)." Appx20-23; Appx103-106.

For that reason, the Board was wrong to criticize Apple for not having anticipated the Board's midstream change on claim construction. Appx20-23; Appx103-106. The Board wrongly faulted Apple because Apple's papers purportedly "provide no basis to allow for a portion of the request message to be unencrypted" and because they allegedly "d[id] not point to any evidence" about the meaning of a request message "being encrypted." Appx20-23; Appx103-106. But "[i]t is difficult to imagine either party anticipating" that undisputed terms "were actually moving targets, and it is thus unreasonable to expect that they would have briefed" such issues. *SAS I*, 825 F.3d at 1351-52.

Nor was the Board's less-than-clear questioning at the hearing sufficient notice or an adequate opportunity to respond on this issue. The APA requires "timely" notice and an opportunity to submit "facts," "argument," and "rebuttal evidence." 5 U.S.C. §§ 554(b), (c), 556(d). Raising issues for the first time at an oral hearing provides none of that. *Dell Inc. v. Acceleron*, 818 F.3d 1293, 1300-01 (Fed. Cir. 2016) (rejecting similar argument). *Dell* thus vacated and remanded a

Board decision for relying on a new issue raised for the first time at the oral hearing. *Id.* The same facts here require at least the same result, if not outright reversal.

###### 2.  **The Board's error was prejudicial because it deprived Apple of the chance to present rebuttal argument and evidence, which would, or at least could, have led to a different result**

Had Apple been given notice and an adequate opportunity to respond, it would have further developed a record on claim construction.  As shown above, the intrinsic evidence contradicts the Board's construction and extrinsic evidence about internet protocols and encryption gives further insight into how a person of ordinary skill in the art would understand the phrase a request message "being encrypted."  *Supra* pp. 19-28.  Although the intrinsic evidence and the admissions of MPH's own expert should require reversal, had Apple been given proper notice and an opportunity to address the issue, it would have provided additional testimony from its own expert and documentary evidence about the outside-the-patent meaning of an "encrypted" request message in this field.

Apple also should be given an opportunity to show obviousness even under the Board's construction.  Had the Board followed proper procedures, Apple would have shown there is no patentable difference between Ishiyama and the claims even under the Board's construction.  After all, the Board agreed that an encapsulated, encrypted request message—one sent as the inner packet of another packet—would satisfy its new construction.  Appx22.  Yet as Apple's petition showed and MPH's

expert admitted, Ishiyama sends such an encapsulated, encrypted message to trigger the recipient to update a secure connection for a new address.   Appx192-196, Appx202-204; Appx2324-2329.

MPH's expert admitted that Ishiyama teaches that if a mobile host changes addresses after creating an IPSec tunnel with a correspondent host, the mobile host will send a message to the correspondent with a fully "encrypted" and encapsulated inner packet.   Appx2324-2329 (171:5-176:2).   He explained that, in Ishiyama, the encrypted inner packet has a header "home address" that identifies the mobile host and an outer unencrypted header that has a new "care-of address" indicating the mobile host's new address.   Appx2324-2329 (171:5-176:2).   Based on that message, Ishiyama teaches that the correspondent host "detects" that there was a change in "care-of addresses" for the encapsulated, encrypted inner packet with the mobile host's "home address" and carries out "address-changing functionality" to update an IPSec secure connection.   Appx2324-2329 (171:5-176:2); Appx1252.

Although Ishiyama's correspondent host updates the secure connection with a new address based on both the inner encrypted packet and address information in the outer header, that is no different from the very limited details the patents themselves give about an exemplary embodiment.   As explained, even when an inner, encapsulated packet is encrypted, address information in the outer header must remain unencrypted for routing *and* so the recipient can perform IPSec processing.

*Supra* pp. 25-26; Appx134 (col.2:41-51) (IPSec security association "uniquely identified" by, among other things, "IP destination address"); Appx2699-2670 (explaining same).

The patents make clear that, regardless of whether a request message is encrypted and encapsulated within another packet, the request message's recipient also responds to address information in the outer header. They explain that "the invention" may "require[] a change in a normal IPSec implementation to accept a packet that appears to belong to a certain IPSec tunnel, but comes from a wrong address." Appx137 (col.7:51-62) ("required specifically for processing" a request message). Thus, just like Ishiyama, the patents explain that the "invention" must be able to recognize—before IPSec "processing" and decryption of the encapsulated message—that a mobile terminal's address changed and respond accordingly, a change that would come from the unencrypted outer header. Appx137 (col.7:51-62). Doing so does *not* mean the encrypted request message falls outside the claims' scope.

Because MPH's expert admissions about Ishiyama's disclosure show Ishiyama matches the patents' own description of the invention, Apple should have been given the opportunity to prove obviousness under the Board's construction. Indeed, given that the admissions came from MPH's own witness, no reasonable factfinder could conclude that Ishiyama does not disclose an encrypted request

36

message as the Board construed that term. The Court should thus reverse outright, because even under the Board's construction no substantial evidence supports nonobviousness. At the very least, a remand is required for further development.

## II. THE BOARD ERRED BECAUSE IT UPHELD '581 PATENT CLAIMS 6-8 BASED ON THE LIMITATION THEY SHARE WITH CLAIM 5 EVEN THOUGH IT FOUND CLAIM 5 OBVIOUS

The Board's nonobviousness conclusion for '581 patent claims 6-8 is illogical. The critical fact is this: The Board found that Apple proved independent claim 1 and its dependent claim 5 would have been obvious. The prior art taught every claimed limitation, and persons of ordinary skill in the art would have had ample reason to combine those limitations with reasonable expectation of success. Appx72-101, Appx119-123. Yet the Board upheld claims 6-8, which depend from claim 5, because Apple purportedly failed to "account for the limitations of intervening claim 5," Appx107, Appx124-125 (citation omitted)—even though the very same order found that Apple *did* establish that the limitations of claim 5 were obvious, Appx72-101, Appx119-123. The Board was not free to revive claim 5's limitations when evaluating its dependent claims. The Court should reverse or at least vacate and remand.

The "ultimate" question of obviousness is a legal question that this Court reviews de novo. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007); *Belden*,

805 F.3d at 1073 (Court reviews "Board's compliance with the governing legal standards de novo").

### A. Apple Showed, And MPH Hardly Disputed, That The Limitations Added By Claims 6-8 Could Not Be A Basis For Patentability

Where a challenger proves a claim unpatentable, its dependent claims "can only be sustained based upon the language of the dependent claims themselves." *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1319-20 (Fed. Cir. 2007). In *Ormco*, for example, two independent claims were found to have been obvious in the same case. *Id.* The Court held that four other claims depending from those independent claims thus could survive only if the limitations unique to those claims supported nonobviousness. *Id.* Because they did not, the Court affirmed summary judgment of invalidity. *Id.*

This Court regularly applies that rule. For example, even when a claim is held unpatentable based on different prior art, this Court has vacated and remanded the Board for holding other dependent claims nonobvious based on that unpatentable claims' limitations. *MaxLinear, Inc. v. CF CRESPE LLC*, 880 F.3d 1373, 1375, 1377-78 (Fed. Cir. 2018). In *MaxLinear*, the Court vacated and remanded the Board with instructions to consider whether "the differences" between the unpatentable claim and its dependent claims made the dependent claims "patentably distinct." *Id.* (citation omitted). It explained that holding one claim unpatentable often "requires the invalidation of related claims that present identical issues of patentability." *Id.*

38

Although the context there was issue preclusion, the principle was the same as in *Ormco*—when a claim is found unpatentable, its dependent claims' patentability hangs on the further limitations they add. *Id.* If those dependent claims add nothing to distinguish over the prior art or to present a "materially different" patentability question from the unpatentable claim, the dependent claims should also be invalidated. *Id.*; *see Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt.*, 778 F.3d 1311, 1319-20 (Fed. Cir. 2015) (where independent claim obvious, holding dependent claim obvious because only added limitation was "routine incorporation" of known technology).

Here, this straightforward principle required the Board to hold '581 patent claims 6-8 unpatentable for obviousness. Each of those claims depends from claim 5, which itself depends from claim 1. For claim 1's limitations, Apple showed and the Board found that Ishiyama and Murakawa disclose every limitation and that an ordinarily skilled artisan would and could have combined those limitations as claimed. Appx72-102; Appx3282-3302. Similarly for claim 5's single added limitation—sending a confirmatory reply message—Apple showed and the Board ultimately found that Ahonen discloses that limitation and that an ordinarily skilled artisan would and could have combined Ahonen's teachings with those of Ishiyama and Murakawa to arrive at the claimed invention. Appx119-123; Appx3316-3323.

Apple followed the same approach for claims 6-8. Each of those claims also adds only a single limitation to claim 5. For each new limitation, Apple showed that Ishiyama and Murakawa (for claims 6 and 7) or Ishiyama, Murakawa, and Forslöw (for claim 8) disclose the added limitation and that skilled artisans would have and could have combined the prior art teachings. Appx3312-3316; Appx3323-3326; *see* Appx3987-3993, Appx4001-4005 (similar from Apple's expert), Appx3919-4006. Apple's showing was in fact unrebutted for claims 6 and 8—none of MPH's papers disputed that those claims' added limitations could not be a basis for patentability; MPH relied solely on claim 5 as the basis for alleged patentability. Appx3427; Appx3607-3609, Appx3617; Appx3791-3792. And on claim 7, MPH's sole argument besides pointing to claim 5 was a claim construction argument that the Board never adopted—that the claimed "tunneling protocol" excludes the IPSec tunneling protocol. Appx3607-3609; Appx106-112. But MPH never disputed that the prior art otherwise disclosed a tunneling protocol (since it does). Appx3607-3609; Appx1276 (col.2:62-65) (describing security gateway of embodiment as "in the tunnel mode").

Given the Board's own findings that claims 1 and 5 would have been obvious and MPH's choice to rely almost exclusively on claim 5 as the basis for patentability of claims 6-8, the Board's finding that claim 5 would have been obvious should have led it to hold claims 6-8 unpatentable for obviousness as well. After all, although

each claim is entitled to its own presumption of validity, "[w]hen a dependent claim and the independent claim it incorporates are not separately argued," such as by addressing "the specific limitation" of the dependent claim, "the claims rise or fall together." *Soverain Software LLC v. NewEgg Inc.*, 728 F.3d 1332, 1335-36 (Fed. Cir. 2013). That principle applies here and required holding '581 patent claims 6-8 unpatentable.

### B.    The Board's Contrary Reasoning Ignores Governing Law

#### 1.    *No statute or regulation required the Board to ignore Apple's arguments about claim 5's unpatentability when addressing dependent claims 6-8's unpatentability*

Despite Apple's straightforward and largely unrebutted obviousness case for claims 6-8, the Board thought it was required to uphold those claims because of the way Apple's petition grouped them. Appx106-112, Appx123-124. Specifically, Apple's petition identified claims 6-7 as part of "Ground 1" based on Ishiyama and Murakawa, claim 5 as part of "Ground 2" based on Ishiyama, Murakawa, and Ahonen, and claim 8 as part of "Ground 3" based on Ishiyama, Murakawa, and Forslöw. Appx3266. The Board believed that grouping meant Apple automatically failed to prove claims 6-8 unpatentable because those claims were not grouped with claim 5 from which they depend or otherwise included in a ground including Ahonen. Appx106-112, Appx123-124. The Board thus thought legal requirements compelled it to ignore Apple's arguments about claim 5's unpatentability when

deciding the unpatentability of claims 6-8 because of Apple's choice in grouping its grounds.  Appx106-112; Appx123-124.

But no law required the Board to ignore its invalidity finding on claim 5 when addressing dependent claims 6-8, because no law dictated that Apple group claims in a particular way or copy-and-paste arguments from one part of its petition to another.   Congress gave petitioners discretion in identifying the grounds for challenging claims in *inter partes* reviews.  It required only that petitioners identify the grounds "in writing and with particularity."  35 U.S.C. § 312(a)(3).  The Director has followed Congress's approach.  As relevant here, regulations require petitioners to identify each challenged "claim"; the "specific statutory grounds under 35 U.S.C. 102 or 103 on which the challenge to the claim is based and the patents or printed publications relied upon for each ground"; and how each claim is "unpatentable" by "specify[ing] where each element of the claim is found in the prior art."  37 C.F.R. § 42.104(b).  Beyond these basic limitations, both Congress and the Director gave petitioners considerable leeway in how they frame their grounds, consistent with the Supreme Court's directive that the petitioner is "master of its complaint."  *SAS II*, 138 S. Ct. at 1355-56.

Apple easily cleared the low hurdles Congress and the Director set up.  Apple identified in writing and with particularity that it was challenging "claims 1-9," that all of its challenges were based on "35 U.S.C. § 103," and upon which prior art

references it relied.  Appx3266.  And as explained, *supra* pp. 38-41, Apple showed where "each element" of each challenged claim "is found in the prior art," 37 C.F.R. § 42.104(b):  it showed how Ishiyama and Murakawa disclose each limitation of independent claim 1; how Ishiyama, Murakawa, and Ahonen disclose claim 5's single, additional limitation; how Ishiyama and Murakawa also disclose the single, additional limitations of claims 6 and 7; and how Ishiyama, Murakawa, and Forslöw disclose claim 8's single, additional limitation.  Appx3282-3302; Appx3312-3326. For claim 5 specifically, Apple showed how Ahonen renders claim 5's added limitation obvious and how "Ishiyama also describes" and renders obvious that limitation.  Appx3320-3323.  And for all the petition's references, Apple established the necessary motivation to combine with a reasonable expectation of success. Appx3282-3302; Appx3312-3326.

Despite the petition's particularity, the Board thought Apple had failed to "address claim 5's reply message in its showing for claims" 6-8 because Apple addressed that limitation in a separate ground.  Appx106, Appx123.  But as explained, the petition followed this Court's precedent by showing why each independent claim was invalid for obviousness and then, for each dependent claim, showing why that claim's additional limitation did not independently support nonobviousness.  *Supra* pp. 38-39.  The petition was unambiguous in that approach—when addressing each dependent claim, it consistently explained why the

43

prior art identified for that claim disclosed the limitation added by that claim, without ever hinting it was relying on some different analysis for limitations inherited from a parent claim.  Appx3312-3326.  And the Board understood Apple was following that approach at institution, because it found Apple had established "a reasonable likelihood" of proving claims 6-8 unpatentable at institution despite their dependence on claim 5.  Appx3473-3474.  Apple thus *did* address claim 5's reply message in its showing for claims 6-8, because its showings for claims 6-8 were cumulative of its showing for claim 5.  Appx3316-3323.

### 2.    *Precedent required the Board to address the petition on the petition's terms*

Given the petition's clarity, the Board got it exactly backwards in thinking *Koninklijke* compelled it to hold claims 6-8 patentable.  Appx107-108 (citing 948 F.3d at 1335-36).  *Koninklijke* recognized that "it's the petitioner, not the Director [or the Board], who gets to define the contours of the proceeding."  948 F.3d at 1335 (quoting *SAS II*, 138 S. Ct. at 1355).  That principle required the Board to address the petition on its terms—to determine whether (as the Board found) claim 1 is unpatentable based on Ishiyama and Murakawa, whether (as the Board also found) claim 5's additional reply-message limitation could not support patentability independent of claim 1 given the teachings of Ishiyama, Murakawa, and Ahonen, and whether (as the Board wrongly refused to consider) claims 6-8's additional limitations could not support patentability independent of claim 5 given the

teachings of Ishiyama, Murakawa, and Forslöw (for claim 8 only). Nothing in the petition suggested the Board reconsider claim 5's patentability based on references other than Ishiyama, Murakawa, and Ahonen when deciding claims 6-8's patentability.

The Board's reasoning is particularly flawed because the added limitations of claims 6-8 are wholly independent of claim 5 and thus independent of Ahonen. Although those claims depend from claim 5, the limitations they add relate only to limitations they share with claim 1. Appx151 (col.11:16-24). Thus, claim 6 requires that claim 1's "mobile terminal" and "other terminal form an end-to-end connection." Appx151 (col.11:16-19). Claim 7 requires using a "tunneling protocol" for claim 1's "secure connection." Appx151 (col.11:20-22). And claim 8 requires that claim 1's "other terminal is a mobile terminal." Appx151 (col.11:23-24). Not one of those claims adds a limitation that depends on anything in claim 5. It was thus perfectly consistent for Apple's petition to identify that it was challenging the limitations added by those claims without relying on Ahonen. Lumping those claims together with claim 5 and Ahonen would have identified the basis for unpatentability with less particularity, not more, because it would have left unclear whether Ahonen was necessary for the limitations that claims 6-8 add.

### 3.    *The Board's flawed approach should be rejected because it serves no purpose*

The novel briefing rule the Board fashioned and then enforced against Apple serves no purpose. The Board never disputed that the petition gave adequate notice of the issues to be considered, which this Court has called the "critical question" for ensuring the Board does not unfairly stray from the petition in *inter partes* review proceedings. *Genzyme Therapeutic Prods. v. Biomarin Pharm.*, 825 F.3d 1360, 1367 (Fed. Cir. 2016) (rejecting patent owner argument because it had adequate notice); Appx108. And MPH never suggested it lacked notice that Apple was challenging the unpatentability of the limitation claim 5 adds based on Ishiyama, Murakawa, and Ahonen. Appx3613-3616. MPH clearly did have notice since it actually tried (but failed) to defend that limitation against those references. Appx3613-3616.

Nor would it help anyone to require for every dependent claim that a petition repeat a ground already presented or include a bare statement that the shared limitations would have been obvious for the reasons stated for the parent claim. This Court has repeatedly cautioned against imposing requirements that "serve no useful purpose" and "exalt form over substance." *In re Bennett*, 766 F.2d 524, 527-28 (Fed. Cir. 1985) (reversing Board for this reason; citation omitted). The Board's repetition of the same error here requires reversal, particularly on claims 6 and 8 where MPH relied solely on claim 5 for patentability, or at least vacatur and a remand.

## CONCLUSION

For all these reasons, the Court should reverse or at least vacate and remand the Board's decisions that '810 patent claims 1-6 and '581 patent claims 4 and 6-8 are not unpatentable.

Respectfully submitted,

BITA RAHEBI                                 /s/ Joseph R. Palmore
MORRISON & FOERSTER LLP                     JOSEPH R. PALMORE
707 Wilshire Boulevard                      BRIAN R. MATSUI
Los Angeles, CA 90017                       SETH W. LLOYD
                                            MORRISON & FOERSTER LLP
RICHARD HUNG                                2100 L Street NW, Suite 900
MORRISON & FOERSTER LLP                     Washington, DC 20037
425 Market Street                           Telephone:  202.887.6940
San Francisco, CA 94105                     JPalmore@mofo.com

*Counsel for Appellant Apple Inc.*

# ADDENDUM

# APPLE INC.

## V.

## MPH TECHNOLOGIES OY

### Nos. 21-1355, -1356, -1390, -1391 (Fed. Cir.)

### APPELLANT'S ADDENDUM
### TABLE OF CONTENTS

| | | |
|---|---|---|
| 09/24/2020 | Final Written Decision, IPR2019-00819 | Appx1 |
| 09/24/2020 | Final Written Decision, IPR2019-00820 | Appx58 |
| | U.S. Patent No. 7,620,810 B2 | Appx127 |
| | U.S. Patent No. 7,937,581 B2 | Appx140 |

Trials@uspto.gov                                                    Paper 37
Tel: 571-272-7822                          Entered: September 24, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.,
Petitioner,

v.

MPH TECHNOLOGIES OY,
Patent Owner.

———————————

IPR2019-00819
Patent 7,620,810 B2

———————————

Before KAMRAN JIVANI, JOHN D. HAMANN, and
STACY B. MARGOLIES, *Administrative Patent Judges.*

HAMANN, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2019-00819
Patent 7,620,810 B2

## I.    INTRODUCTION

In this *inter partes* review, instituted pursuant to 35 U.S.C. § 314, Apple Inc. ("Petitioner") challenges the patentability of claims 1–7 ("the challenged claims") of U.S. Patent No. 7,620,810 B2 (Ex. 1001, "the '810 patent"), owned by MPH Technologies Oy ("Patent Owner").  We have jurisdiction under 35 U.S.C § 6.  This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

For the reasons discussed herein, we determine that Petitioner has not shown by a preponderance of the evidence that claims 1–6 are unpatentable, but Petitioner has shown by a preponderance of the evidence that claim 7 is unpatentable.

## II.    BACKGROUND

### A.  Procedural History

Petitioner filed a Petition requesting *inter partes* review of the challenged claims of the '810 patent.  Paper 2 ("Pet.").  The Petition is supported by the Declaration of David Goldschlag, Ph.D. (Ex. 1002).  Patent Owner filed a Preliminary Response.  Paper 8.

We instituted *inter partes* review of all of the challenged claims of the '810 patent on all of the grounds raised in the Petition.  Paper 10 ("Dec. on Inst."), 7, 40.  As to this Decision on Institution, Patent Owner filed a Request for Rehearing, and requested review by the Precedential Opinion Panel ("POP").  Paper 13; Ex. 3001.  Patent Owner's request for POP review was denied, and we subsequently denied Patent Owner's Request for Rehearing.  Papers 16, 24.

Patent Owner filed a replacement Response to the Petition.  Paper 23 ("PO Resp.").  The Response is supported by the Declaration of Professor

IPR2019-00819
Patent 7,620,810 B2

George N. Rouskas, Ph.D. (Ex. 2003). Petitioner filed a Reply to Patent Owner's Response. Paper 26 ("Pet. Reply"). The Reply is supported by an additional Declaration of David Goldschlag, Ph.D. (Ex. 1020). Patent Owner filed a Sur-Reply to Petitioner's Reply. Paper 29 ("PO Sur-Reply").

An oral hearing was held on June 25, 2020. A transcript of the oral hearing is included in the record. Paper 36 ("Tr.").

### B. Related Matter

The parties identify *MPH Techs. Oy v. Apple Inc.*, No. 5:18-cv-05935-PJH (N.D. Cal.), as a matter that may affect or would be affected by a decision in this proceeding. Pet. 2–3; Paper 7, 1. The parties also identify, as a related matter, *Apple Inc. v. MPH Techs. Oy*, IPR2019-00820 (PTAB), involving U.S. Patent No. 7,937,581, which claims the benefit of the '810 patent's filing date. Pet. 2–3; Paper 7, 1.

### C. The Challenged Patent (Ex. 1001)

The '810 patent relates to "secur[ing] mobile connections in telecommunication networks." Ex. 1001, 1:13–14. In particular, the '810 patent describes reducing the handover latency and computational overhead for secure connections, such as those employing Internet Protocol ("IP") Security ("IPSec") with mobile terminals[1] (i.e., terminals that can move from one network to another). *Id.* at 1:13–15, 1:57–64, 4:10–31, 6:48–50, 7:28–42, 10:34–42.

---

[1] The '810 patent discloses that "the term[s] mobility and mobile terminal do[] not only mean physical mobility, . . . [but also] mean[] moving from one network to another, which can be performed by a physically fixed terminal as well." Ex. 1001, 4:27–31.

3

IPR2019-00819
Patent 7,620,810 B2

IPSec comprises a set of rules defined by the Internet Engineering Task Force ("IETF") to "provide[] the capability to secure communications between arbitrary hosts," according to the '810 patent.  *Id.* at 1:57–64, 2:3, 2:6–10.  The '810 patent states that these rules describe, *inter alia*, providing "access control based on the distribution of cryptographic keys."  *Id.* at 2:11–20.  The '810 patent also describes the concept of a Security Association ("SA"), which according to the '810 patent is "a one-way relationship between a sender and a receiver that offers [negotiated] security services to the traffic carried on it."  *Id.* at 2:21–24.

The '810 patent discloses that IPSec supports two modes of operation (i.e., transport mode and tunnel mode).  *Id.* at 3:8–9.  "Typically, transport mode is used for end-to-end communication between two hosts."  *Id.* at 3:10–13.  "Tunnel mode . . . is generally used for sending messages through more than two components," such as "when one or both ends of a SA is a security gateway, such as a firewall or a router that implements IPSec."  *Id.* at 3:16–21.

"IPSec is intended to work with static network topolog[ies]," according to the '810 patent.  *Id.* at 4:10–11.  For example, IPSec can secure communications between hosts across a local area network ("LAN"), as well as across a private or public wide area network ("WAN").  *Id.* at 1:57–59.  Figure 1, shown below, "illustrates an example of a telecommunication network to be used in the invention" of the '810 patent.  *Id.* at 8:40–41.

4

IPR2019-00819
Patent 7,620,810 B2



## FIG. 1

Figure 1 depicts an example telecommunication network comprising "computer 1 . . . and computer 2[,] a destination computer, to which the secure messages are sent . . . by means of an IPSec tunnel established between computer 1 and computer 2." *Id.* at 8:54–58. The '810 patent adds: "Computer 2 [can] be a security gateway for a third computer 3. Then, the messages sent from computer 2 to computer 3 are sent in plaintext." *Id.* at 8:53–60.

The '810 patent discloses that in forming an IPSec tunnel under IPSec's default automated key management protocol (i.e., the Internet Key Exchange ("IKE") protocol), "the tunnel endpoints are fixed and remain constant." *Id.* at 3:66–4:4, 4:12–17. The '810 patent adds: "If IPSec is used with a mobile host the IKE key exchange will have to be redone from every new[ly] visited network. This is problematic, because IKE key exchanges involve computationally expensive" calculations and require exchanging numerous messages between the endpoints, leading to higher latency. *Id.* at 4:15–26.

To address these problems, the '810 patent discloses avoiding a full re-negotiation between the tunnel endpoints, when computer 1 moves

5

networks. *E.g.*, *id.* at 9:33–44 (describing prior art requires a full re-negotiation), 9:63–66. More specifically, the '810 patent discloses initially establishing an IPSec tunnel between computer 1 (address A) and computer 2 (address X) using IKE, as in the prior art. *Id.* at 9:48–62, Fig. 5 (illustrating steps 1a–9a for setting up the tunnel); *compare id.* at Fig. 5, *with id.* at Fig. 4 (showing the same nine steps as the prior art solution); *see also id.* at 9:12–39 (describing the prior art IKE establishment of the tunnel).

The '810 patent discloses that, when computer 1 moves from address A to address B, computer 1 sends from its new address (address B) to computer 2 (address X) at the other end of the established IPSec tunnel, a request for computer 2 to register its new address. *Id.* at 9:63–10:2. According to the '810 patent, this request can be "encrypt[ed] and/or authenticat[ed] . . . us[ing] the same IPSec SA [that is used] for protecting both data and registration traffic." *Id.* at 10:4–8.

The '810 patent thus discloses that the tunnel's IPSec SA is carried over to the new connection point, and computer 1 can send IPSec-protected messages to computer 2 after sending the request, which "essentially makes the handover latency zero." *Id.* at 10:11–19, 10:34–37. "[T]he exact method of signalling is not important[;] the essence is to carry over the IPSec SA to the new connection point." *Id.* at 10:11–13.

### D. The Challenged Claims

Petitioner challenges claims 1–7 of the '810 patent, of which claims 1 and 7 are independent. Claims 1 and 7 are reproduced below:

> 1. A method for ensuring secure forwarding of a message in a telecommunication network, having at least one mobile terminal and another terminal and a security gateway therebetween, the method comprising:

6

IPR2019-00819
Patent 7,620,810 B2

a) establishing a secure connection between a first address of the mobile terminal and an address of the security gateway, the secure connection defined by at least the addresses of the mobile terminal and the security gateway,

b) the mobile terminal changing from the first address to a second address,

c) while at the second address, the mobile terminal sending a request message to the address of the security gateway to request the security gateway to change the secure connection to be defined between the second address and the address of the security gateway,

in response to the request message from the mobile terminal, the security gateway changing an address definition of the secure connection from the first address to the second address, the mobile terminal sending a secure message in the secure connection from the second address of the mobile terminal to the other terminal via the security gateway,

the secure connection being established by forming a Security Association (SA) using IPSec protocols, and the request message and/or a reply message being encrypted and/or authenticated by using the same SA already established.

Ex. 1001, 10:48–11:8.

7.  A method for ensuring secure forwarding of a message in a telecommunication network, having at least one mobile terminal and another terminal and a security gateway therebetween, the method comprising:

a) establishing a secure connection between a first address of the mobile terminal and an address of the security gateway,

the secure connection defined by at least the addresses of the mobile terminal and the security gateway,

b) the mobile terminal moving from the first address to a second address,

c) while at the second address, the mobile terminal sending a request message to the address of the security gateway to request the security gateway to change the secure connection to be defined between the second address and the address of the security gateway,

7

IPR2019-00819
Patent 7,620,810 B2

> the security gateway changing an address definition of the
> secure connection from the first address to the second address,
> and
>
> the other terminal sending a secure message in the secure
> connection to the second address of the mobile terminal via the
> security gateway.

Ex. 1001, 12:1–22.

### E. Instituted Grounds of Unpatentability

We instituted trial based on the following grounds of unpatentability,

which are all the grounds of unpatentability raised in the Petition:

| | References | Basis[2] | Challenged Claim(s) |
|---|---|---|---|
| 1. | Ishiyama,[3] Murakawa[4] | § 103(a) | 1, 4, 5, 7 |
| 2. | Ishiyama, Murakawa, Ahonen[5] | § 103(a) | 2, 3 |
| 3. | Ishiyama, Murakawa, Forslöw[6] | § 103(a) | 6 |

Pet. 4, 12–69.

### III.    LEVEL OF ORDINARY SKILL IN THE ART

To determine whether an invention would have been obvious at the

time it was made, we consider the level of ordinary skill in the pertinent art

at the time of the invention. *Graham v. John Deere Co.*, 383 U.S. 1,

17 (1966).  In assessing the level of ordinary skill in the art, various factors

---

[2] The Leahy-Smith America Invents Act ("AIA") included revisions to
35 U.S.C. § 103 that became effective on March 16, 2013.  Because the '810
patent issued from an application filed before March 16, 2013, we apply the
pre-AIA version of the statutory basis for unpatentability.
[3] U.S. Patent No. 6,904,466 B1 (issued June 7, 2005) (Ex. 1004).
[4] U.S. Patent No. 7,028,337 B2 (issued Apr. 11, 2006) (Ex. 1005).
[5] U.S. Patent No. 6,976,177 B2 (issued Dec. 13, 2005) (Ex. 1006).
[6] U.S. Patent No. 6,954,790 B2 (issued Oct. 11, 2005) (Ex. 1007).

IPR2019-00819
Patent 7,620,810 B2

may be considered, including the "type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field." *In re GPAC, Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995) (citing *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986)). "[O]ne or more factors may predominate." *Id.*

In our Decision on Institution, we adopted Petitioner's proposed definition for one having ordinary skill in the art at the time of the invention of the '810 patent as one who "would have had a B.S. degree in Computer Engineering, Electrical Engineering, or an equivalent field, as well as at least 3–5 years of academic or industry experience in the Internet security industry." Pet. 12 (citing Ex. 1002 ¶¶ 20–21). Patent Owner does not dispute our adoption of Petitioner's definition, nor otherwise address the level of ordinary skill at the time of the invention of the '810 patent. *See generally* PO. Resp.

Because Petitioner's definition of the level of skill in the art is consistent with the '810 patent and the asserted prior art, we maintain Petitioner's definition for purposes of this Final Written Decision. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *GPAC*, 57 F.3d at 1579; *In re Oelrich*, 579 F.2d 86, 91 (CCPA 1978). We apply Petitioner's definition in our analysis below.

IV.    CLAIM CONSTRUCTION

Because the Petition was filed after November 13, 2018, we construe the challenged claims by applying "the standard used in federal courts, in other words, the claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. [§] 282(b), which is articulated in

9

IPR2019-00819
Patent 7,620,810 B2

*Phillips* [*v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc)]." *See* Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board, 83 Fed. Reg. 51,340, 51,340, 51,358, 51,343–44 (Oct. 11, 2018) (amending 37 C.F.R. § 42.100(b) effective November 13, 2018) (now codified at 37 C.F.R. § 42.100(b) (2019)). Under *Phillips*, the words of a claim are generally given their "ordinary and customary meaning," which is the meaning they would have to a person of ordinary skill in the art at the time of the invention, in light of the specification and prosecution history. *See Phillips*, 415 F.3d at 1312–13.

Petitioner does not submit any terms for construction. Pet. 12 (arguing that "[a]ll claim terms of the '810 patent should receive their ordinary and customary meaning"). Patent Owner submits the term "security gateway" for construction, and argues that its meaning is in dispute. PO Resp. 11–24. To show a dispute, Patent Owner quotes from our Decision on Institution where we preliminarily found that (i) "Petitioner argues that one of ordinary skill in the art would have understood that Ishiyama's 'correspondent [host]' would be a security gateway," and (ii) "there [wa]s sufficient support in the [preliminary] record that Ishiyama's correspondent host is a security gateway." PO Resp. 11 (citing Dec. on Inst. 25, 33). Patent Owner argues "[t]hus, the claim construction dispute in this proceeding is whether a correspondent host is a 'security gateway.'" *Id.*

For our analysis below, however, we do not rely on Petitioner's arguments that Ishiyama's correspondent host is a security gateway. Rather,

10

IPR2019-00819
Patent 7,620,810 B2

we consider Petitioner's alternative argument[7] that Murakawa teaches a security gateway in our analysis of challenged claim 7; the remaining challenged claims are addressed without implicating this claim term. Thus, we conclude that no express claim construction is necessary to determine whether Petitioner has shown by a preponderance of evidence that the challenged claims are unpatentable. *See, e.g.*, *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'").

V.    PRINCIPLES OF LAW

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time of the invention to a person having ordinary skill in the art. *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of non-obviousness, if present.[8] *See Graham*, 383 U.S. at 17–18. When evaluating a claim for obviousness, we also must "determine whether there

---

[7] "Petitioner alternatively relies on Ishiyama's teachings combined with Murakawa's teachings of a 'security gateway configuration' (e.g., 'a security gateway' and 'another terminal') for disclosing claim 1." Dec. on Inst. 24; *see also* Pet. 12–54.

[8] Patent Owner does not present arguments or evidence of such objective evidence of non-obviousness in its Response. *See generally* PO Resp.

11

was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).

## VI.    ALLEGED OBVIOUSNESS OVER ISHIYAMA AND MURAKAWA

Petitioner argues that the combination of Ishiyama and Murakawa renders claims 1, 4, 5, and 7 of the '810 patent obvious under 35 U.S.C. § 103(a).  Pet. 12–59.  We have reviewed the parties' arguments and the evidence of record.  For the reasons that follow, we determine that Petitioner (1) fails to show by a preponderance of the evidence that claims 1, 4, and 5 would have been obvious to one of ordinary skill in the art in view of Ishiyama and Murakawa; and (2) shows by a preponderance of the evidence that claim 7 would have been obvious to one of ordinary skill in the art in view of Ishiyama and Murakawa.

### A.  Summary of Ishiyama

Ishiyama relates to improving a mobile computer's "capab[ility] of carrying out communications while moving among a plurality of inter-connected networks."  Ex. 1004, 1:9–11.  In furtherance of this mobility, Ishiyama discloses having the mobile computer notify its correspondent host (i.e., the host at the other end of a communication) of its new address when the mobile computer moves networks.  *E.g.*, *id.* at 3:43–67, 6:13–18, 15:37–16:10.  The mobile computer makes this notification by changing the source address of an outer packet of an encapsulated packet to the mobile computer's new address before sending the packet to the correspondent host. *Id.*  When the correspondent host receives the packet from the mobile computer, the correspondent host detects the address change and updates its

12

IPR2019-00819
Patent 7,620,810 B2

stored information to reflect the new address for the mobile computer. *E.g.*, *id.* at 3:9–14.

Figure 4, shown below, is a schematic diagram illustrating a mobile computer changing locations in an exemplary configuration of a mobile communication system, in accordance with an embodiment of Ishiyama's invention. *Id.* at 5:5–7, 5:11–13.

## FIG. 4



Figure 4 "shows an exemplary situation in which a packet is transferred from mobile computer 2 to . . . correspondent host 3 using [an] IPSEC tunnel." *Id.* at 8:33–35. Initially, mobile computer 2 communicates with correspondent host 3 via an IPSec tunnel, with mobile computer 2's address (CoA1) indicating its endpoint of the tunnel. *Id.* at 8:43–49. In other words, "mobile computer 2 transmits an encapsulated packet in which the outer packet has the source address='CoA1' and the destination address='CN.'" *Id.* at 8:50–54. As shown, when mobile computer 2 moves, its address changes from CoA1 to CoA2. *Id.* at 8:55–58, Fig. 4 (showing that mobile computer 2 moves networks). To convey this change, mobile

13

computer 2 changes the source address of the outer packet to CoA2 and transmits the packet to correspondent host 3 via the IPSec tunnel. *Id.* at 8:59–63, Fig. 4. Correspondent host 3 detects this change in mobile computer 2's address, and replaces the CoA1 address with CoA2 in its database for the IPSec tunnel. *Id.* at 8:66–9:4; *see also id.* at Figs. 9B, 9D (showing the update of the address in correspondent host 3's SA database), 12:51–59. Ishiyama discloses that the other SA information "remain[s] unchanged, so that there is no need to re-negotiate keys for IPS[ec] encryption and authentication." *Id.* at 9:5–10.

### B. Summary of Murakawa

Murakawa relates to allowing a PC outside a LAN to be virtually regarded as a PC on the LAN and communicate with a terminal on the LAN. Ex. 1005, 1:16–24, 3:62–65. Specifically, Murakawa discloses allowing an outside terminal to communicate (via a WAN, a security gateway, and a LAN) with a terminal on the LAN. *Id.* at 1:11–24, 3:61–4:16.

Petitioner's annotated version of Murakawa's Figure 5, which illustrates a "prior art typical network system," *id.* at 4:32–33, is shown below.

14

IPR2019-00819
Patent 7,620,810 B2



Murakawa's Figure 5 above shows a "prior art typical network system" and is further annotated by Petitioner to add labels for a mobile terminal, security gateway, and other terminals. Pet. 28. According to Murakawa, Figure 5 "is a block diagram of a typical network system including a WAN." Ex. 1005, 1:51–53. As shown in Figure 5, the network system includes "PC 101 [(labeled by Petitioner as 'Mobile Terminal')], which is located outside . . . LAN [104 and] establish[es] a dialup connection to the provider, WAN 102, and security gateway 103 [(labeled by Petitioner as 'Security Gateway')] that connects WAN 102 and LAN 104." *Id.* at 1:54–58. In addition, "LAN 104[,] being subjected to security gateway 103[,] includes . . . client PCs 106, 107" (labeled by Petitioner as "Other Terminals"). *Id.* at 1:59–60. Also shown is virtual private network ("VPN") 108, which is established between PC 101 and security gateway 103 to perform IPSec communication. *Id.* at 1:61–63. Murakawa discloses

15

IPR2019-00819
Patent 7,620,810 B2

that this network system ensures safe communications between PC 101 and the terminals on LAN 104. *Id.* at 2:1–4.

## C. *Challenged Claim 1*

Among independent claim 1's limitations is a "mobile terminal sending a request message to the address of the security gateway to request the security gateway to change the secure connection to be defined between the second address and the address of the security gateway." Ex. 1001, 10:59–63. Claim 1 further recites "*the request message* and/or a reply message *being encrypted* and/or authenticated by using the same SA already established." *Id.* at 11:5–8 (emphases added). Petitioner does not argue, however, that the combination of Ishiyama and Murakawa teaches "a reply message," or that the request message is "authenticated." *See* Pet. 45–47; Pet. Reply 18–19; Tr. 25:8–26:22. Hence, we focus on the request message being encrypted.

As we discuss below, we agree with Petitioner that Ishiyama teaches a request message. *See* Pet. 35–37. However, we find that Petitioner fails to show that Ishiyama teaches the request message is encrypted, for which Petitioner relies solely on Ishiyama to teach.

First, we agree with Petitioner and find that Ishiyama teaches that after a mobile terminal moves from a first address (CoA1) to a second address (CoA2), the mobile terminal sends a *request message* to the address of the correspondent host to change the security association definition from CoA1 to CoA2. Ex. 1004, 8:59–65; Pet. 35. Specifically, Ishiyama teaches that "the mobile computer 2 changes the source address of the outer packet of the encapsulated packet to be transmitted to the IPSEC tunnel by the mobile computer 2 into 'CoA2.'" Ex. 1004, 8:59–62; Pet. 35. We agree

16

IPR2019-00819
Patent 7,620,810 B2

with Petitioner that Ishiyama teaches that "the encapsulated packet in which the outer packet has the source address ='CoA2' will be transferred." Ex. 1004, 8:63–65; Pet. 35. This is shown in Ishiyama's Figure 4, shown below as annotated in the Petition. *See* Pet. 36 (providing annotated Figure 4).

FIG. 4



Annotated Figure 4 "is a schematic diagram for explaining operations in the case where the mobile computer changes a connected location in the mobile communication system," with (i) a dotted-line red box around mobile computer 2 at its first location, (ii) a solid-line red box around mobile computer 2 at its second location, (iii) a solid-line green box around correspondent host 3, (iv) a "Mobile Terminal" label for each mobile computer 2 location, and (v) a "Security Gateway" label for correspondent host 3. Ex. 1004, 5:11–13; Pet. 36 (annotating Ex. 1004, Fig. 4). Ishiyama's Figure 4 illustrates that after the mobile computer 2 moves to a second address, a request message is sent from mobile computer 2 to correspondent host 3, with the request message illustrated as a rectangle (with "src: Haddr" and "dst: CN" labels) depicting the encapsulated packet, surrounded by a larger rectangle, depicting the outer packet (with "src: CoA2" and "dst: CN"

17

labels). Ex. 1004, Fig. 4, 8:59–65; Pet. 35–36.  Thus, Ishiyama teaches the entire transmitted packet comprises the request message.  *Id.* at 8:59–65, Fig. 4.  This finding is consistent with Petitioner's arguments made during the oral hearing that Ishiyama's entire transmitted packet (i.e., the encapsulated packet plus the outer packet, which has the changed source address) is the claimed request message.  *See, e.g.*, Tr. 27:23–28:4, 29:10–17, 30:3–11, 34:14–35:1, 40:12–14, 65:8–67:7.

Second, we agree with Petitioner and find that Ishiyama teaches that the "[r]equest [is] for changing the security association to the correspondent [host]" as part of mobile computer 2 performing a SA Gateway Update. Pet. 36 (quoting Ex. 1004, 11:39–40); Ex. 1004, 11:39–46.  More specifically, Ishiyama teaches that mobile computer 2's "request [is] to change the previous CoA used as the destination in the security association into the current CoA."  Ex. 1004, 11:43–45; *see also* Pet. at 36–37 (annotating Ex. 1004, Fig. 7; citing Ex. 1004, 12:54–57 (arguing that "[t]he SA Gateway Update operation is depicted as operation (5) in Figure 7")).  In other words, Ishiyama teaches that the request message is sent to request that the correspondent host change the secure connection so as to be defined between the mobile computer's second address and the address of the correspondent host.  *See, e.g.*, Ex. 1004, 11:39–45, 12:54–60, Fig 7; Pet. 36–37.  "As a result of these operations, at the correspondent [node] currently communicating with the mobile computer 2, the endpoint of the IPSEC tunnel is changed from 'CoA1' to 'CoA2' as the destination of all the security associations is changed to the current CoA 'CoA2.'"  Ex. 1004, 12:66–13:3; Pet. 37.

18

IPR2019-00819
Patent 7,620,810 B2

Petitioner, however, fails to show that Ishiyama's request message is encrypted, as required by claim 1. Petitioner instead focuses on only a portion of Ishiyama's request message (i.e., the encapsulated packet) in arguing that Ishiyama teaches that the request message is encrypted. *See* Pet. 45–46; Pet. Reply 18. For example, Petitioner argues that "[r]egarding the encryption of the request message, Ishiyama explains that the mobile computer 2 includes 'an encryption unit 114 for carrying out the encapsulation and encryption on transmission packets.'" Pet. 45–46 (quoting Ex. 1004, 13:40–41; citing Ex. 1004, 13:33–35). "Indeed a main requirement and pillar of IPsec is to encrypt messages," according to Petitioner. *Id.* at 46 (citing Ex. 1011, 4 at § 2.1, 6–7 at §§ 3.1–3.2). Moreover, Petitioner argues that "Ishiyama explains that '[i]n the tunnel mode IPSEC communications, the packet encapsulation and the encryption/decryption of the inner packet are carried out and the IPSEC module 22 [of mobile unit 2] has functions for realizing such encapsulation and encryption/decryption processing.'" Pet. Reply 18 (quoting Ex. 1004, 7:56–60). "The mobile unit then uses this IPSEC module to transmit an 'encapsulated packet' via the IPSEC tunnel to update the address at the other endpoint," according to Petitioner. *Id.* at 18–19 (citing Ex. 1004, 8:55–9:10). Petitioner argues that "[b]y using IPSec to perform the update, the packet and the request message are encrypted." *Id.* at 19 (citing Ex. 1020 ¶¶ 60–62; Ex. 1011, 4 at § 2.1, 6–7 at §§ 3.1–3.2). Petitioner adds that Patent Owner's expert, "Dr. Rouskas[,] even confirmed this during his deposition." *Id.* (citing Ex. 1019, 175:19–176:2 (Dr. Rouskas testifying "[s]o, yes, the payload of that packet is encrypted")).

19

IPR2019-00819
Patent 7,620,810 B2

None of the passages that Petitioner cites for this limitation, however, teach that the request message's outer packet's source address is encrypted. Rather, Ishiyama only teaches that the encapsulated packet (payload) is encrypted. *E.g.*, Ex. 1004, 7:56–60. In fact, Petitioner admits that in Ishiyama the request message's outer packet's source address is unencrypted. *See, e.g.*, Tr. 27:9–16. However, the outer packet's source address is a part of the request message in Ishiyama. *See, e.g.*, Ex. 1004, Fig. 4, 8:59–65. For example, Ishiyama teaches:

> [W]hen the current location address of the mobile computer is changed to a new address, the mobile computer notifies the change of the own current location address to the correspondent by setting the new current location address as the source address of the outer packet of the encapsulated packet. Upon receiving this encapsulated packet, the correspondent can continue communications by changing only the destination address of the outer packet to the new current location address in the encapsulated packets to be transmitted thereafter.

*Id.* at 6:13–22. Thus, Ishiyama describes the request message as including the outer packet, and that packet is unencrypted.

Claim 1 recites "the request message . . . being encrypted." Ex. 1001, 11:6. Thus, the plain words of the claim state that the message is encrypted—not that a portion of the message is encrypted. The '810 patent Specification likewise does not describe that only a portion of the request message is encrypted. *Id.* at 9:63–10:8. Specifically, the Specification discloses that, "[i]n signal 10a of [Figure 5]," which is sent from the mobile terminal when a mobile terminal moves to address B, "a request for registration (RREQ) of the new address is sent." *Id.* at 9:66–10:2. The Specification adds that "signal[] 10a . . . can be encrypted and/or authenticated." *Id.* at 10:4–5. Petitioner does not identify any description in

20

IPR2019-00819
Patent 7,620,810 B2

the '810 patent of encrypting only a portion of the request message. *See* Pet. Reply 18–19; Tr. 67:8–68:20. At the hearing, Petitioner argued that one of ordinary skill in the art would have understood that only a portion of the message need be encrypted. Tr. 67:8–68:20. Petitioner, however, fails to provide any persuasive evidence in support of this reading of the claim in view of the express claim language and the description in the Specification.

Petitioner's papers provide no basis to allow for a portion of the request message to be unencrypted. *See generally* Pet. 45–47; Pet. Reply. 18–19. Simply put, claim 1 requires that the request message (not just a portion thereof) is encrypted, and Petitioner fails to show that Ishiyama's request message (which includes the unencrypted outer packet's source address) meets this requirement. Ex. 1001, 11:6; *see also In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998) ("[T]he name of the game is the claim.").

Furthermore, during the oral hearing, Petitioner repeated its argument that Ishiyama's request message is encrypted because the encapsulated packet is encrypted, even though the outer packet's header is unencrypted. *See* Tr. 27:9–11, 30:3–11. Having an unencrypted outer packet "would be just like [what] the claims would require, as well, because you can't send a request message without having an outer packet that's unencrypted," according to Petitioner. *Id.* at 30:12–16. Put differently, Petitioner argued:

> [T]he request message that's being sent is encrypted. The outer header isn't encrypted, but the rest of the message is. And there's a reason why the outer header isn't encrypted: because it can't be. If the outer header was encrypted, then the message wouldn't be able to be sent because nobody would be able to know what the destination and source addresses are. So, of course, the outer header isn't encrypted, but the rest of the message is, in fact, encrypted.

21

IPR2019-00819
Patent 7,620,810 B2

*Id.* at 27:9–16.  We are not persuaded by Petitioner's argument that Ishiyama teaches this limitation because the outer header cannot be encrypted.  First, Petitioner does not point to any evidence to support this argument, and thus, we do not credit it.  *See In re Geisler*, 116 F.3d 1465, 1470 (Fed. Cir. 1997) (explaining that attorney arguments and conclusory statements that are unsupported by factual evidence are entitled to little probative value).

Second, even if we consider this argument, Petitioner conflates a request message that includes its unencrypted outer packet as a part of the request message (such as in Ishiyama) with a request message that does not (e.g., a request message that is contained wholly within the encrypted encapsulated packet), and Petitioner does not account for the latter.  *E.g.*, Tr. 27:9–16, 30:12–16.  Nor does Petitioner provide any argument or evidence to show that an example request message (i.e., "a registration request (RREQ)") disclosed in the '810 patent is not wholly within the encrypted encapsulated packet.  *See generally* Pet.; Pet. Reply; *see also* Ex. 1001, 7:43–62.

Lastly, we find Patent Owner's arguments concerning Ishiyama's SA Gateway Update not specifying a format (including as to whether there is encryption) for its operation 5 of Figure 7 inapposite.  PO Resp. 61–63.  Patent Owner ignores that the Petition also relies of Ishiyama's Figure 4, and its accompanying text, which teach that Ishiyama's request message comprises an outer packet having its source address changed to the second (moved to) address and an encapsulated inner packet.  Pet. 35–36 (citing Ex. 1004, 8:59–65; annotating Ex. 1004, Fig. 4).  We likewise do not credit the testimony of Patent Owner's expert, Dr. Rouskas, on this point as he also

22

IPR2019-00819
Patent 7,620,810 B2

ignores Ishiyama's Figure 4, and its accompanying text. *See* Ex. 2003
¶ 157.

In summary, we find that Petitioner fails to show that Ishiyama
teaches a limitation of claim 1, for which Petitioner relies on Ishiyama
solely. Thus, Petitioner has not demonstrated by a preponderance of the
evidence that claim 1 of the '810 patent would have been obvious to one of
ordinary skill in the art in view of Ishiyama and Murakawa.

### D. Challenged Claims 4 and 5

Claims 4 and 5 depend from independent claim 1, and thus,
incorporate claim 1's limitations. We determine above that the combination
of Ishiyama and Murakawa fails to teach a limitation of independent claim 1.
In addition, the Petition does not present any information with respect to
dependent claims 4 or 5 that addresses the deficiencies discussed above
regarding independent claim 1. Pet. 54–59. Thus, Petitioner has not
demonstrated by a preponderance of the evidence that claims 4 and 5 of the
'810 patent would have been obvious to one of ordinary skill in the art in
view of Ishiyama and Murakawa.

### E. Challenged Claim 7

Claim 7 is an independent claim. Petitioner combines Ishiyama and
Murakawa in two alternative ways in arguing that claim 7[9] would have been
obvious to one of ordinary skill in the art. *See* Pet. 12–54; Dec. on Inst. 24–
25, 37–38 (noting the two alternative ways). Below we address Petitioner's

---

[9] Petitioner argues that "[t]he limitations of independent claim 7 are
substantially similar to claim 1." Pet. 47–48. Thus, for claim 7, Petitioner
adopts its arguments from claim 1 for the shared limitations. *Id.* Likewise,
"Patent Owner relies on the same responses it provided . . . for claim 1
regarding these limitations of claim 7." PO Resp. 64–65.

23

second way of combining Ishiyama and Murakawa (i.e., combining Ishiyama's address changing functionality with Murakawa's security gateway and another terminal)).  In other words, Petitioner combines Ishiyama's "address updating for a mobile terminal operating in the IPsec tunneling mode" with "Murakawa's . . . security gateway configuration" for "tunneling of communications through a security gateway so that two terminals are able to communicate."  *E.g.*, Pet. 23–24 (citing Ex. 1004, 7:46–49; Ex. 1005, 4:13–16; Ex. 1002 ¶ 61).  For that combination, we find that Petitioner demonstrates by a preponderance of the evidence that claim 7 would have been obvious to one of ordinary skill in the art.  Because of this finding, we do not reach the parties' arguments concerning the first way Petitioner combines Ishiyama and Murakawa.  For example, we do not reach whether Ishiyama teaches that its correspondent host is a security gateway.

### 1. Preamble

Claim 7's preamble recites "[a] method for ensuring secure forwarding of a message in a telecommunication network, having at least one mobile terminal and another terminal and a security gateway therebetween."  Ex. 1001, 12:1–4.  We agree with Petitioner and find that the combination of Ishiyama and Murakawa teaches claim 7's preamble.  Pet. 24–29, 47.  As we find that Ishiyama and Murakawa teach the preamble, we need not determine whether the preamble is limiting.

As to Ishiyama, we agree with Petitioner that Ishiyama teaches "a mobile communication scheme capable of easily changing a connected location of a mobile computer on [an] IP network."  Ex. 1004, 2:42–45; Pet. 25.  More specifically, we find that Ishiyama teaches using care-of addresses ("CoA") for a "mobile computer 2 [that] always uses the IPSEC in

the tunnel mode at a time of making a connection to the correspondent host 3." Ex. 1004, 7:66–67, 11:9–16; Pet. 25.

As to Murakawa, we agree with Petitioner and find that Murakawa teaches forwarding messages received from a terminal at a security gateway located between the terminal and another terminal. *E.g.*, Ex. 1005, Fig. 5; Pet. 27–28 (annotating Ex. 1005, Fig. 5). As illustrated in Figure 5, Murakawa discloses that PC 101 establishes an IPSec tunnel (VPN 108), with security gateway 103. Ex. 1005, 1:61–63, 2:62–65, Fig. 5; Pet. 28. Murakawa's security gateway 103 connects to PC 106 and PC 107. Ex. 1005, 1:59–60. We agree with Petitioner and find that either PC 106 or PC 107 is the claimed another terminal. *Id.* at 1:61–2:4, Fig. 5; *see also* Pet. 28 (annotating Ex. 1005, Fig. 5 (labeling PC 106 and PC 107 "Other Terminals")). We find that Murakawa's network system allows for PC 101 and another terminal (e.g., PC 106 or PC 107) to communicate securely via security gateway 103. Ex. 1005, 1:64–2:4, Fig. 5; Pet. 28.

Lastly, we are not persuaded by Patent Owner's arguments that "[i]ncorporating Murakawa's security gateway 103 into Ishiyama does not fill in the missing limitation of . . . '[an]other terminal' because no host computer has been incorporated from Murakawa." PO Resp. 49; *see also id.* at 45 (explaining that the claim recites "another terminal" and "other terminal"). Put differently, Patent Owner argues that "Petitioner's modification of Ishiyama by Murakawa does not explain how the combination provides the recited 'other terminal.'" *Id.* (citing Ex. 2003 ¶¶ 143–144). To the contrary, Petitioner argues that "Murakawa describes the forwarding of messages at a security gateway located between a mobile terminal and other terminals." Pet. 27. Petitioner then proceeds to

25

IPR2019-00819
Patent 7,620,810 B2

describe Murakawa's Figure 5, and to identify Murakawa's PC 106 and PC 107 as other terminals. *See id.* at 27–28 (citing Ex. 1005, 1:59–63; annotating Ex. 1005, Fig. 5 (labeling PC 106 and PC 107 "Other Terminals")). Petitioner again identifies Murakawa's PC 106 as the other terminal when arguing that the other terminal sends a secure message to the second address of the mobile terminal via the security gateway. Pet. 52 (annotating Ex. 1005, Fig. 8 (labeling PC 106 "Other Terminal"). Thus, we disagree with Patent Owner that "no host computer has been incorporated from Murakawa." PO Resp. 49.

In summary, we find combining Ishiyama's mobile address changing functionality with Murakawa's security gateway and another terminal teaches "[a] method for ensuring secure forwarding of a message in a telecommunication network, having at least one mobile terminal and another terminal and a security gateway therebetween."

## 2. Establishing a Secure Connection

Claim 7 further recites "establishing a secure connection between a first address of the mobile terminal and an address of the security gateway, the secure connection defined by at least the addresses of the mobile terminal and the security gateway." Ex. 1001, 12:5–9. We agree with Petitioner that the combination of Ishiyama and Murakawa teaches this limitation. Pet. 29–33, 47. We find that Ishiyama teaches that mobile computer 2 first establishes an IPSec tunnel between its first address (CoA1) and correspondent host 3's address (CN). Ex. 1004, 8:25–26, 8:36–38, 8:43–47, 8:50–53, 11:9–17, 12:3–5, Fig. 4; Pet. 30–31, 45. Furthermore, Ishiyama teaches that the IPSec tunnel is defined by, *inter alia*, the addresses

26

IPR2019-00819
Patent 7,620,810 B2

of mobile computer 2 and correspondent host 3. Ex. 1004, 12:9–12, 12:51–59; Figs. 9A, 9B; Pet. 32–33.

In addition, we agree with Petitioner and find that Murakawa teaches a security gateway. Ex. 1005, 1:59–2:4, 2:62–65, 4:13–16, Fig. 5; Pet. 23–24, 27–29, 28 (citing Ex. 1005, Fig. 5) (annotating the figure with "Security Gateway"). Moreover, Murakawa teaches establishing a secure connection between a terminal (PC 101) and the security gateway. Ex. 1005, 1:61–63 ("[I]n order to perform the IPsec communication, VPN 108 is established between PC 101 and security gateway 103."), Fig. 5.

In summary, we find combining Ishiyama's mobile address changing functionality with Murakawa's security gateway and an other terminal teaches "establishing a secure connection between a first address of the mobile terminal and an address of the security gateway, the secure connection defined by at least the addresses of the mobile terminal and the security gateway."

### 3. Mobile Terminal Moving Addresses

Claim 7 further recites "the mobile terminal moving from the first address to a second address." Ex. 1001, 12:10–11. We agree with Petitioner and find that Ishiyama teaches that after the IPSec tunnel has been established, Ishiyama's mobile computer 2 moves networks, moving from a first address (CoA1) to a second address (CoA2). *See, e.g.*, Ex. 1004, 8:55–57, Fig. 4; Pet. 34, 48. This is depicted in Ishiyama's Figure 4, as annotated by Petitioner, where mobile terminal 2 moves from its first location (dashed red box corresponding to CoA1) to its second location (solid red box corresponding to CoA2). *See* Pet. 34 (annotating Ex. 1004, Fig. 4).

27

IPR2019-00819
Patent 7,620,810 B2

Based on Ishiyama's teachings, we find that the combination of Ishiyama and Murakawa teaches "the mobile terminal moving from the first address to a second address."

### 4. While at the Second Address

Claim 7 further recites "while at the second address, the mobile terminal sending a request message to the address of the security gateway to request the security gateway to change the secure connection to be defined between the second address and the address of the security gateway." Ex. 1001, 12:12–16. We agree with Petitioner and find that the combination of Ishiyama and Murakawa teaches this limitation. Pet. 35–37, 48. We find Ishiyama teaches that after changing addresses, mobile computer 2 sends a request message (having CoA2 for its outer packet's source address) to correspondent host 3 via the IPSec tunnel, requesting that correspondent host 3 update to mobile computer 2's new address. Ex. 1004, 8:59–65, 11:39–45, 12:66–13:5, Figs. 4, 7; Pet. 35–37. We provide a more detailed analysis of Ishiyama's request message above in our discussion of claim 1.[10] *See supra* Section VI(C) (addressing, *inter alia*, Ishiyama's Figures 4 and 7, and accompanying text). Our findings above regarding Ishiyama's request message also apply here. *Id.* In addition, as we discuss in detail above, Murakawa teaches a security gateway, as well as establishing a secure connection between a terminal (PC 101) and the security gateway. *See, e.g.*, Ex. 1005, 1:59–2:4, 2:62–65, 4:13–16, Fig. 5; *supra* Section VI(E)(1)–(2)

---

[10] Although claim 1 and claim 7 both recite this limitation, claim 7 does not have an additional limitation requiring that the request message is encrypted. *Compare* Ex. 1001, 10:48–11:8, *with* Ex. 1001, 12:1–22.

28

(discussing our findings regarding, *inter alia*, Figure 5's and Figure 8's teachings).

We find combining Ishiyama's mobile address changing functionality with Murakawa's security gateway and another terminal teaches "while at the second address, the mobile terminal sending a request message to the address of the security gateway to request the security gateway to change the secure connection to be defined between the second address and the address of the security gateway."

### 5. *Security Gateway Changing an Address Definition*

Claim 7 further recites "the security gateway changing an address definition of the secure connection from the first address to the second address." Ex. 1001, 12:17–19. We agree with Petitioner and find that the combination of Ishiyama and Murakawa teaches this limitation. Pet. 37–39, 48. We find that Ishiyama teaches that correspondent host 3 detects mobile computer 2's address change based on the request message (i.e., the source address in the request message's outer packet has changed), and updates mobile computer 2's address to CoA2 for the IPSec tunnel in the correspondent host's SA database. *See* Ex. 1004, 8:66–9:4, 12:51–59, Figs. 9B, 9D (illustrating exemplary SA databases); Pet. 38. Ishiyama's Figure 9B (mobile computer's first location) and Figure 9D (mobile computer's second location) illustrate this update at the correspondent host (labeled "CN" in the figures) by replacing Figure 9B's "dst" field value of "CoA1" with "CoA2," as shown in Figure 9D. *Compare* Ex. 1004, Fig. 9B, *with id.* at Fig. 9D. "As a result of these operations, at the correspondent [node] currently communicating with the mobile computer 2, the endpoint of the IPSEC tunnel is changed from 'CoA1' to 'CoA2' as the destination of all

29

IPR2019-00819
Patent 7,620,810 B2

the security associations is changed to the current CoA 'CoA2'."  Ex. 1004,
12:66–13:3; Pet. 39.  In addition, as we discuss in detail above, Murakawa
teaches a security gateway, as well as establishing a secure connection
between a terminal and the security gateway.  *See, e.g.*, Ex. 1005, 1:59–2:4,
2:62–65, 4:13–16, Fig. 5; *supra* Section VI(E)(1)–(2) (discussing our
findings regarding, *inter alia*, Figure 5's and Figure 8's teachings).

In summary, we find combining Ishiyama's mobile address changing
functionality with Murakawa's security gateway and another terminal
teaches "the security gateway changing an address definition of the secure
connection from the first address to the second address."

### 6. *Other Terminal Sending a Secure Message*

Claim 7 further recites "the other terminal sending a secure message
in the secure connection to the second address of the mobile terminal via the
security gateway."  Ex. 1001, 12:20–22.  We agree with Petitioner and find
that the combination of Ishiyama and Murakawa teaches this limitation.
Pet. 48–54.  We find that Ishiyama teaches sending a secure message from
Ishiyama's correspondent host to the mobile computer's second location, as
shown below in Figure 7's operation (7), as annotated by Petitioner.  *See*
Pet. 49 (annotating Ex. 1004, Fig. 7).

30

IPR2019-00819
Patent 7,620,810 B2



Annotated Figure 7 "is a sequence chart showing an exemplary processing sequence in the case where the mobile computer initiates communications at a visited site and then changes . . . location" with a green box around the correspondent node ("CN") identifier and a red box around the mobile computer identifier ("MN").  Ex. 1004, 5:20–23; Pet. 49 (annotating Ex. 1004, Fig. 7).  Ishiyama teaches that as a result of its CoA update operations, "at the correspondent [host] currently communicating with the mobile computer 2, the endpoint of the IPSEC tunnel is changed from 'CoA1' to 'CoA2' as the destination of all the security associations,'" and "[c]onsequently, the session is guaranteed even when the mobile computer 2 moves . . . ."  Ex. 1004, 12:66–13:5; Pet. 49.  Put differently, as Figure 7 illustrates, the secure message is sent to the second address of the mobile terminal from Ishiyama's correspondent host.  Ex. 1004, Fig. 7

31

IPR2019-00819
Patent 7,620,810 B2

(illustrating for operation (7) that the outer packet's Src: has the value "CN" and Dst: has the value "CoA2").

As to Murakawa, we agree with Petitioner and find that Murakawa teaches an other terminal sending a secure message in a secure connection to an address of a terminal via the security gateway. *E.g.*, Ex. 1005, Fig. 5; Pet. 51–53. This is shown in Murakawa's Figure 5, shown below as annotated in the Petition. *See* Pet. 51 (providing annotated Figure 5).



FIG. 5   PRIOR ART

Murakawa's Figure 5, as annotated by Petitioner, shows a "prior art typical network system" with (i) a red box around PC 101 and labeled "Mobile Terminal," (ii) a green box around security gateway 103 and labeled "Security Gateway," and (iii) a blue box around each of PC 106 and PC 107, and labeled "Other Terminals." Ex. 1005, 4:32–33; Pet. 51 (annotating Ex. 1005, Fig. 5). As illustrated in Figure 5, Murakawa teaches

32

IPR2019-00819
Patent 7,620,810 B2

that an other terminal (PC 106) sends a secure message in the secure connection (VPN 108) to the mobile terminal (PC 101) via security gateway 103. *Id.* at 1:61–2:4, 2:62–65, Fig. 5; *see also supra* Section VI(E)(1) (discussing our findings regarding Figure 5's teachings). Furthermore, Figure 8, shown below as annotated in the Petition, also illustrates the addressing of the secure message sent from PC 106 (other terminal) to the PC 101 (mobile terminal).

FIG. 8   PRIOR ART



Annotated Figure 8 "illustrates diagrammatically . . . prior art IPsec communication in the tunnel mode" with (i) a red box around PC 101 and labeled "Mobile Terminal," (ii) a green box around security gateway 103 and labeled "Security Gateway," and (iii) a blue box around PC 106, and labeled "Other Terminal." Ex. 1005, 4:41–42; Pet. 52 (annotating Ex. 1005, Fig. 8). As illustrated, "IP addresses 'A', 'B', and 'C' are assigned to PC 101, security gateway 103, and client PC 106, respectively." Ex. 1006, Fig. 5, 3:4–6; Pet. 52. Murakawa teaches the following:

33

IPR2019-00819
Patent 7,620,810 B2

When client PC 106 on LAN 104 transmits an IP packet
to PC 101, which has established connection with PC 106 via
VPN 108,

1) client PC 106 generates IP packet 100 in which the
sender's IP address is "C" and the receiver's IP address is
"A", then sends it to security gateway 103;

2) received packet 100, gateway 103 identifies that the
packet is the one to be sent to PC 101 which has established
VPN 108;

3) gateway 103 encapsulates IP packet 100 according to
exchanged information during the IKE communication;

4) the IP header including the sender's IP address B and
the receiver's IP address "A" is added to outside the
originally set IP address;

5) authentication information is added to the encapsulated
IP packet based on the exchanged information, then the IP
packet is encrypted;

6) received the encapsulated packet via VPN 108, PC 101
retrieves encapsulated original IP packet 100 from the
received packet, according to the exchanged information,
then process[es] it.

Ex. 1005, 3:8–28; Pet. 52–53. In other words, Murakawa teaches an other
terminal sending a secure message in a secure connection to an address of a
mobile terminal via the security gateway. *Id.* Furthermore, we credit Dr.
Goldschlag's testimony that one of ordinary skill in the art would have
understood that Murakawa teaches a well-known IPSec tunnel mode
configuration with a security gateway facilitating communication between a
mobile terminal and other terminals because this testimony is consistent with
our findings of Murakawa's teachings. *See* Ex. 1002 ¶¶ 66–67.

Accordingly, we find that the combination of Ishiyama and Murakawa
teaches the other terminal (PC 106) sending a secure message in the secure
connection (VPN 108) to the second address (CoA2) of the mobile terminal
via security gateway 103.

34

IPR2019-00819
Patent 7,620,810 B2

Lastly, we are not persuaded by Patent Owner's arguments that Ishiyama's "operation (7) is an end-to-end, two-component secure communication from correspondent terminal CN to mobile terminal MN," and does not teach "[t]he three-component communication called for by the claim (other terminal-security gateway-first terminal)." PO Resp. 66–67 (citing Ex. 2003 ¶¶ 161–162). Patent Owner focuses on Ishiyama's teachings individually, rather than the combined teachings of Ishiyama and Murakawa. *See In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) ("Non-obviousness cannot be established by attacking references individually where the rejection is based upon the teachings of a combination of references"). Again, as to the second way Petitioner combines Ishiyama and Murakawa, Ishiyama's mobile address changing functionality is combined with Murakawa's security gateway configuration (e.g., security gateway 103 and other terminal 106). *See* Pet. 12–54; Dec. on Inst. 24–25, 37–38 (noting the two alternative ways). Hence, a mobile terminal securely communicates with another terminal via Murakawa's security gateway 103 rather than Ishiyama's correspondent host 3. *Id.*

In summary, we find combining Ishiyama's mobile address changing functionality with Murakawa's security gateway and another terminal teaches "the other terminal sending a secure message in the secure connection to the second address of the mobile terminal via the security gateway."

### 7. *Combining Ishiyama and Murakawa*

For the reasons we provide below, we find that Petitioner has demonstrated by a preponderance of the evidence that one of ordinary skill in the art would have found it obvious to combine Ishiyama's mobile

35

IPR2019-00819
Patent 7,620,810 B2

address changing functionality with Murakawa's security gateway and other terminal in the manner claimed.

First, we agree with Petitioner and find that Ishiyama teaches using IPSec in tunnel mode with its mobile address changing functionality. *E.g.*, Ex. 1004, 8:43–65, 11:9–16, Fig. 4; Pet. 21–22, 24. More specifically, we find that Ishiyama teaches that "mobile computer 2 always uses the IPSEC in the tunnel mode at a time of making a connection to the correspondent host 3." Ex. 1004, 11:9–16. Figure 4 also illustrates that mobile computer 2 connects to correspondent host 3 via an IPSec tunnel. *See* Ex. 1004, Fig. 4 (labeling the connections as "IPSEC TUNNEL"), 8:43–65; Pet. 25.

Second, Petitioner persuasively shows that one of ordinary skill in the art would have understood that tunnel mode was used for communicating via a security gateway. Specifically, we find that one of ordinary skill in the art would have known that "[t]unnel mode . . . is generally used for sending

36

messages through more than two components . . . ." Ex. 1001, 3:16–19[11];

Pet. 21 (citing Ex. 1001, 3:16–27, Ex. 1002 ¶ 57).  We also credit in support

of this finding the below deposition testimony of Patent Owner's expert, Dr.

Rouskas, who testified as follows:

> Q:  So in all the instances where you personally have used IPSec,
> you have only ever used IPSec tunnel mode with security
> gateway being one of the endpoints.  Right?
>
> A:  So I have been using IPSec for, you know, more than 20
> years.  But to the best of my recollection that is right, I have only
> used it when one of endpoints is security gateway.

Ex. 1019, 111:21–112:9; Pet. Reply 8.  In addition, we credit Dr.

Goldschlag's declaration testimony, which is consistent with

contemporaneous evidence in the record, that "[t]unnel mode is used when

---

[11] "Statements in a challenged patent's specification may be used . . . when
they evidence the general knowledge possessed by someone of ordinary skill
in the art."  Memorandum:  Treatment of Statements of the Applicant in the
Challenged Patent in Inter Partes Reviews Under § 311 (Aug. 2020)
(available at
https://www.uspto.gov/sites/default/files/documents/signed_aapa_guidance_
memo.pdf), 4.  "Permissible uses . . . under § 103 include . . . supporting a
motivation to combine particular disclosures."  *Id.* at 6 (citing *Koninklijke
Philips v. Google*, 948 F.3d 1330, 1337–38 (Fed. Cir. 2020)).  We find that
the statements cited by Petitioner from the '810 patent's Technical
Background section evidence the general knowledge possessed by one of
ordinary skill in the art at the time of the invention of the '810 patent as they
are contained in the "Technical Background" section and are consistent with
the evidence of record.  *See, e.g.*, Pet. 8 (citing, e.g., Ex. 1001, 3:8–9, 3:12–
13, 3:19–21), 11 (citing Ex. 1001, 3:19–21), 20 (citing same), 21 (citing
Ex. 1001, 3:19–27).  Patent Owner does not challenge Petitioner's reliance
on statements from the Technical Background section of the '810 patent.
*See generally* PO Resp.  Even so, we reach the same conclusions even
without reliance on the statements from the '810 patent.

one or both ends of an SA is a security gateway . . . that implements IPSec."
Ex. 1002 ¶ 33 (quoting Ex. 1009, 14) (emphasis omitted); *see also* Ex. 1001,
3:19–21 (admitting that "tunnel mode is often used when one or both ends of
a SA is a security gateway, such as a firewall or a router that implements
IPSec"); Pet. 50.

Lastly, we agree with Petitioner and find that tunneling packets
through a security gateway for two terminals to communicate (such as in
Murakawa) was well-known in the art at the time of the invention of the
'810 patent. Pet. 27–29. In particular, we find that Murakawa's security
gateway configuration (e.g., Figure 5) is "a prior art typical network
system," which provides communications between terminals. Ex. 1005,
4:32–33, Fig. 5; Pet. 27–28. Moreover, in its Technical Background section,
the '810 patent teaches the following:

> The IPSec tunnel mode operates e.g. in such a way that if
> a host on a network generates an IP packet with a destination
> address of another host on another network, the packet is routed
> from the originating host to a security gateway (SGW), firewall
> or other secure router at the boundary of the first network. The
> SGW or the like filters all outgoing packets to determine the need
> for IPSec processing. If this packet from the first host to another
> host requires IPSec, the firewall performs IPSec processing and
> encapsulates the packet in an outer IP header. The source IP
> address of this outer IP header is this firewall and the destination
> address may be a firewall that forms the boundary to the other
> local network. This packet is now routed to the other host[']s
> firewall with intermediate routers examining only the outer IP
> header. At the other host firewall, the outer IP header is stripped
> off and the inner packet is delivered to the other host.

Ex. 1001, 3:44–59; *see also* Pet. 50 (citing same). In other words, this
passage also teaches that tunneling packets through a security gateway for
two terminals to communicate was well-known in the art at the time of the

38

IPR2019-00819
Patent 7,620,810 B2

invention of the '810 patent. Ex. 1001, 3:44–59. We also credit Dr. Goldschlag's testimony that it was well-known in the art for a security gateway, such as that disclosed in Murakawa, to facilitate communication between a mobile terminal and other terminals as this testimony is consistent with Murakawa's teachings. Ex. 1002 ¶ 66; Pet. 53.

In summary, we find that (1) Ishiyama's address changing functionality employs tunnel mode, (2) tunnel mode was generally used when at least one end of an SA was a security gateway, and (3) Murakawa teaches a typical, prior art security gateway configuration. Based on these findings, we find that one of ordinary skill in the art would have found it obvious to employ Ishiyama's address changing functionality with a security gateway, such as taught in Murakawa. *See PGS Geophysical AS v. Iancu*, 891 F.3d 1354, 1365 (Fed. Cir. 2018) ("[T]he motivation to modify a reference can come from the knowledge of those skilled in the art, from the prior art reference itself, or from the nature of the problem to be solved.") (citation omitted).

Put differently, based on these findings, Ishiyama's use of tunnel mode would have suggested to one of ordinary skill in the art using Ishiyama's address changing functionality with Murakawa's security gateway configuration. *Id.*; Pet. 23–24, 27 (citing Ex. 1002 ¶¶ 33–36), 28–29, 53. We also credit Dr. Goldschlag's testimony that one of ordinary skill in the art "reading Ishiyama would have understood that the use of tunnel mode suggests the use of a security gateway that tunnels messages to an 'other node.'" Ex. 1002 ¶ 61 (citing *id.* ¶¶ 33–36); Pet. 24. This testimony is consistent with our findings discussed above.

39

Additionally, we also credit the following testimony of Dr.

Goldschlag:

> [I]n view of Ishiyama's stated goal of addressing a mobile terminal with a changing address, [one of ordinary skill in the art] would have understood that implementing Ishiyama's correspondent host functionality with the security gateway described in Murakawa would be highly desirable in the telecommunication context. As Ishiyama explains, implementing its IPsec address updating algorithm allows a mobile terminal and a security gateway to maintain communication 'without interrupting the session' initially established even when the mobile terminal changes to another address.

Ex. 1002 ¶ 67 (citing Ex. 1004, 6:54–60); *see also* Pet. 29 (citing Ex. 1002 ¶ 67). We find that one of ordinary skill in the art would have been motivated to incorporate Ishiyama's mobile address changing functionality with Murakawa's security gateway configuration "to maintain communication 'without interrupting the session' initially established even when the mobile terminal changes to another address." Ex. 1002 ¶ 67; *KSR*, 550 U.S. 417 ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious . . . ."). Moreover, we do not find this testimony conclusory, as Patent Owner alleges (PO Resp. 50), because Dr. Goldschlag explains why combining Ishiyama and Murakawa would have been highly desirable (i.e., because it would maintain communication without interrupting the session). Ex. 1002 ¶ 67 (citing Ex. 1004, 6:54–60). We agree that having no interruption when the mobile terminal moves "would [have] be[en] highly desirable in the telecommunication context." *Id.*

40

We are not persuaded by Patent Owner's arguments that Petitioner "fails to provide the requisite explanation as to **how** Ishiyama and Murakawa are to be combined or **what is the operation of the resulting combination**."  PO Resp. 51–52; *see also id.* at 59 (citing Ex. 2003 ¶ 152), 67 (citing Ex. 2003 ¶ 165) (making same arguments).  Rather, we agree with Petitioner and find that one of ordinary skill in the art "could[12] have easily performed th[e] implementation" of combining Ishiyama's address changing functionality with the security gateway described in Murakawa "in view of the security gateway suggestion from Ishiyama's tunnel mode operation." Pet. 29 (citing Ex. 1002 ¶ 67).  Simply put, Ishiyama's mobile computer 2 communicates with correspondent host 3 using IPSec tunnel mode just as Murakawa's PC 101 communicates with security gateway 103 using IPSec tunnel mode.  *E.g.*, Ex. 1004, 8:43–49, 11:9–16, Fig. 4; Ex. 1005, 1:61–63, 2:62–65, Fig. 5; Pet. 53.  Ishiyama's address changing functionality utilizes the outer packet's source address with Ishiyama's tunnel mode connection. *E.g.*, 1004, 8:43–65, Fig. 4.  Petitioner's combination likewise utilizes the outer packet's source address (as in Ishiyama) with Murakawa's tunnel mode connection.  *E.g.*, 1004, 8:43–65, Fig. 4.; Ex. 1005, 1:59–2:4, Fig. 5; Pet. 43–44; Pet. Reply 16–17 (citing Pet. 43–44; Ex. 1020 ¶¶ 48–56).

---

[12] Although we consider whether one of ordinary skill in the art "could" have combined Ishiyama's and Murakawa's relevant teachings with respect to these arguments related to operability, we above find that one of ordinary skill in the art "would" have combined Ishiyama's and Murakawa's relevant teachings. *See PGS Geophysical*, 891 F.3d at 1365 (recognizing that whether one of ordinary skill in the art "could" or "would" have combined references are related, separate questions); *see also supra* Section VI(E)(7) (finding that one of ordinary skill in the art would have combined the references).

41

IPR2019-00819
Patent 7,620,810 B2

Moreover, we do not find Dr. Goldschlag's testimony conclusory, as Patent Owner alleges (PO Resp. 68), but rather Dr. Goldschlag explains that one of ordinary skill in the art could have easily combined Ishiyama's address changing functionality with the security gateway described in Murakawa in light of Ishiyama's tunnel mode operation (i.e., both Murakawa and Ishiyama employ tunnel mode). *See* Ex. 1002 ¶ 67.

We also are not persuaded by Patent Owner's argument that "the security gateway 103 and computer 106 illustrated in Murakawa's Figure 5 could not be combined into the address changing system as of Ishiyama illustrated in Figure 4." PO Resp. 53. In particular, Patent Owner argues "that Ishiyama's security policy databases [("SPDs")] (Figures 8A–8B) and the security association databases [("SADs")] (Figures 9A–9D) would not operate if the components of Murakawa were inserted in place of Ishiyama's correspondent host." *Id.* (citing Ex. 2003 ¶ 148). Contrary to Patent Owner's arguments, however, "it is not necessary that the inventions of the references be physically combinable to render obvious the invention under review." *In re Sneed*, 710 F.2d 1544, 1550 (Fed. Cir. 1983). The relevant inquiry is whether the claimed subject matter would have been obvious to those of ordinary skill in the art in light of the combined teachings of those references. *See In re Keller*, 642 F.2d 413, 425 (CCPA 1981). And, as we find above, one of ordinary skill in the art would have found it obvious to combine Ishiyama's address changing functionality with Murakawa's security gateway and other terminal. This does not mean that Ishiyama's specific SPD and SAD databases are used in that combination, as Patent Owner argues. *In re Nievelt*, 482 F.2d 965, 968 (CCPA 1973) ("Combining the *teachings* of references does not involve an ability to combine their

42

specific structures."); *see also In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012) ("It is well-established that a determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements." (citing *In re Etter*, 756 F.2d 852, 859 (Fed. Cir. 1985) (en banc))). Rather, one of ordinary skill in the art would have "be[en] able to fit the teachings of [Ishiyama and Murakawa] . . . together like pieces of a puzzle" because the skilled artisan is "a person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 420–21. Likewise, we are not persuaded by Patent Owner's example that if a new terminal with a new address was added, "the Ishiyama system would be unable to process messages sent to or received from the new terminal" because the new address would not be found in Ishiyama's SPD. PO Resp. 53–54. Again, combining the teachings of Ishiyama and Murakawa does not involve woodenly combining their specific structures, and does not require using Ishiyama's specific SPD. *Nievelt*, 482 F.2d at 968. And, Murakawa's existing role in addressing packets between terminals (e.g., PC 101 and PC 106) also remains a part of Petitioner's combination. *See, e.g.*, *supra* Section VI(E)(6) (discussing Murakawa's Figure 8, and accompanying text, concerning addressing messages sent between terminals via a security gateway); Pet. 52–53.

Likewise, we are not persuaded by Patent Owner's argument that "Petitioner fails to explain what modifications to Ishiyama's . . . [SPDs and SADs] would be required for Ishiyama to work with security gateway 103 as the opposing endpoint instead of correspondent host 3." PO Sur-Reply 20 (citing Ex. 1004, Figs. 8–9). Again, Ishiyama's specific SPDs and SADs are not part of Petitioner's combination. *In re Nievelt*, 482 F.2d at 968. In

43

IPR2019-00819
Patent 7,620,810 B2

addition, we agree with Petitioner and find that SADs and SPDs are commonplace in IPSec communications, and security gateways are required to have at least "one pair of SADs and one pair of SPDs." *See* Pet. Reply 13 (citing Ex. 1011, 13; Ex. 1019, 89:8–15); *see also* Ex. 1020 ¶ 56.  And, we agree with Petitioner that Ishiyama's description of SPDs and SADs "does not preclude the operation of a security gateway also implementing these components." Pet. Reply 17 (citing Ex. 1020 ¶ 56).  In other words, we find that one of ordinary skill in the art would have understood that the address changing functionality used with Ishiyama's SPDs and SADs also can be used with the SPDs and SADs of a common security gateway configuration, such as described by Murakawa.  *See* Ex. 1011, 13; Ex. 1019, 89:8–15; Ex. 1020 ¶ 56.  Accordingly, we find that one of ordinary skill in the art would have found it obvious to combine the teachings of Ishiyama and Murakawa to provide for Ishiyama's address changing functionality being incorporated into Murakawa's security gateway configuration.  *See KSR*, 550 U.S. at 420–21 (finding the skilled artisan would "be able to fit the teachings of multiple patents together like pieces of a puzzle" because the skilled artisan is "a person of ordinary creativity, not an automaton").  In addition, we find misplaced Patent Owner's focus on Petitioner's use of the word "preclude."  PO Sur-Reply 18 (arguing that Ishiyama "should be interpreted for what it affirmatively teaches as opposed to what it does not 'preclude'") (citation omitted).  In the context of Petitioner's argument, it is clear that Petitioner means that Murakawa's security gateway's SPDs and SADs also can implement Ishiyama's address changing functionality.  *See* Pet. Reply 17 (citing Ex. 1020 ¶ 56).

44

IPR2019-00819
Patent 7,620,810 B2

We also are not persuaded by Patent Owner's argument that "[a] person of ordinary skill in the art would not readily understand how Ishiyama's SA databases could be modified to accommodate Murakawa's components." PO Resp. 54 (citing Ex. 2003 ¶ 148). Nor are we persuaded that "[a] person of ordinary skill would not have a reasonable expectation of success given that there is no explanation as to how the references would be combined and how the resulting system would operate," as Patent Owner argues. *Id.* (citation omitted). Rather, as we find above, combining the teachings of Ishiyama and Murakawa does not require using Ishiyama's specific SA databases. *Nievelt*, 482 F.2d at 968. And, as we find above, one of ordinary skill in the art would and could have easily combined Ishiyama's address changing functionality with the security gateway described in Murakawa. *See* Ex. 1002 ¶ 67.

We also are not persuaded by Patent Owner's argument that "a person of ordinary skill would be taught away from combining Ishiyama and Murakawa." PO Resp. 54. We find that Patent Owner does not cite any portion of Ishiyama that criticizes, discredits, or otherwise discourages combining Ishiyama's mobile address changing functionality with Murakawa's security gateway configuration. *Id.*; *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004) (teaching away requires that a reference "criticize, discredit, or otherwise discourage" investigation into the claimed solution). To the contrary, as we find above, Ishiyama's use of tunnel mode suggests combining its address changing functionality with Murakawa's security gateway configuration. *In re Urbanski*, 809 F.3d 1237, 1243–44 (Fed. Cir. 2016) (finding that there was no teaching away as the prior art references suggested the modification and did not teach that the modified

45

IPR2019-00819
Patent 7,620,810 B2

process would be inoperable).  We also do not credit Dr. Rouskas' testimony as it is contrary to our findings above.  Ex. 2003 ¶ 148.

Lastly, we agree with Patent Owner that only asserting that references "could" be combined may be insufficient.  PO Resp. 53 (citations omitted).  However, as we find above, Petitioner provides persuasive articulated reasoning as to why one of ordinary skill in the art "would" have combined Ishiyama's address changing functionality with Murakawa's security gateway configuration.  Thus, we are not persuaded that Petitioner fails to show sufficient rationale for combining Ishiyama and Murakawa.

Accordingly, for the reasons discussed above, we find that Petitioner provides "some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness."  *See In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) (citations omitted), *cited with approval in KSR*, 550 U.S. at 418.

### 8. *Alleged Security Flaw*

Patent Owner argues in its Sur-Reply[13] that there is "a major security flaw in Ishiyama that would prevent it from ever being used by . . . [one of ordinary skill in the art] as a reference to construct a secure communication system."  PO Sur-Reply 1.  In particular, Patent Owner argues that "the new

---

[13] Petitioner sought our authorization to file a motion to strike Patent Owner's Sur-Reply, or, in the alternative, to file a Sur-Sur-Reply to address the new security flaw argument.  Paper 34, 2.  We denied the request, finding that, as in most cases, we are "capable of identifying new issues . . . when weighing the evidence at the close of trial, and disregarding any new issues . . . that exceeds the proper scope of . . . sur-reply."  *Id.* at 3 (quoting Patent Trial and Appeal Board Consolidated Trial Practice Guide 80 ("Consolidated Practice Guide") (Nov. 2019) (available at https://www.uspto.gov/TrialPracticeGuideConsolidated)).

46

IPR2019-00819
Patent 7,620,810 B2

source address in the outer packet of Ishiyama's . . . request message . . . is unencrypted and sent in the clear." *Id.* Because of this flaw, one of ordinary skill in the art "would never use Ishiyama's outer packet to change the address definition for the mobile device in a secure connection because it could easily be intercepted by a malicious intermediary and manipulated to cause message traffic to be misdirected to an imposter device," according to Patent Owner. *Id.*; *see also id.* at 2–11 (arguing Ishiyama's security flaw defeats Petitioner's unpatentability allegations).

The security flaw argument, however, is new. Nowhere in its Response does Patent Owner make this argument. *See generally* PO Resp.; *see also* Tr. 48:11–25 (Patent Owner admitting that it did not address the security flaw issue in its Response). Furthermore, Patent Owner admits that "[n]either the Reply nor [Petitioner's] expert's supplemental declaration address the security flaw." PO Sur-Reply 5 n.1 (citing Ex. 1020). Accordingly, we do not consider Patent Owner's security flaw argument because it was not made in the Patent Owner Response and is beyond the proper scope of the Sur-Reply, and thus, is waived. *See* Paper 11 (Scheduling Order), 7 ("Patent Owner is cautioned that any arguments for patentability not raised in the response may be deemed waived."); Consolidated Practice Guide 74 (citing 37 C.F.R. § 42.23) ("Generally, a reply or sur-reply may only respond to arguments raised in the preceding brief.").

47

IPR2019-00819
Patent 7,620,810 B2

Additionally, we are not persuaded by Patent Owner's arguments to excuse the waiver.[14]  During the oral hearing, Patent Owner argued that the Petition was unclear as to whether the request message was (i) "the message containing the outer header where the source address of the outer header has been changed from CoA1 to CoA2," as shown in Figure 4 of Ishiyama, or (2) "step 5, the SA gateway update operation, of Figure 7 of Ishiyama." Tr. 47:2–14.  Patent Owner argued that it asked Dr. Goldschlag during his deposition "to elaborate on what [Petitioner]'s position was as to what was the claim's request message." *Id.* at 45:2–4.  According to Patent Owner, "Dr. Goldschlag clarified that the claimed request message was step 5 of Figure 7 at the Ishiyama patent," and not the outer header. *Id.* at 45:4–6, 48:19–49:10.  Patent Owner argued that it did not address the security flaw argument in its Response[15] based on (i) the Petition not clearly identifying that the request message includes the outer header, and (ii) Patent Owner's "reliance on Dr. Goldschlag's testimony that the request message was step 5 and not the outer header." *Id.* at 48:19–49:10.

We are not persuaded by Patent Owner's arguments for either reason. First, as we discuss above, the Petition clearly sets forth that Ishiyama's request message includes the outer packet's source address. *See supra* Section VI(C) (addressing, *inter alia*, Ishiyama's Figure 4 and accompanying text).  For example, the Petition states:

---

[14] We are not suggesting that providing reasons during the oral hearing for why a new argument was made in a Sur-Reply is the appropriate procedural mechanism, if any, to excuse waiver.  Regardless, we address the merits of Patent Owner's reasons here.

[15] Patent Owner argued that it included its security flaw argument in its Sur-Reply in light of Petitioner's Reply, which explains that the request message includes the outer packet. Tr. 47:18–48:7.

IPR2019-00819
Patent 7,620,810 B2

> After the mobile terminal of Ishiyama moves from CoA1 (i.e.[,] *first* address) to CoA2 (i.e., *second* address), Ishiyama further describes the mobile terminal sending a *request message* to the address of the correspondent node (i.e[.], *security gateway*) to change the security association definition from CoA1 to CoA2. This is shown below in Figure 4 (annotated). Specifically, "the mobile computer 2 changes the source address of the outer packet of the encapsulated packet to be transmitted to the IPSEC tunnel by the mobile computer 2 into 'CoA2'…. [T]he encapsulated packet in which the outer packet has the source address ='CoA2' will be transferred." Ishiyama, 8:59–65.

Pet. 35.  Moreover, in our Decision on Institution, when addressing the claimed request message, we noted that:

> Petitioner argues that after changing addresses, mobile computer 2 sends a message (*having CoA2 for its outer packet's source address*) to correspondent host 3 via the IPSec tunnel, requesting that correspondent host 3 update to mobile computer 2's new address. [Pet. 35–37] (citing Ex. 1004, 8:59–65, 11:39–45, 12:66–13:5, Figs. 4, 7).

Dec. on Inst. 29 (emphasis added).  Accordingly, we find that the Petition clearly sets forth that Ishiyama's request message includes the outer packet's source address.

Second, we disagree with Patent Owner that Dr. Goldschlag testified that "the request message is step 5 of Figure 7, *not the outer header of the message in Figure 4*." Tr. 45:10–13 (emphasis added).  In support of its argument, Patent Owner referenced the following deposition testimony during the oral hearing:

> Q [D]o you recall that in the [P]etitioner's analysis of Claim 1, the recited request was allegedly satisfied by the SA gateway update Operation 5 in Figure 7 of Ishiyama?
> A  Right. So I think that was the section that we were just looking through, that Paragraph 74 in my declaration which walks through the address change operation.

49

IPR2019-00819
Patent 7,620,810 B2

Tr. 45:14–18 (quoting Ex. 2008, 219:12–19).[16]  Patent Owner incorrectly focused on only the first word of Dr. Goldschlag's answer — "Right." *Id.* at 45:10–18.  Dr. Goldschlag clearly includes paragraph 74 of his declaration in his answer to the question.  *Id.*  Paragraph 74, *inter alia*, annotates Figure 4 and states that it "depicts the change in the security association definition from CoA1 to CoA2."  Ex. 1002 ¶ 74 (citing Ex. 1004, 8:59–65; annotating Ex. 1004, Fig. 4).  Thus, this deposition testimony clearly does not support that Dr. Goldschlag testified that the request message does not include the outer header of the message or Figure 4's teachings.

Patent Owner also cited additional deposition testimony of Dr. Goldschlag during the oral hearing in support of its argument.  Tr. 45:7–10 (citing Ex. 2008, 219:20–220:4, 228:1–9).  For example, Patent Owner identified the following testimony:

> Q  So is it correct that the request recited in the claim is alleged to correspond to the SA update -- SA gateway update operation, Step 5 of Figure 7 of Ishiyama?
> I can refer you to the petition.
> A  Right. So the SA update operation is in Operation 5 --
> Q  Okay.
> A  -- and that's Paragraph 76 of my declaration.

Ex. 2008, 219:20–220:6.[17]  This passage supports that operation 5 of Figure 7 teaches about the claimed request message, as cited in the Petition.  *See id.*; Pet. 36–37.  It does not exclude, however, the teachings of Figure 4,

---

[16] During the oral hearing, Patent Owner read this question and the first word ("Right.") of Dr. Goldschlag's answer into the record, rather than providing the specific cite.  Tr. 45:14–18.  We here provide Dr. Goldschlag's complete answer to the question posed.

[17] Patent Owner cited only a portion of Dr. Goldschlag's answer (through line 4) to the question posed, but we here provide his answer in its entirety.

and its accompanying text. *See* Ex. 2008, 219:20–220:6. "Fig[ure] 4 is a schematic diagram for explaining operations in the case where the mobile computer changes a connected location in the mobile communication system of Fig[ure] 2" while "Fig[ure] 7 is a sequence chart showing an exemplary processing sequence in the case where the mobile computer initiates communications at a visited site and then changes a location in the mobile communication system of Fig[ure] 2." *Compare* Ex. 1004, 5:11–13, *with id.* at 5:21–24. In other words, Figure 4 and Figure 7 are not mutually exclusive, but rather are complementary in teaching Ishiyama's invention. *Id.* Petitioner cites both figures in support of its arguments that Ishiyama teaches the claimed request message. Pet. 35–37.

Moreover, paragraph 76 of Dr. Goldschlag's declaration (to which he refers in his answer) begins "Ishiyama refers to this operation as an 'SA Gateway Update,'" referring to the previous declaration paragraph 75. Ex. 1002 ¶ 76. Paragraph 75 recites that "[t]he mobile computer 2 changes the source address of the outer packet of the encapsulated packet to be transmitted to the IPSEC tunnel by the mobile computer 2 into 'CoA2'" and that "the encapsulated packet in which the outer packet has the source address ='CoA2' will be transferred." Ex. 1002 ¶ 75 (citing Ex. 1004, 8:59–65). Thus, this deposition testimony clearly does not exclude the outer packet from the request message. Ex. 2008, 219:20–220:6. Likewise, the third passage of deposition testimony cited by Patent Owner does not exclude the outer header from the request message, but simply discusses Figure 7's teachings. Ex. 2008, 228:1–9.

Lastly, we provide the following example from Dr. Goldschlag's deposition testimony, which Patent Owner did not cite during the oral

51

IPR2019-00819
Patent 7,620,810 B2

hearing but which provides further context for the cited testimony, where Dr.

Goldschlag testified that the request message included the teachings of

Figure 4.

> Q  And in the claim, it indicates that the request is sent from the mobile terminal to the security gateway, and you've mapped that to Operation 5 in Figure 7[?]
> A  Which is also from the mobile terminal to the security gateway, right. And if you go back to it picture, right, there is that IPsec tunnel. If you go back to Figure 4, if you don't mind.
> Q  Let's just stick with Figure 7, please.
> A  But Figure 4 will help sort of illustrate it. The mobile computer has a tunnel, and one of the purposes of the change of address is to use the same SA for the new tunnel, so it uses the new tunnel and it sends those messages over that tunnel.

Ex. 2008, 229:19–230:10.

In summary, Dr. Goldschlag's deposition testimony, taken as a whole, does not support a finding that Dr. Goldschlag stated that the request message excludes Figure 4's teachings and the use of the outer header's source address.  Ex. 2008, 219:12–220:6, 228:1–9.

Additionally, we are not persuaded by Patent Owner's argument that "Petitioner was aware of the security flaw (see March 20, 2020, deposition of Dr. Rouskas) well in advance of the Reply (filed April 1, 2020)" and chose not to address it in its Reply.  PO Sur-Reply 5 n.1; *see also* Tr. 49:24–50:6.  Again, Patent Owner does not address the security flaw argument in its Response.  *See generally* PO Resp.  Thus, Petitioner correctly did not address the security flaw argument in its Reply because doing so would have been beyond the proper scope of the Reply.  *See* 37 C.F.R. § 42.23(b) ("A reply may only respond to arguments raised in the corresponding . . . patent owner response."); Consolidated Practice Guide 74.

52

IPR2019-00819
Patent 7,620,810 B2

Lastly, Patent Owner certainly was aware of its security flaw argument at least as early as March 20, 2020 when Patent Owner's expert, Dr. Rouskas, was deposed. During this deposition, Patent Owner on redirect extensively questioned Dr. Rouskas on Ishiyama's alleged security flaw. *See* Ex. 1019, 184:6–197:22. This occurred more than ten days before Petitioner filed its Reply on April 1, 2020. Nonetheless, Patent Owner did not seek our authorization to supplement its Response (with a showing of good cause) during that more than ten day period or afterwards.

## VII. ALLEGED OBVIOUSNESS OVER ISHIYAMA, MURAKAWA, AND AHONEN

Petitioner argues that the combination of Ishiyama, Murakawa, and Ahonen renders claims 2 and 3 obvious. Pet. 59–66. Claims 2 and 3 depend from independent claim 1, and thus, incorporate claim 1's limitations. Ex. 1001, 11:9–15. We determine above that the combination of Ishiyama and Murakawa fails to teach a limitation of independent claim 1. In addition, the Petition does not present any information with respect to dependent claims 2 and 3 that addresses the deficiencies discussed above regarding independent claim 1. Pet. 59–66. Thus, Petitioner has not demonstrated by a preponderance of the evidence that claims 2 and 3 of the '810 patent would have been obvious to one of ordinary skill in the art in view of Ishiyama, Murakawa, and Ahonen.

## VIII. ALLEGED OBVIOUSNESS OVER ISHIYAMA, MURAKAWA, AND FORSLÖW

Petitioner argues that the combination of Ishiyama, Murakawa, and Forslöw renders claim 6 obvious. Pet. 66–69. Claim 6 depends from independent claim 1, and thus, incorporates claim 1's limitations. Ex. 1001, 11:23–24. We determine above that the combination of Ishiyama and

53

IPR2019-00819
Patent 7,620,810 B2

Murakawa fails to teach a limitation of independent claim 1. In addition, the Petition does not present any information with respect to dependent claim 6 that addresses the deficiencies discussed above regarding independent claim 1. Pet. 66–69. Thus, Petitioner has not demonstrated by a preponderance of the evidence that claim 6 of the '810 patent would have been obvious to one of ordinary skill in the art in view of Ishiyama, Murakawa, and Forslöw.

IX.    CONCLUSION[18]

Based on the full record before us, we determine that Petitioner has not demonstrated by a preponderance of the evidence that claims 1–6 of the '810 patent are unpatentable under 35 U.S.C. § 103(a) for any of the asserted grounds. We also determine that Petitioner has demonstrated by a preponderance of the evidence that claim 7 of the '810 patent is unpatentable under 35 U.S.C. § 103(a) over Ishiyama and Murakawa.

| Claim(s) | 35 U.S.C § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 4, 5, 7, | 103(a) | Ishiyama, Murakawa | 7 | 1, 4, 5 |
| 2, 3 | 103(a) | Ishiyama, Murakawa, Ahonen | | 2, 3 |

---

[18] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

54

IPR2019-00819
Patent 7,620,810 B2

| 6 | 103(a) | Ishiyama, Murakawa, Forslöw | | 6 |
|---|---|---|---|---|
| **Overall Outcome** | | | 7 | 1–6 |

## X.    ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, pursuant to 35 U.S.C. § 314(a), Petitioner has not shown by a preponderance of the evidence that claims 1–6 of the '810 patent are unpatentable;

FURTHER ORDERED that Petitioner has shown by a preponderance of the evidence that claim 7 of the '810 patent is unpatentable; and

FURTHER ORDERED that parties to the proceeding seeking judicial review of this Final Written Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

55

IPR2019-00819
Patent 7,620,810 B2

PETITIONER:

Michael D. Specht
Daniel S. Block
Timothy L. Tang
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
mspecht-ptab@sternekessler.com
dblock-ptab@sternekessler.com
ttang-ptab@sternekessler.com


PATENT OWNER:

James T. Carmichael
Stephen Schreiner
CARMICHAEL IP LAW, PLLC
jim@carmichaelip.com
schreiner@carmichaelip.com


Christopher J. Lee
Richard B. Megley
Brian E. Haan
Ashley E. LaValley
LEE SHEIKH MEGLEY & HAAN LLC
clee@leesheikh.com
rmegley@leesheikh.com
bhaan@leesheikh.com
alavalley@leesheikh.com


Kenneth J. Weatherwax
Patrick Maloney
Jason C. Linger
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com
linger@lowensteinweatherwax.com

56

57

Trials@uspto.gov                                    Paper 37
Tel: 571-272-7822                    Entered: September 24, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.,
Petitioner,

v.

MPH TECHNOLOGIES OY,
Patent Owner.

———————————

IPR2019-00820
Patent 7,937,581 B2

———————————

Before KAMRAN JIVANI, JOHN D. HAMANN, and
STACY B. MARGOLIES, *Administrative Patent Judges.*

HAMANN, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2019-00820
Patent 7,937,581 B2

## I.    INTRODUCTION

In this *inter partes* review, instituted pursuant to 35 U.S.C. § 314, Apple Inc. ("Petitioner") challenges the patentability of claims 1–9 ("the challenged claims") of U.S. Patent No. 7,937,581 B2 (Ex. 1001, "the '581 patent"), owned by MPH Technologies Oy ("Patent Owner").  We have jurisdiction under 35 U.S.C § 6.  This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

For the reasons discussed herein, we determine that Petitioner has shown by a preponderance of the evidence that claims 1–3, 5, and 9 are unpatentable, but Petitioner has not shown by a preponderance of the evidence that claims 4 and 6–8 are unpatentable.

## II.    BACKGROUND

### A. Procedural History

Petitioner filed a Petition requesting *inter partes* review of the challenged claims of the '581 patent.  Paper 2 ("Pet.").  The Petition is supported by the Declaration of David Goldschlag, Ph.D. (Ex. 1002).  Patent Owner filed a Preliminary Response.  Paper 8.

We instituted *inter partes* review of all of the challenged claims of the '581 patent on all of the grounds raised in the Petition.  Paper 10 ("Dec. on Inst."), 7, 42.  As to this Decision on Institution, Patent Owner filed a Request for Rehearing, and requested review by the Precedential Opinion Panel ("POP").  Paper 12; Ex. 3001.  Patent Owner's request for POP review was denied, and we subsequently denied Patent Owner's Request for Rehearing.  Papers 16, 24.

Patent Owner filed a replacement Response to the Petition.  Paper 23 ("PO Resp.").  The Response is supported by the Declaration of Professor

IPR2019-00820
Patent 7,937,581 B2

George N. Rouskas, Ph.D. (Ex. 2009). Petitioner filed a Reply to Patent Owner's Response. Paper 26 ("Pet. Reply"). The Reply is supported by an additional Declaration of David Goldschlag, Ph.D. (Ex. 1022). Patent Owner filed a Sur-Reply to Petitioner's Reply. Paper 29 ("PO Sur-Reply").

An oral hearing was held on June 25, 2020. A transcript of the oral hearing is included in the record. Paper 36 ("Tr.").

### B. Related Matter

The parties identify *MPH Techs. Oy v. Apple Inc.*, No. 5:18-cv-05935-PJH (N.D. Cal.), as a matter that may affect or would be affected by a decision in this proceeding. Pet. 2–3; Paper 7, 1. The parties also identify, as a related matter, *Apple Inc. v. MPH Techs. Oy*, IPR2019-00819 (PTAB), involving U.S. Patent No. 7,620,810, which is the parent of the '581 patent. Pet. 2–3; Paper 7, 1.

### C. The Challenged Patent (Ex. 1001)

The '581 patent relates to "secur[ing] mobile connections in telecommunication networks." Ex. 1001, 1:15–16. In particular, the '581 patent describes reducing the handover latency and computational overhead for secure connections, such as those employing Internet Protocol ("IP") Security ("IPSec") with mobile terminals[1] (i.e., terminals that can move from one network to another). *Id.* at 1:15–16, 1:59–66, 4:12–35, 6:42–44, 7:23–37, 10:31–39.

---

[1] The '581 patent discloses that "the term[s] mobility and mobile terminal do[] not only mean physical mobility, . . . [but also] mean[] moving from one network to another, which can be performed by a physically fixed terminal as well." Ex. 1001, 4:31–35.

3

IPR2019-00820
Patent 7,937,581 B2

IPSec comprises a set of rules defined by the Internet Engineering Task Force ("IETF") to "provide[] the capability to secure communications between arbitrary hosts," according to the '581 patent. *Id.* at 1:59–66, 2:5, 2:8–12. The '581 patent states that these rules describe, *inter alia*, providing "access control based on the distribution of cryptographic keys." *Id.* at 2:13–22. The '581 patent also describes the concept of a Security Association ("SA"), which according to the '581 patent is "a one-way relationship between a sender and a receiver that offers [negotiated] security services to the traffic carried on it." *Id.* at 2:24–26.

The '581 patent discloses that IPSec supports two modes of operation (i.e., transport mode and tunnel mode). *Id.* at 3:6–7. "Typically, transport mode is used for end-to-end communication between two hosts." *Id.* at 3:14–15. "Tunnel mode . . . is generally used for sending messages through more than two components," such as "when one or both ends of a SA is a security gateway, such as a firewall or a router that implements IPSec." *Id.* at 3:19–24.

"IPSec is intended to work with static network topolog[ies]," according to the '581 patent. *Id.* at 4:14–15. For example, IPSec can secure communications between hosts across a local area network ("LAN"), as well as across a private or public wide area network ("WAN"). *Id.* at 1:59–61. Figure 1, shown below, "illustrates an example of a telecommunication network to be used in the invention" of the '581 patent. *Id.* at 8:37–38.

4

IPR2019-00820
Patent 7,937,581 B2



## FIG. 1

Figure 1 depicts an example telecommunication network comprising "computer 1 . . . and computer 2[,] a destination computer, to which the secure messages are sent . . . by means of an IPSec tunnel established between computer 1 and computer 2." *Id.* at 8:50–55. The '581 patent adds: "Computer 2 [can] be a security gateway for a third computer 3. Then, the messages sent from computer 2 to computer 3 are sent in plaintext." *Id.* at 8:55–57.

The '581 patent discloses that in forming an IPSec tunnel under IPSec's default automated key management protocol (i.e., the Internet Key Exchange ("IKE") protocol), "the tunnel endpoints are fixed and remain constant." *Id.* at 4:2–7, 4:15–20. The '581 patent adds: "If IPSec is used with a mobile host, the IKE key exchange will have to be redone from every new[ly] visited network. This is problematic, because IKE key exchanges involve computationally expensive" calculations and require exchanging numerous messages between the endpoints, leading to higher latency. *Id.* at 4:18–29.

To address these problems, the '581 patent discloses avoiding a full re-negotiation between the tunnel endpoints, when computer 1 moves

5

IPR2019-00820
Patent 7,937,581 B2

networks. *E.g.*, *id.* at 9:22–33 (describing prior art requires a full re-negotiation), 9:60–63. More specifically, the '581 patent discloses initially establishing an IPSec tunnel between computer 1 (address A) and computer 2 (address X) using IKE, as in the prior art. *Id.* at 9:44–59, Fig. 5 (illustrating steps 1a–9a for setting up the tunnel); *compare id.* at Fig. 5, *with id.* at Fig. 4 (showing the same nine steps as the prior art solution); *see also id.* at 9:1–28 (describing the prior art IKE establishment of the tunnel).

The '581 patent discloses that, when computer 1 moves from address A to address B, computer 1 sends from its new address (address B) to computer 2 (address X) at the other end of the established IPSec tunnel, a request for computer 2 to register its new address. *Id.* at 9:60–66. According to the '581 patent, this request can be "encrypted and/or authenticated . . . us[ing] the same IPSec SA [that is used] for protecting both data and registration traffic." *Id.* at 10:1–5.

The '581 patent thus discloses that the tunnel's IPSec SA is carried over to the new connection point, and computer 1 can send IPSec-protected messages to computer 2 after sending the request, which "essentially makes the handover latency zero." *Id.* at 10:8–16, 10:31–34. "[T]he exact method of signalling is not important[;] the essence is to carry over the IPSec SA to the new connection point." *Id.* at 10:8–10.

### D. The Challenged Claims

Petitioner challenges claims 1–9 of the '581 patent, of which claims 1 and 9 are independent. Claim 1 is illustrative of the challenged claims and is reproduced below:

> 1. A method for ensuring secure forwarding of a message in a telecommunication network, having at least one mobile terminal

6

IPR2019-00820
Patent 7,937,581 B2

and another terminal and a security gateway therebetween, the method comprising:

a) establishing a secure connection having a first address of the mobile terminal as a first end-point and a gateway address of the security gateway as a second end-point,

b) the mobile terminal changing from the first address to a second address,

c) while at the second address, the mobile terminal sending a request message to the gateway address of the security gateway to request the security gateway to change the secure connection to be defined between the second address and the gateway address of the security gateway,

in response to the request message from the mobile terminal, the security gateway changing an address definition of the secure connection from the first address to the second address, and

the mobile terminal sending a secure message in the secure connection from the second address of the mobile terminal to the other terminal via the security gateway.

Ex. 1001, 10:50–11:3.

### E. Instituted Grounds of Unpatentability

We instituted trial based on the following grounds of unpatentability, which are all the grounds of unpatentability raised in the Petition:

| | References | Basis[2] | Challenged Claim(s) |
|---|---|---|---|
| 1. | Ishiyama,[3] Murakawa[4] | § 103(a) | 1, 2, 4, 6, 7, 9 |
| 2. | Ishiyama, Murakawa, Ahonen[5] | § 103(a) | 3, 5 |

---

[2] The Leahy-Smith America Invents Act ("AIA") included revisions to 35 U.S.C. § 103 that became effective on March 16, 2013. Because the '581 patent issued from an application filed before March 16, 2013, we apply the pre-AIA version of the statutory basis for unpatentability.

[3] U.S. Patent No. 6,904,466 B1 (issued June 7, 2005) (Ex. 1004).

[4] U.S. Patent No. 7,028,337 B2 (issued Apr. 11, 2006) (Ex. 1005).

[5] U.S. Patent No. 6,976,177 B2 (issued Dec. 13, 2005) (Ex. 1006).

7

IPR2019-00820
Patent 7,937,581 B2

| 3. | Ishiyama, Murakawa, Forslöw[6] | § 103(a) | 8 |
|----|-------------------------------|----------|---|

Pet. 4, 11–64.

## III.    LEVEL OF ORDINARY SKILL IN THE ART

To determine whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention. *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). In assessing the level of ordinary skill in the art, various factors may be considered, including the "type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field." *In re GPAC, Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995) (citing *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986)). "[O]ne or more factors may predominate." *Id.*

In our Decision on Institution, we adopted Petitioner's proposed definition for one having ordinary skill in the art at the time of the invention of the '581 patent as one who "would have had a B.S. degree in Computer Engineering, Electrical Engineering, or an equivalent field, as well as at least 3–5 years of academic or industry experience in the Internet security industry." Pet. 11 (citing Ex. 1002 ¶¶ 20–21). Patent Owner does not dispute our adoption of Petitioner's definition, nor otherwise address the level of ordinary skill at the time of the invention of the '581 patent. *See generally* PO. Resp.

Because Petitioner's definition of the level of skill in the art is consistent with the '581 patent and the asserted prior art, we maintain

---

[6] U.S. Patent No. 6,954,790 B2 (issued Oct. 11, 2005) (Ex. 1007).

8

Petitioner's definition for purposes of this Final Written Decision. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *GPAC*, 57 F.3d at 1579; *In re Oelrich*, 579 F.2d 86, 91 (CCPA 1978). We apply Petitioner's definition in our analysis below.

## IV. CLAIM CONSTRUCTION

Because the Petition was filed after November 13, 2018, we construe the challenged claims by applying "the standard used in federal courts, in other words, the claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. [§] 282(b), which is articulated in *Phillips* [*v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc)]." *See* Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board, 83 Fed. Reg. 51,340, 51,340, 51,358, 51,343–44 (Oct. 11, 2018) (amending 37 C.F.R. § 42.100(b) effective November 13, 2018) (now codified at 37 C.F.R. § 42.100(b) (2019)). Under *Phillips*, the words of a claim are generally given their "ordinary and customary meaning," which is the meaning they would have to a person of ordinary skill in the art at the time of the invention, in light of the specification and prosecution history. *See Phillips*, 415 F.3d at 1312–13.

Petitioner does not submit any terms for construction. Pet. 11 (arguing that "[a]ll claim terms of the '581 patent should receive their ordinary and customary meaning"). Patent Owner submits the term "security gateway" for construction, and argues that its meaning is in dispute. PO Resp. 10–24. To show a dispute, Patent Owner quotes from our Decision on Institution where we preliminarily found that (i) "Petitioner argues that one of ordinary skill in the art would have understood that Ishiyama's 'correspondent [host]' would be a security gateway," and

9

IPR2019-00820
Patent 7,937,581 B2

(ii) "there [wa]s sufficient support in the [preliminary] record that
Ishiyama's correspondent host is a security gateway." PO Resp. 10–11
(citing Dec. on Inst. 26, 34). Patent Owner argues "[t]hus, the claim
construction dispute in this proceeding is whether a correspondent host is a
'security gateway.'" *Id.* at 11.

For our analysis below, however, we do not rely on Petitioner's
arguments that Ishiyama's correspondent host is a security gateway. Rather,
we consider Petitioner's alternative argument[7] that Murakawa teaches a
security gateway. Thus, we conclude that no express claim construction is
necessary to determine whether Petitioner has shown by a preponderance of
evidence that the challenged claims are unpatentable. *See, e.g.*, *Nidec Motor
Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed.
Cir. 2017) (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d
795, 803 (Fed. Cir. 1999)) ("[W]e need only construe terms 'that are in
controversy, and only to the extent necessary to resolve the controversy.'").

V.    PRINCIPLES OF LAW

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences
between the claimed subject matter and the prior art are such that the subject
matter, as a whole, would have been obvious at the time of the invention to a
person having ordinary skill in the art. *KSR Int'l Co. v. Teleflex, Inc.*, 550
U.S. 398, 406 (2007). The question of obviousness is resolved on the basis
of underlying factual determinations, including (1) the scope and content of

---

[7] "Petitioner alternatively relies on Ishiyama's teachings combined with
Murakawa's teachings of a 'security gateway configuration' (e.g., 'a security
gateway' and 'another terminal'/'other terminal'") for disclosing claim 1."
Dec. on Inst. 25; *see also* Pet. 11–53.

10

IPR2019-00820
Patent 7,937,581 B2

the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of non-obviousness, if present.[8]  *See Graham*, 383 U.S. at 17–18.  When evaluating a claim for obviousness, we also must "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue."  *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).

VI.    ALLEGED OBVIOUSNESS OVER ISHIYAMA AND MURAKAWA

Petitioner argues that the combination of Ishiyama and Murakawa renders claims 1, 2, 4, 6, 7, and 9 of the '581 patent obvious under 35 U.S.C. § 103(a).  Pet. 11–53.  We have reviewed the parties' arguments and the evidence of record.  For the reasons that follow, we determine that Petitioner (1) shows by a preponderance of the evidence that claims 1, 2, and 9 would have been obvious to one of ordinary skill in the art in view of Ishiyama and Murakawa; and (2) fails to show by a preponderance of the evidence that claims 4, 6, and 7 would have been obvious to one of ordinary skill in the art in view of Ishiyama and Murakawa.

*A.  Summary of Ishiyama*

Ishiyama relates to improving a mobile computer's "capab[ility] of carrying out communications while moving among a plurality of inter-connected networks."  Ex. 1004, 1:9–11.  In furtherance of this mobility, Ishiyama discloses having the mobile computer notify its correspondent host (i.e., the host at the other end of a communication) of its new address when

---

[8] Patent Owner does not present arguments or evidence of such objective evidence of non-obviousness in its Response.  *See generally* PO Resp.

IPR2019-00820
Patent 7,937,581 B2

the mobile computer moves networks. *E.g.*, *id.* at 3:43–67, 6:13–18, 15:37–16:10. The mobile computer makes this notification by changing the source address of an outer packet of an encapsulated packet to the mobile computer's new address before sending the packet to the correspondent host. *Id.* When the correspondent host receives the packet from the mobile computer, the correspondent host detects the address change and updates its stored information to reflect the new address for the mobile computer. *E.g.*, *id.* at 3:9–14.

Figure 4, shown below, is a schematic diagram illustrating a mobile computer changing locations in an exemplary configuration of a mobile communication system, in accordance with an embodiment of Ishiyama's invention. *Id.* at 5:5–7, 5:11–13.

## FIG. 4



Figure 4 "shows an exemplary situation in which a packet is transferred from mobile computer 2 to . . . correspondent host 3 using [an] IPSEC tunnel." *Id.* at 8:33–35. Initially, mobile computer 2 communicates with correspondent host 3 via an IPSec tunnel, with mobile computer 2's

12

IPR2019-00820
Patent 7,937,581 B2

address (CoA1) indicating its endpoint of the tunnel. *Id.* at 8:43–49. In other words, "mobile computer 2 transmits an encapsulated packet in which the outer packet has the source address='CoA1' and the destination address='CN.'" *Id.* at 8:50–54. As shown, when mobile computer 2 moves, its address changes from CoA1 to CoA2. *Id.* at 8:55–58, Fig. 4 (showing that mobile computer 2 moves networks). To convey this change, mobile computer 2 changes the source address of the outer packet to CoA2 and transmits the packet to correspondent host 3 via the IPSec tunnel. *Id.* at 8:59–63, Fig. 4. Correspondent host 3 detects this change in mobile computer 2's address, and replaces the CoA1 address with CoA2 in its database for the IPSec tunnel. *Id.* at 8:66–9:4; *see also id.* at Figs. 9B, 9D (showing the update of the address in correspondent host 3's SA database), 12:51–59. Ishiyama discloses that the other SA information "remain[s] unchanged, so that there is no need to re-negotiate keys for IPS[ec] encryption and authentication." *Id.* at 9:5–10.

### B.  Summary of Murakawa

Murakawa relates to allowing a PC outside a LAN to be virtually regarded as a PC on the LAN and communicate with a terminal on the LAN. Ex. 1005, 1:16–24, 3:62–65. Specifically, Murakawa discloses allowing an outside terminal to communicate (via a WAN, a security gateway, and a LAN) with a terminal on the LAN. *Id.* at 1:11–24, 3:61–4:16.

Petitioner's annotated version of Murakawa's Figure 5, which illustrates a "prior art typical network system," *id.* at 4:32–33, is shown below.

13

IPR2019-00820
Patent 7,937,581 B2



FIG. 5   PRIOR ART

Murakawa's Figure 5 above shows a "prior art typical network system" and is further annotated by Petitioner to add labels for a mobile terminal, security gateway, and other terminals.  Pet. 28.  According to Murakawa, Figure 5 "is a block diagram of a typical network system including a WAN."  Ex. 1005, 1:51–53.  As shown in Figure 5, the network system includes "PC 101 [(labeled by Petitioner as 'Mobile Terminal')], which is located outside . . . LAN [104 and] establish[es] a dialup connection to the provider, WAN 102, and security gateway 103 [(labeled by Petitioner as 'Security Gateway')] that connects WAN 102 and LAN 104."  *Id.* at 1:54–58.  In addition, "LAN 104[,] being subjected to security gateway 103[,] includes . . . client PCs 106, 107" (labeled by Petitioner as "Other Terminals").  *Id.* at 1:59–60.  Also shown is virtual private network ("VPN") 108, which is established between PC 101 and security gateway 103 to perform IPSec communication.  *Id.* at 1:61–63.  Murakawa discloses

14

IPR2019-00820
Patent 7,937,581 B2

that this network system ensures safe communications between PC 101 and the terminals on LAN 104. *Id.* at 2:1–4.

### C. Challenged Claim 1

Claim 1 is an independent claim. Petitioner combines Ishiyama and Murakawa in two alternative ways in arguing that claim 1 would have been obvious to one of ordinary skill in the art. *See* Pet. 11–47; Dec. on Inst. 25, 38–39 (noting the two alternative ways). Below we address Petitioner's second way of combining Ishiyama and Murakawa (i.e., combining Ishiyama's address changing functionality with Murakawa's security gateway and another terminal)). In other words, Petitioner combines Ishiyama's "address updating for a mobile terminal operating in the IPSec tunneling mode" with "Murakawa's . . . security gateway configuration" for "tunneling of communications through a security gateway so that two terminals are able to communicate." *E.g.*, Pet. 20 (citing Ex. 1004, 7:46–49; Ex. 1005, 4:13–16; Ex. 1002 ¶ 61). For that combination, we find that Petitioner demonstrates by a preponderance of the evidence that claim 1 would have been obvious to one of ordinary skill in the art. Because of this finding, we do not reach the parties' arguments concerning the first way Petitioner combines Ishiyama and Murakawa. For example, we do not reach whether Ishiyama teaches that its correspondent host is a security gateway.

### 1. Preamble

Claim 1's preamble recites "[a] method for ensuring secure forwarding of a message in a telecommunication network, having at least one mobile terminal and another terminal and a security gateway therebetween." Ex. 1001, 10:50–53. We agree with Petitioner and find that the combination of Ishiyama and Murakawa teaches claim 1's preamble.

15

Pet. 20–26.  As we find that Ishiyama and Murakawa teach the preamble, we need not determine whether the preamble is limiting.

As to Ishiyama, we agree with Petitioner that Ishiyama teaches "a mobile communication scheme capable of easily changing a connected location of a mobile computer on [an] IP network." Ex. 1004, 2:42–45; Pet. 21.  More specifically, we find that Ishiyama teaches using care-of addresses ("CoA") for a "mobile computer 2 [that] always uses the IPSEC in the tunnel mode at a time of making a connection to the correspondent host 3." Ex. 1004, 7:66–67, 11:9–16; Pet. 21.

As to Murakawa, we agree with Petitioner and find that Murakawa teaches forwarding messages received from a terminal at a security gateway located between the terminal and another terminal. *E.g.*, Ex. 1005, Fig. 5; Pet. 24 (annotating Ex. 1005, Fig. 5).  As illustrated in Figure 5, Murakawa discloses that PC 101 establishes an IPSec tunnel (VPN 108), with security gateway 103.  Ex. 1005, 1:61–63, 2:62–65, Fig. 5; Pet. 24–25.  Murakawa's security gateway 103 connects to PC 106 and PC 107.  Ex. 1005, 1:59–60.  We agree with Petitioner and find that either PC 106 or PC 107 is the claimed another terminal.  *Id.* at 1:61–2:4, Fig. 5; *see also* Pet. 24–25 (annotating Ex. 1005, Fig. 5 (labeling PC 106 and PC 107 "Other Terminals")).  We find that Murakawa's network system allows for PC 101 and another terminal (e.g., PC 106 or PC 107) to communicate securely via security gateway 103.  Ex. 1005, 1:64–2:4, Fig. 5; Pet. 24–25.

Lastly, we are not persuaded by Patent Owner's arguments that "[i]ncorporating Murakawa's security gateway 103 into Ishiyama does not fill in the missing limitation of the '[an]other terminal' because no host computer has been incorporated from Murakawa."  PO Resp. 49; *see also id.*

16

at 45 (explaining that the claim recites "another terminal" and "other terminal"). Put differently, Patent Owner argues that "Petitioner's modification of Ishiyama by Murakawa does not explain how the combination provides the recited 'other terminal.'" *Id.* (citing Ex. 2009 ¶¶ 143–144). To the contrary, Petitioner argues that "Murakawa describes the forwarding of messages at a security gateway located between a mobile terminal and other terminals." Pet. 24. Petitioner then proceeds to describe Murakawa's Figure 5, and to identify Murakawa's PC 106 and PC 107 as other terminals. *See id.* at 24–25 (citing Ex. 1005, 1:59–63; annotating Ex. 1005, Fig. 5 (labeling PC 106 and PC 107 "Other Terminals")). Thus, we disagree with Patent Owner that "no host computer has been incorporated from Murakawa." PO Resp. 49.

In summary, we find combining Ishiyama's mobile address changing functionality with Murakawa's security gateway and another terminal teaches "[a] method for ensuring secure forwarding of a message in a telecommunication network, having at least one mobile terminal and another terminal and a security gateway therebetween."

### 2. *Establishing a Secure Connection*

Claim 1 further recites "establishing a secure connection having a first address of the mobile terminal as a first end-point and a gateway address of the security gateway as a second end-point." Ex. 1001, 10:54–56. We agree with Petitioner that the combination of Ishiyama and Murakawa teaches this limitation. Pet. 26–30. We find that Ishiyama teaches that mobile computer 2 first establishes an IPSec tunnel between its first address (CoA1) and correspondent host 3's address (CN). Ex. 1004, 8:25–26, 8:36–38, 8:43–47, 8:50–53, 11:9–17, 12:3–5, Fig. 4; Pet. 26–27. Furthermore,

17

IPR2019-00820
Patent 7,937,581 B2

Ishiyama teaches that the IPSec tunnel is defined by, *inter alia*, the addresses of mobile computer 2 and correspondent host 3.  Ex. 1004, 12:9–12, 12:51–59; Figs. 9A, 9B; Pet. 28–29.

In addition, we agree with Petitioner and find that Murakawa teaches a security gateway.  Ex. 1005, 1:59–2:4, 2:62–65, 4:13–16, Fig. 5; Pet. 18–19, 24–25 (citing Ex. 1005, Fig. 5) (annotating the figure with "Security Gateway").  Moreover, Murakawa teaches establishing a secure connection between a terminal (PC 101) and the security gateway.  Ex. 1005, 1:61–63 ("[I]n order to perform the IPsec communication, VPN 108 is established between PC 101 and security gateway 103."), Fig. 5.

In summary, we find combining Ishiyama's mobile address changing functionality with Murakawa's security gateway and another terminal teaches "establishing a secure connection having a first address of the mobile terminal as a first end-point and a gateway address of the security gateway as a second end-point."

### 3. *Mobile Terminal Changing Addresses*

Claim 1 further recites "the mobile terminal changing from the first address to a second address."  Ex. 1001, 10:57–58.  We agree with Petitioner and find that Ishiyama teaches that after the IPSec tunnel has been established, Ishiyama's mobile computer 2 moves networks, moving from a first address (CoA1) to a second address (CoA2).  *See, e.g.*, Ex. 1004, 8:55–57, Fig. 4; Pet. 30.  This is depicted in Ishiyama's Figure 4, as annotated by Petitioner, where mobile terminal 2 moves from its first location (dashed red box corresponding to CoA1) to its second location (solid red box corresponding to CoA2).  *See* Pet. 30 (annotating Ex. 1004, Fig. 4).

18

IPR2019-00820
Patent 7,937,581 B2

Based on Ishiyama's teachings, we find that the combination of Ishiyama and Murakawa teaches "the mobile terminal changing from the first address to a second address."

### 4. *While at the Second Address*

Claim 1 further recites "while at the second address, the mobile terminal sending a request message to the gateway address of the security gateway to request the security gateway to change the secure connection to be defined between the second address and the gateway address of the security gateway." Ex. 1001, 10:59–63. We agree with Petitioner that the combination of Ishiyama and Murakawa teaches this limitation. Pet. 31–33.

First, we agree with Petitioner and find that Ishiyama teaches that after a mobile terminal moves from a first address (CoA1) to a second address (CoA2), the mobile terminal sends a *request message* to the address of the correspondent host to change the security association definition from CoA1 to CoA2. Ex. 1004, 8:59–65; Pet. 31. Specifically, Ishiyama teaches that "the mobile computer 2 changes the source address of the outer packet of the encapsulated packet to be transmitted to the IPSEC tunnel by the mobile computer 2 into 'CoA2.'" Ex. 1004, 8:59–62; Pet. 31. We agree with Petitioner that Ishiyama teaches that "the encapsulated packet in which the outer packet has the source address ='CoA2' will be transferred." Ex. 1004, 8:63–65; Pet. 31. This is shown in Ishiyama's Figure 4, shown below as annotated in the Petition. *See* Pet. 31 (providing annotated Figure 4).

19

IPR2019-00820
Patent 7,937,581 B2

FIG. 4



Annotated Figure 4 "is a schematic diagram for explaining operations in the case where the mobile computer changes a connected location in the mobile communication system" with (i) a dotted-line red box around mobile computer 2 at its first location, (ii) a solid-line red box around mobile computer 2 at its second location, (iii) a solid-line green box around correspondent host 3, (iv) a "Mobile Terminal" label for each mobile computer 2 location, and (v) a "Security Gateway" label for correspondent host 3. Ex. 1004, 5:11–13; Pet. 31 (annotating Ex. 1004, Fig. 4). Ishiyama's Figure 4 illustrates that after the mobile computer 2 moves to a second address, a request message is sent from mobile computer 2 to correspondent host 3, with the request message illustrated as a rectangle (with "src: Haddr" and "dst: CN" labels) depicting the encapsulated packet, surrounded by a larger rectangle, depicting the outer packet (with "src: CoA2" and "dst: CN" labels). Ex. 1004, Fig. 4, 8:59–65; Pet. 35–36. Thus, Ishiyama teaches the entire transmitted packet comprises the request message. *Id.* at 8:59–65, Fig. 4. This finding is consistent with Petitioner's arguments made during the oral hearing that Ishiyama's entire transmitted packet (i.e., the

20

IPR2019-00820
Patent 7,937,581 B2

encapsulated packet plus the outer packet, which has the changed source address) is the claimed request message. *See, e.g.*, Tr. 27:23–28:4, 29:10–17, 30:3–11, 34:14–35:1, 40:12–14, 65:8–67:7.

Second, we agree with Petitioner and find that Ishiyama teaches that the "[r]equest [is] for changing the security association to the correspondent [host]" as part of mobile computer 2 performing a SA Gateway Update. Pet. 32 (quoting Ex. 1004, 11:39–40); Ex. 1004, 11:39–46. More specifically, Ishiyama teaches that mobile computer 2's "request [is] to change the previous CoA used as the destination in the security association into the current CoA." Ex. 1004, 11:43–45; *see also* Pet. at 32 (annotating Ex. 1004, Fig. 7; citing Ex. 1004, 12:54–57 (arguing that "[t]he SA Gateway Update operation is depicted as operation (5) in Figure 7")). In other words, Ishiyama teaches that the request message is sent to request that the correspondent host change the secure connection so as to be defined between the mobile computer's second address and the address of the correspondent host. *See, e.g.*, Ex. 1004, 11:39–45, 12:54–60, Fig 7; Pet. 32. "As a result of these operations, at the correspondent [node] currently communicating with the mobile computer 2, the endpoint of the IPSEC tunnel is changed from 'CoA1' to 'CoA2' as the destination of all the security associations is changed to the current CoA 'CoA2.'" Ex. 1004, 12:66–13:3; Pet. 33.

In addition, as we discuss in detail above, Murakawa teaches a security gateway, as well as establishing a secure connection between a terminal (PC 101) and the security gateway. *See, e.g.*, Ex. 1005, 1:59–2:4, 2:62–65, 4:13–16, Fig. 5; *supra* Section VI(C)(1)–(2) (discussing our findings regarding, *inter alia*, Figure 5's teachings).

21

IPR2019-00820
Patent 7,937,581 B2

We find combining Ishiyama's mobile address changing functionality with Murakawa's security gateway and another terminal teaches "while at the second address, the mobile terminal sending a request message to the gateway address of the security gateway to request the security gateway to change the secure connection to be defined between the second address and the gateway address of the security gateway."

### 5. *In Response to the Request Message*

Claim 1 further recites "in response to the request message from the mobile terminal, the security gateway changing an address definition of the secure connection from the first address to the second address." Ex. 1001, 10:64–67. We agree with Petitioner and find that the combination of Ishiyama and Murakawa teaches this limitation. Pet. 33–34. We find that Ishiyama teaches that correspondent host 3 detects mobile computer 2's address change based on the request message (i.e., the source address in the request message's outer packet has changed), and updates mobile computer 2's address to CoA2 for the IPSec tunnel in the correspondent host's SA database. *See* Ex. 1004, 8:66–9:4, 12:51–59, Figs. 9B, 9D (illustrating exemplary SA databases); Pet. 33–34. Ishiyama's Figure 9B (mobile computer's first location) and Figure 9D (mobile computer's second location) illustrate this update at the correspondent host (labeled "CN" in the figures) by replacing Figure 9B's "dst" field value of "CoA1" with "CoA2," as shown in Figure 9D. *Compare* Ex. 1004, Fig. 9B, *with id.* at Fig. 9D. "As a result of these operations, at the correspondent [node] currently communicating with the mobile computer 2, the endpoint of the IPSEC tunnel is changed from 'CoA1' to 'CoA2' as the destination of all the security associations is changed to the current CoA 'CoA2'." Ex. 1004,

22

IPR2019-00820
Patent 7,937,581 B2

12:66–13:3; Pet. 34.  In addition, as we discuss in detail above, Murakawa teaches a security gateway, as well as establishing a secure connection between a terminal and the security gateway.  *See, e.g.*, Ex. 1005, 1:59–2:4, 2:62–65, 4:13–16, Fig. 5; *supra* Section VI(C)(1)–(2) (discussing our findings regarding, *inter alia*,  Figure 5's teachings).

In summary, we find combining Ishiyama's mobile address changing functionality with Murakawa's security gateway and another terminal teaches "in response to the request message from the mobile terminal, the security gateway changing an address definition of the secure connection from the first address to the second address."

### 6.  Mobile Terminal Sending a Secure Message

Claim 1 further recites "the mobile terminal sending a secure message in the secure connection from the second address of the mobile terminal to the other terminal via the security gateway."  Ex. 1001, 11:1–3.  We agree with Petitioner and find that the combination of Ishiyama and Murakawa teaches this limitation.  Pet. 35–40.  We find that Ishiyama teaches sending a secure message in the secure connection from the second address of Ishiyama's mobile computer to its correspondent host, as shown below in Figure 7's operation (6), as annotated by Petitioner.  *See* Pet. 37 (annotating Ex. 1004, Fig. 7).

23

IPR2019-00820
Patent 7,937,581 B2



Figure 7 "is a sequence chart showing an exemplary processing sequence in the case where the mobile computer initiates communications at a visited site and then changes . . . location." Ex. 1004, 5:20–23. Petitioner annotated Figure 7 with a green box around the correspondent node ("CN") identifier and a red box around the mobile computer identifier ("MN"). Pet. 49 (annotating Ex. 1004, Fig. 7). Ishiyama teaches that as a result of its CoA update operations, "at the correspondent [host] currently communicating with the mobile computer 2, the endpoint of the IPSEC tunnel is changed from 'CoA1' to 'CoA2' as the destination of all the security associations,'" and "[c]onsequently, the session is guaranteed even when the mobile computer 2 moves . . . ." Ex. 1004, 12:66–13:5; Pet. 35 & n.6. Put differently, as Figure 7 illustrates, mobile computer 2 sends a secure message from its second address to correspondent host 3 using the same IPSec. Ex. 1004, Fig. 7 (illustrating for operation (6) that the outer

24

IPR2019-00820
Patent 7,937,581 B2

packet's Src: has the value "CoA2" and Dst: has the value "CN"); 12:66–13:5.

As to Murakawa, we agree with Petitioner and find that Murakawa teaches a terminal sending a secure message in a secure connection to an address of another terminal via the security gateway. *E.g.*, Ex. 1005, Fig. 5; Pet. 38–39. This is shown in Murakawa's Figure 5, shown below as annotated in the Petition. *See* Pet. 38 (providing annotated Figure 5).



Murakawa's Figure 5 shows a "prior art typical network system." Ex. 1005, 4:32–33. Petitioner annotated the figure with (i) a red box around PC 101 and labeled "Mobile Terminal," (ii) a green box around security gateway 103 and labeled "Security Gateway," and (iii) a blue box around each of PC 106 and PC 107, and labeled "Other Terminals." Pet. 38 (annotating Ex. 1005, Fig. 5). As illustrated in Figure 5, Murakawa teaches

25

that outside terminal (PC 101) sends a secure message in the secure connection (VPN 108) to another terminal (PC 106) via security gateway 103. *Id.* at 1:61–2:4, 2:62–65, Fig. 5; *see also supra* Section VI(C)(1) (discussing our findings regarding Figure 5's teachings); Pet. 38–39.

Furthermore, we credit Dr. Goldschlag's testimony that one of ordinary skill in the art would have understood that Murakawa teaches a well-known IPSec tunnel mode configuration with a security gateway facilitating communication between a mobile terminal and other terminals because this testimony is consistent with our findings of Murakawa's teachings. *See* Ex. 1002 ¶¶ 85–88.

Accordingly, we find that the combination of Ishiyama and Murakawa teaches the mobile terminal sending a secure message in the secure connection (VPN 108) from its second address (CoA2) to the other terminal (PC 106) via security gateway 103.

Lastly, we are not persuaded by Patent Owner's arguments that Ishiyama's "operation (6) is shown to be an end-to-end, two-way secure communication from the mobile terminal MN to the correspondent terminal CN," and does not teach "[t]he three-component connection called for by the claim (mobile terminal-security gateway-other terminal)." PO Resp. 57. Patent Owner focuses on Ishiyama's teachings individually, rather than the combined teachings of Ishiyama and Murakawa. *See In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) ("Non-obviousness cannot be established by attacking references individually where the rejection is based upon the teachings of a combination of references"). Again, as to the second way Petitioner combines Ishiyama and Murakawa, Ishiyama's mobile address changing functionality is combined with Murakawa's security

26

IPR2019-00820
Patent 7,937,581 B2

gateway configuration (e.g., security gateway 103 and other terminal 106). *See* Pet. 12–54; Dec. on Inst. 24–25, 37–38 (noting the two alternative ways). Hence, a mobile terminal securely communicates with another terminal via Murakawa's security gateway 103 rather than Ishiyama's correspondent host 3. *Id.*

In summary, we find combining Ishiyama's mobile address changing functionality with Murakawa's security gateway and another terminal teaches "the mobile terminal sending a secure message in the secure connection from the second address of the mobile terminal to the other terminal via the security gateway."

### 7. *Combining Ishiyama and Murakawa*

For the reasons we provide below, we find that Petitioner has demonstrated by a preponderance of the evidence that one of ordinary skill in the art would have found it obvious to combine Ishiyama's mobile address changing functionality with Murakawa's security gateway and other terminal in the manner claimed.

First, we agree with Petitioner and find that Ishiyama teaches using IPSec in tunnel mode with its mobile address changing functionality. *E.g.*, Ex. 1004, 7:45–49, 8:43–65, 11:9–16, Fig. 4; Pet. 17–18, 20, 22. More specifically, we find that Ishiyama teaches that "mobile computer 2 always uses the IPSEC in the tunnel mode at a time of making a connection to the correspondent host 3." Ex. 1004, 11:9–16. Figure 4 also illustrates that mobile computer 2 connects to correspondent host 3 via an IPSec tunnel. *See* Ex. 1004, Fig. 4 (labeling the connections as "IPSEC TUNNEL"), 8:43–65; Pet. 22.

27

Second, Petitioner persuasively shows that one of ordinary skill in the art would have understood that tunnel mode was used for communicating via a security gateway.  Specifically, we find that one of ordinary skill in the art would have known that "[t]unnel mode . . . is generally used for sending messages through more than two components . . . ."  Ex. 1001, 3:19–21[9]; Pet. 17 (citing Ex. 1001, 3:19–30; Ex. 1002 ¶ 57).  We also credit in support of this finding the below deposition testimony of Patent Owner's expert, Dr. Rouskas, who testified as follows:

> Q:  So in all the instances where you personally have used IPSec, you have only ever used IPSec tunnel mode with security gateway being one of the endpoints.  Right?
>
> A:  So I have been using IPSec for, you know, more than 20 years.  But to the best of my recollection that is right, I have only used it when one of endpoints is security gateway.

---

[9] "Statements in a challenged patent's specification may be used . . . when they evidence the general knowledge possessed by someone of ordinary skill in the art."  Memorandum:  Treatment of Statements of the Applicant in the Challenged Patent in Inter Partes Reviews Under § 311 (Aug. 2020) (available at https://www.uspto.gov/sites/default/files/documents/ signed_aapa_guidance_memo.pdf), 4.  "Permissible uses . . . under § 103 include . . . supporting a motivation to combine particular disclosures."  *Id.* at 6 (citing *Koninklijke Philips v. Google*, 948 F.3d 1330, 1337–38 (Fed. Cir. 2020)).  We find that the statements cited by Petitioner from the '581 patent's Technical Background section evidence the general knowledge possessed by one of ordinary skill in the art at the time of the invention of the '581 patent as they are contained in the "Technical Background" section and are consistent with the evidence of record.  *See, e.g.*, Pet. 8–9 (citing, e.g., Ex. 1001, 3:10–11, 3:14–15, 3:22–24), 17 (citing Ex. 1001, 3:19–30), 20 (citing Ex. 1001, 3:19–21).  Patent Owner does not challenge Petitioner's reliance on statements from the Technical Background section of the '581 patent.  *See generally* PO Resp.  Even so, we reach the same conclusions even without reliance on the statements from the '581 patent.

IPR2019-00820
Patent 7,937,581 B2

Ex. 1019, 111:21–112:9; Pet. Reply 8.  In addition, we credit Dr.
Goldschlag's declaration testimony, which is consistent with
contemporaneous evidence in the record, that "[t]unnel mode is used when
one or both ends of an SA is a security gateway . . . that implements IPSec."
Ex. 1002 ¶ 33 (quoting Ex. 1009, 14) (emphasis omitted); *see also* Ex. 1001,
3:19–21 (admitting that "tunnel mode is often used when one or both ends of
a SA is a security gateway, such as a firewall or router that implements
IPSec"); Pet. 20.

Lastly, we agree with Petitioner and find that tunneling packets
through a security gateway for two terminals to communicate (such as in
Murakawa) was well-known in the art at the time of the invention of the
'581 patent.  Pet. 24–25.  In particular, we find that Murakawa's security
gateway configuration (e.g., Figure 5) is "a prior art typical network
system," which provides communications between terminals.  Ex. 1005,
4:32–33, Fig. 5; Pet. 24–25.  Moreover, in its Technical Background section,
the '581 patent teaches the following:

> The IPSec tunnel mode operates e.g. in such a way that if
> a host on a network generates an IP packet with a destination
> address of another host on another network, the packet is routed
> from the originating host to a security gateway (SGW), firewall
> or other secure router at the boundary of the first network.  The
> SGW or the like filters all outgoing packets to determine the need
> for IPSec processing.  If this packet from the first host to another
> host requires IPSec, the firewall performs IPSec processing and
> encapsulates the packet in an outer IP header.  The source IP
> address of this outer IP header is this firewall and the destination
> address may be a firewall that forms the boundary to the other
> local network. This packet is now routed to the other host[']s
> firewall with intermediate routers examining only the outer IP
> header.  At the other host firewall, the outer IP header is stripped
> off and the inner packet is delivered to the other host.

29

IPR2019-00820
Patent 7,937,581 B2

Ex. 1001, 3:47–62; *see also* Pet. 36, 43.  In other words, this passage also teaches that tunneling packets through a security gateway for two terminals to communicate was well-known in the art at the time of the invention of the '581 patent.  Ex. 1001, 3:47–62.  We also credit Dr. Goldschlag's testimony that it was well-known in the art for a security gateway, such as that disclosed in Murakawa, to facilitate communication between a mobile terminal and other terminals as this testimony is consistent with Murakawa's teachings.  Ex. 1002 ¶ 66; Pet. 24.

In summary, we find that (1) Ishiyama's address changing functionality employs tunnel mode, (2) tunnel mode was generally used when at least one end of an SA was a security gateway, and (3) Murakawa teaches a typical, prior art security gateway configuration.  Based on these findings, we find that one of ordinary skill in the art would have found it obvious to employ Ishiyama's address changing functionality with a security gateway, such as taught in Murakawa.  *See PGS Geophysical AS v. Iancu*, 891 F.3d 1354, 1365 (Fed. Cir. 2018) ("[T]he motivation to modify a reference can come from the knowledge of those skilled in the art, from the prior art reference itself, or from the nature of the problem to be solved.") (citation omitted).

Put differently, based on these findings, Ishiyama's use of tunnel mode would have suggested to one of ordinary skill in the art using Ishiyama's address changing functionality with Murakawa's security gateway configuration.  *Id.*; Pet. 18, 20, 22, 23, 25.  We also credit Dr. Goldschlag's testimony that one of ordinary skill in the art "reading Ishiyama would have understood that the use of tunnel mode suggests the use of a security gateway that tunnels messages to an 'other node.'"

30

IPR2019-00820
Patent 7,937,581 B2

Ex. 1002 ¶ 61 (citing *id.* ¶¶ 33–36); Pet. 20.  This testimony is consistent

with our findings discussed above.

Additionally, we also credit the following testimony of Dr.

Goldschlag:

> [I]n view of Ishiyama's stated goal of addressing a mobile
> terminal with a changing address, [one of ordinary skill in the
> art] would have understood that implementing Ishiyama's
> correspondent host functionality with the security gateway
> described in Murakawa would be highly desirable in the
> telecommunication context. As Ishiyama explains, implementing
> its IPsec address updating algorithm allows a mobile terminal
> and a security gateway to maintain communication 'without
> interrupting the session' initially established even when the
> mobile terminal changes to another address.

Ex. 1002 ¶ 68 (citing Ex. 1004, 6:54–60); Pet. 25.  We find that one of

ordinary skill in the art would have been motivated to incorporate

Ishiyama's mobile address changing functionality with Murakawa's security

gateway configuration "to maintain communication 'without interrupting the

session' initially established even when the mobile terminal changes to

another address."  Ex. 1002 ¶ 68; *KSR*, 550 U.S. 417 ("[I]f a technique has

been used to improve one device, and a person of ordinary skill in the art

would recognize that it would improve similar devices in the same way,

using the technique is obvious . . . .").  Moreover, we do not find this

testimony conclusory, as Patent Owner alleges (PO Resp. 50), because

Dr. Goldschlag explains why combining Ishiyama and Murakawa would

have been highly desirable (i.e., because it would maintain communication

without interrupting the session).  Ex. 1002 ¶ 68 (citing Ex. 1004, 6:54–60).

We agree that having no interruption when the mobile terminal moves

IPR2019-00820
Patent 7,937,581 B2

"would [have] be[en] highly desirable in the telecommunication context." *Id.*

We are not persuaded by Patent Owner's arguments that Petitioner "fails to provide the requisite explanation as to **how** Ishiyama and Murakawa are to be combined or **what is the operation of the resulting combination**." PO Resp. 51; *see also id.* at 59 (citing Ex. 2009 ¶ 152). Rather, we agree with Petitioner and find that one of ordinary skill in the art "could[10] have easily performed th[e] implementation" of combining Ishiyama's address changing functionality with the security gateway described in Murakawa "in view of the security gateway suggestion from Ishiyama's tunnel mode operation." Pet. 26 (citing Ex. 1002 ¶ 69). Simply put, Ishiyama's mobile computer 2 communicates with correspondent host 3 using IPSec tunnel mode just as Murakawa's PC 101 communicates with security gateway 103 using IPSec tunnel mode. *E.g.*, Ex. 1004, 8:43–49, 11:9–16, Fig. 4; Ex. 1005, 1:61–63, 2:62–65, Fig. 5; Pet. 39. Ishiyama's address changing functionality utilizes the outer packet's source address with Ishiyama's tunnel mode connection. *E.g.*, 1004, 8:43–65, Fig. 4. Petitioner's combination likewise utilizes the outer packet's source address (as in Ishiyama) with Murakawa's tunnel mode connection. *E.g.*, 1004,

---

[10] Although we consider whether one of ordinary skill in the art "could" have combined Ishiyama's and Murakawa's relevant teachings with respect to these arguments related to operability, we above find that one of ordinary skill in the art "would" have combined Ishiyama's and Murakawa's relevant teachings. *See PGS Geophysical*, 891 F.3d at 1365 (recognizing that whether one of ordinary skill in the art "could" or "would" have combined references are related, separate questions); *see also supra* Section VI(C)(7) (finding that one of ordinary skill in the art would have combined the references).

8:43–65, Fig. 4.; Ex. 1005, 1:59–2:4, Fig. 5; Pet. 38–40; Pet. Reply 16–17 (citing Pet. 39–40; Ex. 1022 ¶¶ 48–56). Moreover, we do not find Dr. Goldschlag's testimony conclusory, as Patent Owner alleges (PO Resp. 59), but rather Dr. Goldschlag explains that one of ordinary skill in the art could have easily combined Ishiyama's address changing functionality with the security gateway described in Murakawa in light of Ishiyama's tunnel mode operation (i.e., both Murakawa and Ishiyama employ tunnel mode). *See* Ex. 1002 ¶ 68.

We also are not persuaded by Patent Owner's argument that "the security gateway 103 and computer 106 illustrated in Murakawa's Figure 5 could not be combined into the address changing system as of Ishiyama illustrated in Figure 4." PO Resp. 53. In particular, Patent Owner argues "that Ishiyama's security policy databases [("SPDs")] (Figures 8A–8B) and the security association databases [("SADs")] (Figures 9A–9D) would not operate if the components of Murakawa were inserted in place of Ishiyama's correspondent host." *Id.* at 53–54 (citing Ex. 2009 ¶ 148). Contrary to Patent Owner's arguments, however, "it is not necessary that the inventions of the references be physically combinable to render obvious the invention under review." *In re Sneed*, 710 F.2d 1544, 1550 (Fed. Cir. 1983). The relevant inquiry is whether the claimed subject matter would have been obvious to those of ordinary skill in the art in light of the combined teachings of those references. *See In re Keller*, 642 F.2d 413, 425 (CCPA 1981). And, as we find above, one of ordinary skill in the art would have found it obvious to combine Ishiyama's address changing functionality with Murakawa's security gateway and other terminal. This does not mean that Ishiyama's specific SPD and SAD databases are used in that combination, as

IPR2019-00820
Patent 7,937,581 B2

Patent Owner argues. *In re Nievelt*, 482 F.2d 965, 968 (CCPA 1973)

("Combining the *teachings* of references does not involve an ability to

combine their specific structures."); *see also In re Mouttet*, 686 F.3d 1322,

1332 (Fed. Cir. 2012) ("It is well-established that a determination of

obviousness based on teachings from multiple references does not require an

actual, physical substitution of elements." (citing *In re Etter*, 756 F.2d 852,

859 (Fed. Cir. 1985) (en banc))). Rather, one of ordinary skill in the art

would have "be[en] able to fit the teachings of [Ishiyama and Murakawa] . . .

together like pieces of a puzzle" because the skilled artisan is "a person of

ordinary creativity, not an automaton." *KSR*, 550 U.S. at 420–21. Likewise,

we are not persuaded by Patent Owner's example that if a new terminal with

a new address was added, "the Ishiyama system would be unable to process

messages sent to or received from the new terminal" because the new

address would not be found in Ishiyama's SPD. PO Resp. 53. Again,

combining the teachings of Ishiyama and Murakawa does not involve

woodenly combining their specific structures, and does not require using

Ishiyama's specific SPD. *Nievelt*, 482 F.2d at 968. And, Murakawa's

existing role in addressing packets between terminals (e.g., PC 101 and PC

106) also remains a part of Petitioner's combination. *See, e.g., infra* Section

VI(G) (discussing Murakawa's Figure 8, and accompanying text, concerning

addressing messages sent between terminals via a security gateway); Pet. 45.

    Likewise, we are not persuaded by Patent Owner's argument that

"Petitioner fails to explain what modifications to Ishiyama's . . . [SPDs and

SADs] would be required for Ishiyama to work with security gateway 103 as

the opposing endpoint instead of correspondent host 3." PO Sur-Reply 20

(citing Ex. 1004, Figs. 8–9). Again, Ishiyama's specific SPDs and SADs are

IPR2019-00820
Patent 7,937,581 B2

not part of Petitioner's combination. *In re Nievelt*, 482 F.2d at 968. In addition, we agree with Petitioner and find that SADs and SPDs are commonplace in IPSec communications, and security gateways are required to have at least "one pair of SADs and one pair of SPDs." *See* Pet. Reply 13 (citing Ex. 1011, 13; Ex. 1019, 89:8–15); *see also* Ex. 1022 ¶ 56. And, we agree with Petitioner that Ishiyama's description of SPDs and SADs "does not preclude the operation of a security gateway also implementing these components." Pet. Reply 17 (citing Ex. 1022 ¶ 56). In other words, we find that one of ordinary skill in the art would have understood that the address changing functionality used with Ishiyama's SPDs and SADs also can be used with the SPDs and SADs of a common security gateway configuration, such as described by Murakawa. *See* Ex. 1011, 13; Ex. 1019, 89:8–15; Ex. 1022 ¶ 56. Accordingly, we find that one of ordinary skill in the art would have found it obvious to combine the teachings of Ishiyama and Murakawa to provide for Ishiyama's address changing functionality being incorporated into Murakawa's security gateway configuration. *See KSR*, 550 U.S. at 420–21 (finding the skilled artisan would "be able to fit the teachings of multiple patents together like pieces of a puzzle" because the skilled artisan is "a person of ordinary creativity, not an automaton"). In addition, we find misplaced Patent Owner's focus on Petitioner's use of the word "preclude." PO Sur-Reply 18 (arguing that Ishiyama "should be interpreted for what it affirmatively teaches as opposed to what it does not 'preclude'") (citation omitted). In the context of Petitioner's argument, it is clear that Petitioner means that Murakawa's security gateway's SPDs and SADs also can implement Ishiyama's address changing functionality. *See* Pet. Reply 17 (citing Ex. 1022 ¶ 56).

35

IPR2019-00820
Patent 7,937,581 B2

We also are not persuaded by Patent Owner's argument that "[a] person of ordinary skill in the art would not readily understand how Ishiyama's SA databases could be modified to accommodate Murakawa's components." PO Resp. 53 (citing Ex. 2009 ¶ 148). Nor are we persuaded that "[a] person of ordinary skill would not have a reasonable expectation of success given that there is no explanation as to how the references would be combined and how the resulting system would operate," as Patent Owner argues. *Id.* (citation omitted). Rather, as we find above, combining the teachings of Ishiyama and Murakawa does not require using Ishiyama's specific SA databases. *Nievelt*, 482 F.2d at 968. And, as we find above, one of ordinary skill in the art would and could have easily combined Ishiyama's address changing functionality with the security gateway described in Murakawa. *See* Ex. 1002 ¶ 68.

We also are not persuaded by Patent Owner's argument that "a person of ordinary skill would be taught away from combining Ishiyama and Murakawa." PO Resp. 54. We find that Patent Owner does not cite any portion of Ishiyama that criticizes, discredits, or otherwise discourages combining Ishiyama's mobile address changing functionality with Murakawa's security gateway configuration. *Id.*; *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004) (teaching away requires that a reference "criticize, discredit, or otherwise discourage" investigation into the claimed solution). To the contrary, as we find above, Ishiyama's use of tunnel mode suggests combining its address changing functionality with Murakawa's security gateway configuration. *In re Urbanski*, 809 F.3d 1237, 1243–44 (Fed. Cir. 2016) (finding that there was no teaching away as the prior art references suggested the modification and did not teach that the modified

36

IPR2019-00820
Patent 7,937,581 B2

process would be inoperable).  We also do not credit Dr. Rouskas' testimony as it is contrary to our findings above.  Ex. 2009 ¶ 148.

Lastly, we agree with Patent Owner that only asserting that references "could" be combined may be insufficient.  PO Resp. 52–53 (citations omitted).  However, as we find above, Petitioner provides persuasive articulated reasoning as to why one of ordinary skill in the art "would" have combined Ishiyama's address changing functionality with Murakawa's security gateway configuration.  Thus, we are not persuaded that Petitioner fails to show sufficient rationale for combining Ishiyama and Murakawa.

Accordingly, for the reasons discussed above, we find that Petitioner provides "some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness."  *See In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) (citations omitted), *cited with approval in KSR*, 550 U.S. at 418.

### 8. *Alleged Security Flaw*

Patent Owner argues in its Sur-Reply[11] that there is "a major security flaw in Ishiyama that would prevent it from ever being used by . . . [one of ordinary skill in the art] as a reference to construct a secure communication system."  PO Sur-Reply 1.  In particular, Patent Owner argues that "the new

---

[11] Petitioner sought our authorization to file a motion to strike Patent Owner's Sur-Reply, or, in the alternative, to file a Sur-Sur-Reply to address the new security flaw argument.  Paper 34, 2.  We denied the request, finding that, as in most cases, we are "capable of identifying new issues . . . when weighing the evidence at the close of trial, and disregarding any new issues . . . that exceeds the proper scope of . . . sur-reply."  *Id.* at 3 (quoting Patent Trial and Appeal Board Consolidated Trial Practice Guide 80 ("Consolidated Practice Guide") (Nov. 2019) (available at https://www.uspto.gov/TrialPracticeGuideConsolidated)).

source address in the outer packet of Ishiyama's . . . request message . . . is unencrypted and sent in the clear." *Id.* Because of this flaw, one of ordinary skill in the art "would never use Ishiyama's outer packet to change the address definition for the mobile device in a secure connection because it could easily be intercepted by a malicious intermediary and manipulated to cause message traffic to be misdirected to an imposter device," according to Patent Owner. *Id.*; *see also id.* at 2–11 (arguing Ishiyama's security flaw defeats Petitioner's unpatentability allegations).

The security flaw argument, however, is new. Nowhere in its Response does Patent Owner make this argument. *See generally* PO Resp.; *see also* Tr. 48:11–25 (Patent Owner admitting that it did not address the security flaw issue in its Response). Furthermore, Patent Owner admits that "[n]either the Reply nor [Petitioner's] expert's supplemental declaration address the security flaw." PO Sur-Reply 5 n.1 (citing Ex. 1022). Accordingly, we do not consider Patent Owner's security flaw argument because it was not made in the Patent Owner Response and is beyond the proper scope of the Sur-Reply, and thus, is waived. *See* Paper 11 (Scheduling Order), 7 ("Patent Owner is cautioned that any arguments for patentability not raised in the response may be deemed waived."); Consolidated Practice Guide 74 (citing 37 C.F.R. § 42.23) ("Generally, a reply or sur-reply may only respond to arguments raised in the preceding brief.").

IPR2019-00820
Patent 7,937,581 B2

Additionally, we are not persuaded by Patent Owner's arguments to excuse the waiver.[12]  During the oral hearing, Patent Owner argued that the Petition was unclear as to whether the request message was (i) "the message containing the outer header where the source address of the outer header has been changed from CoA1 to CoA2," as shown in Figure 4 of Ishiyama, or (2) "step 5, the SA gateway update operation, of Figure 7 of Ishiyama." Tr. 47:2–14.  Patent Owner argued that it asked Dr. Goldschlag during his deposition "to elaborate on what [Petitioner]'s position was as to what was the claim's request message."  *Id.* at 45:2–4.  According to Patent Owner, "Dr. Goldschlag clarified that the claimed request message was step 5 of Figure 7 at the Ishiyama patent," and not the outer header.  *Id.* at 45:4–6, 48:19–49:10.  Patent Owner argued that it did not address the security flaw argument in its Response[13] based on (i) the Petition not clearly identifying that the request message includes the outer header, and (ii) Patent Owner's "reliance on Dr. Goldschlag's testimony that the request message was step 5 and not the outer header."  *Id.* at 48:19–49:10.

We are not persuaded by Patent Owner's arguments for either reason. First, as we discuss above, the Petition clearly sets forth that Ishiyama's request message includes the outer packet's source address.  *See supra* Section VI(C)(4) (addressing, *inter alia*, Ishiyama's Figure 4 and accompanying text).  For example, the Petition states:

---

[12] We are not suggesting that providing reasons during the oral hearing for why a new argument was made in a Sur-Reply is the appropriate procedural mechanism, if any, to excuse waiver.  Regardless, we address the merits of Patent Owner's reasons here.

[13] Patent Owner argued that it included its security flaw argument in its Sur-Reply in light of Petitioner's Reply, which explains that the request message includes the outer packet.  Tr. 47:18–48:7.

IPR2019-00820
Patent 7,937,581 B2

> After the mobile terminal of Ishiyama moves from CoA1 (i.e., *first* address) to CoA2 (i.e., *second* address), Ishiyama further describes the *sending a request message to the gateway address* of the correspondent node (i.e[.], *security gateway*) to change the security association definition from CoA1 to CoA2. This is shown below in Figure 4 (annotated). Specifically, "the mobile computer 2 changes the source address of the outer packet of the encapsulated packet to be transmitted to the IPSEC tunnel by the mobile computer 2 into 'CoA2'. . . . [T]he encapsulated packet in which the outer packet has the source address ='CoA2' will be transferred." Ishiyama, 8:59–65.

Pet. 31. Moreover, in our Decision on Institution, when addressing the claimed request message, we noted that:

> Petitioner argues that after changing addresses, mobile computer 2 sends a message (*having CoA2 for its outer packet's source address*) to correspondent host 3 via the IPSec tunnel, requesting that correspondent host 3 update to mobile computer 2's new address. [Pet. 31–33] (citing Ex. 1004, 8:59–65, 11:39–45, 12:66–13:5, Figs. 4, 7).

Dec. on Inst. 31 (emphasis added). Accordingly, we find that the Petition clearly sets forth that Ishiyama's request message includes the outer packet's source address.

Second, we disagree with Patent Owner that Dr. Goldschlag testified that "the request message is step 5 of Figure 7, *not the outer header of the message in Figure 4*." Tr. 45:10–13 (emphasis added). In support of its argument, Patent Owner referenced the following deposition testimony during the oral hearing:

> Q [D]o you recall that in the [P]etitioner's analysis of Claim 1, the recited request was allegedly satisfied by the SA gateway update Operation 5 in Figure 7 of Ishiyama?

40

IPR2019-00820
Patent 7,937,581 B2

> A  Right. So I think that was the section that we were just
> looking through, that Paragraph 7[5] in my declaration[14] which
> walks through the address change operation.

Tr. 45:14–18 (quoting Ex. 2008, 219:12–19).[15]  Patent Owner incorrectly

focused on only the first word of Dr. Goldschlag's answer — "Right." *Id.* at

45:10–18.  Dr. Goldschlag clearly includes paragraph 75 of his declaration

in his answer to the question.  *Id.*  Paragraph 75, *inter alia*, annotates Figure

4 and states that it "depicts the change in the security association definition

from CoA1 to CoA2."  Ex. 1002 ¶ 75 (citing Ex. 1004, 8:59–65; annotating

Ex. 1004, Fig. 4).  Thus, this deposition testimony clearly does not support

that Dr. Goldschlag testified that the request message does not include the

outer header of the message or Figure 4's teachings.

Patent Owner also cited additional deposition testimony of

Dr. Goldschlag during the oral hearing in support of its argument.  Tr. 45:7–

---

[14] Dr. Goldschlag was referring to his declaration submitted in IPR2019-00819 (Ex. 1002), as Patent Owner had previously marked that declaration during the deposition, placed it before Dr. Goldschlag, and questioned him on it.  Ex. 2008, 20:17–20, 189:15–19, 209:22–217:10.  Dr. Goldschlag's declaration in IPR2019-00820 (Ex. 1002) was marked by Patent Owner later in the deposition.  *Id.* at 233:1–2, 233:10–13.  This timing applies to all of Dr. Goldschlag's deposition testimony discussed in this section.  Moreover, paragraphs 74–76 of the IPR2019-00819 declaration appear in the IPR2019-00820 declaration, but shifted by one paragraph number (i.e., 74–76 correspond to 75–77).  We adjust the numbering in Dr. Goldschlag's testimony for clarity to refer to the correct paragraph in the IPR2019-00820 declaration.

[15] During the oral hearing, Patent Owner read this question and the first word ("Right.") of Dr. Goldschlag's answer into the record, rather than providing the specific cite.  Tr. 45:14–18.  We here provide Dr. Goldschlag's complete answer to the question posed.

IPR2019-00820
Patent 7,937,581 B2

10 (citing Ex. 2008, 219:20–220:4, 228:1–9).  For example, Patent Owner
identified the following testimony:

> Q  So is it correct that the request recited in the claim is
> alleged to correspond to the SA update -- SA gateway update
> operation, Step 5 of Figure 7 of Ishiyama?
> I can refer you to the petition.
> A  Right. So the SA update operation is in Operation 5 --
> Q  Okay.
> A  -- and that's Paragraph 7[7] of my declaration.

Ex. 2008, 219:20–220:6.[16]  This passage supports that operation 5 of Figure
7 teaches about the claimed request message, as cited in the Petition.  *See
id.*; Pet. 36–37.  It does not exclude, however, the teachings of Figure 4, and
its accompanying text.  *See* Ex. 2008, 219:20–220:6.  "F[igure] 4 is a
schematic diagram for explaining operations in the case where the mobile
computer changes a connected location in the mobile communication system
of F[igure] 2" while "F[igure] 7 is a sequence chart showing an exemplary
processing sequence in the case where the mobile computer initiates
communications at a visited site and then changes a location in the mobile
communication system of F[igure] 2."  *Compare* Ex. 1004, 5:11–13, *with id.*
at 5:21–24.  In other words, Figure 4 and Figure 7 are not mutually
exclusive, but rather are complementary in teaching Ishiyama's invention.
*Id.*  Petitioner cites both figures in support of its arguments that Ishiyama
teaches the claimed request message.  Pet. 35–37.

Moreover, paragraph 77 of Dr. Goldschlag's declaration (to which he
refers in his answer) begins "Ishiyama refers to this operation as an 'SA
Gateway Update,'" referring to the previous declaration paragraph 76.

---

[16] Patent Owner cited only a portion of Dr. Goldschlag's answer (through
line 4) to the question posed, but we here provide his answer in its entirety.

42

IPR2019-00820
Patent 7,937,581 B2

Ex. 1002 ¶ 77.  Paragraph 76 recites that "the mobile computer 2 changes the source address of the outer packet of the encapsulated packet to be transmitted to the IPSEC tunnel by the mobile computer 2 into 'CoA2'" and that "the encapsulated packet in which the outer packet has the source address ='CoA2' will be transferred."  Ex. 1002 ¶ 76 (citing Ex. 1004, 8:59–65).  Thus, this deposition testimony clearly does not exclude the outer packet from the request message.  Ex. 2008, 219:20–220:6.  Likewise, the third passage of deposition testimony cited by Patent Owner does not exclude the outer header from the request message, but simply discusses Figure 7's teachings.  Ex. 2008, 228:1–9.

Lastly, we provide the following example from Dr. Goldschlag's deposition testimony, which Patent Owner did not cite during the oral hearing but which provides further context for the cited testimony, where Dr. Goldschlag testified that the request message included the teachings of Figure 4.

> Q  And in the claim, it indicates that the request is sent from the mobile terminal to the security gateway, and you've mapped that to Operation 5 in Figure 7[?]
> A  Which is also from the mobile terminal to the security gateway, right. And if you go back to it picture, right, there is that IPsec tunnel. If you go back to Figure 4, if you don't mind.
> Q  Let's just stick with Figure 7, please.
> A  But Figure 4 will help sort of illustrate it. The mobile computer has a tunnel, and one of the purposes of the change of address is to use the same SA for the new tunnel, so it uses the new tunnel and it sends those messages over that tunnel.

Ex. 2008, 229:19–230:10.

In summary, Dr. Goldschlag's deposition testimony, taken as a whole, does not support a finding that Dr. Goldschlag stated the request message

IPR2019-00820
Patent 7,937,581 B2

excludes Figure 4's teachings and the use of the outer header's source address.  Ex. 2008, 219:12–220:6, 228:1–9.

Additionally, we are not persuaded by Patent Owner's argument that "Petitioner was aware of the security flaw (see March 20, 2020, deposition of Dr. Rouskas) well in advance of the Reply (filed April 1, 2020)" and chose not to address it in its Reply.  PO Sur-Reply 5 n.1; *see also* Tr. 49:24–50:6.  Again, Patent Owner does not address the security flaw argument in its Response.  *See generally* PO Resp.  Thus, Petitioner correctly did not address the security flaw argument in its Reply because doing so would have been beyond the proper scope of the Reply.  *See* 37 C.F.R. § 42.23(b) ("A reply may only respond to arguments raised in the corresponding . . . patent owner response."); Consolidated Practice Guide 74.

Lastly, Patent Owner certainly was aware of its security flaw argument at least as early as March 20, 2020 when Patent Owner's expert, Dr. Rouskas, was deposed.  During this deposition, Patent Owner on redirect extensively questioned Dr. Rouskas on Ishiyama's alleged security flaw.  *See* Ex. 1019, 184:6–197:22.  This occurred more than ten days before Petitioner filed its Reply on April 1, 2020.  Nonetheless, Patent Owner did not seek our authorization to supplement its Response (with a showing of good cause) during that more than ten day period or afterwards.

### *D. Challenged Claim 2*

Claim 2 depends from independent claim 1, and recites "[t]he method of claim 1, wherein the secure connection is established in step a) by forming a Security Association (SA)."  Ex. 1001, 11:4–5.  Patent Owner does not raise any arguments specific to claim 2.

44

IPR2019-00820
Patent 7,937,581 B2

We agree with Petitioner and find that Ishiyama teaches this additional limitation. Pet. 47–48. We find that Ishiyama teaches that "mobile computer 2 always uses the IPSEC in the tunnel mode at a time of making a connection to the correspondent host 3, [and] the appropriate existing key management protocol is followed at a time of exchanging the *security association* with the correspondent host 3." Ex. 1004, 11:9–17 (emphasis added). Ishiyama also teaches that "a procedure for making agreement regarding the contents of the *security association* with the correspondent is carried out before the use of the IPSEC [tunnel]." *Id.* at 9:63–66 (emphasis added). And, Ishiyama teaches that its "IPSEC processing is carried out according to the contents described in the *security association*." *Id.* at 9:50–51 (emphasis added).

Accordingly, based on a review of the entire record, we find that Petitioner has demonstrated by a preponderance of the evidence that claim 2 would have been obvious over the combined teachings of Ishiyama and Murakawa.

### E. Challenged Claim 4

Claim 4 depends from independent claim 1, and recites "[t]he method of claim 1, wherein the request message and/or a reply message is encrypted and/or authenticated." Ex. 1001, 11:9–10. Petitioner argues that Ishiyama teaches that the request message is encrypted. Pet. 48–50. We disagree.

Petitioner focuses on only a portion of Ishiyama's request message (i.e., the encapsulated packet) in arguing that Ishiyama teaches that the request message is encrypted. *See* Pet. 48–50; Pet. Reply 18–19. For example, Petitioner argues that "Ishiyama explains that the mobile computer 2 includes 'an encryption unit 114 for carrying out the

45

IPR2019-00820
Patent 7,937,581 B2

encapsulation and encryption on transmission packets.'" Pet. 49 (quoting Ex. 1004, 13:40–41; citing Ex. 1004, 13:33–35). "Indeed a main requirement and pillar of IPsec is to encrypt messages," according to Petitioner. *Id.* (citing Ex. 1011, 4 at § 2.1, 6–7 at §§ 3.1–3.2). Moreover, Petitioner argues that "Ishiyama explains that '[i]n the tunnel mode IPSEC communications, the packet encapsulation and the encryption/decryption of the inner packet are carried out and the IPSEC module 22 [of mobile unit 2] has functions for realizing such encapsulation and encryption/decryption processing.'" Pet. Reply 18 (quoting Ex. 1004, 7:56–60). "The mobile unit then uses this IPSEC module to transmit an 'encapsulated packet' via the IPSEC tunnel to update the address at the other endpoint," according to Petitioner. *Id.* (citing Ex. 1004, 8:55–9:10). Petitioner argues that "[b]y using IPSec to perform the update, the packet and the request message are encrypted." *Id.* at 18–19 (citing Ex. 1022 ¶¶ 60–62; Ex. 1011, 4 at § 2.1, 6–7 at §§ 3.1–3.2). Petitioner adds that Patent Owner's expert, "Dr. Rouskas[,] even confirmed this during his deposition." *Id.* at 19 (citing Ex. 1019, 175:19–176:2 (Dr. Rouskas testifying "[s]o, yes, the payload of that packet is encrypted")).

None of the passages that Petitioner cites for this limitation, however, teach that the request message's outer packet's source address is encrypted. Rather, Ishiyama only teaches that the encapsulated packet (payload) is encrypted. *E.g.*, Ex. 1004, 7:56–60. In fact, Petitioner admits that in Ishiyama the request message's outer packet's source address is unencrypted. *See, e.g.*, Tr. 27:9–16. However, the outer packet's source address is a part of the request message in Ishiyama. *See, e.g.*, Ex. 1004, Fig. 4, 8:59–65. For example, Ishiyama teaches the following:

46

IPR2019-00820
Patent 7,937,581 B2

> [W]hen the current location address of the mobile computer is changed to a new address, the mobile computer notifies the change of the own current location address to the correspondent by setting the new current location address as the source address of the outer packet of the encapsulated packet. Upon receiving this encapsulated packet, the correspondent can continue communications by changing only the destination address of the outer packet to the new current location address in the encapsulated packets to be transmitted thereafter.

*Id.* at 6:13–22. Thus, Ishiyama describes the request message as including the outer packet, and that packet is unencrypted.

Claim 4 recites that "the request message . . . is encrypted." Ex. 1001, 11:9–10. Thus, the plain words of the claim state that the message is encrypted—not that a portion of the message is encrypted. The '581 patent Specification likewise does not describe that only a portion of the request message is encrypted. *Id.* at 9:60–10:5. Specifically, the Specification discloses that, "[i]n signal 10a of [Figure 5]," which is sent from the mobile terminal when a mobile terminal moves to address B, "a request for registration (RREQ) of the new address is sent." *Id.* at 9:63–66. The Specification adds that "signal[] 10a . . . can be encrypted and/or authenticated." *Id.* at 10:1–2. Petitioner does not identify any description in the '581 patent of encrypting only a portion of the request message. *See* Pet. Reply 18–19; Tr. 67:8–68:20. At the hearing, Petitioner argued that one of ordinary skill in the art would have understood that only a portion of the message need be encrypted. Tr. 67:8–68:20. Petitioner, however, fails to provide any persuasive evidence in support of this reading of the claim in view of the express claim language and the description in the Specification.

Petitioner thus provides no basis to allow for a portion of the request message to be unencrypted. *See generally* Pet. 48–50; Pet. Reply. 18–19.

47

IPR2019-00820
Patent 7,937,581 B2

Claim 4 requires that the request message (not just a portion thereof) is encrypted, and Petitioner fails to show that Ishiyama's request message (which includes the unencrypted outer packet's source address) meets this requirement.  Ex. 1001, 11:6; *see also In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998) ("[T]he name of the game is the claim.").

Furthermore, during the oral hearing, Petitioner repeated its argument that Ishiyama's request message is encrypted because the encapsulated packet is encrypted, even though the outer packet's header is unencrypted. *See* Tr. 27:9–11, 30:3–11.  Having an unencrypted outer packet "would be just like [what] the claims would require, as well, because you can't send a request message without having an outer packet that's unencrypted," according to Petitioner.  *Id.* at 30:12–16.  Put differently, Petitioner argued:

> [T]he request message that's being sent is encrypted.  The outer header isn't encrypted, but the rest of the message is.  And there's a reason why the outer header isn't encrypted: because it can't be.  If the outer header was encrypted, then the message wouldn't be able to be sent because nobody would be able to know what the destination and source addresses are.  So, of course, the outer header isn't encrypted, but the rest of the message is, in fact, encrypted.

*Id.* at 27:9–16.  We are not persuaded by Petitioner's argument that Ishiyama teaches this limitation because the outer header cannot be encrypted.  First, Petitioner does not point to any evidence to support this argument, and thus, we do not credit it.  *See In re Geisler*, 116 F.3d 1465, 1470 (Fed. Cir. 1997) (explaining that attorney arguments and conclusory statements that are unsupported by factual evidence are entitled to little probative value).

Second, even if we consider this argument, Petitioner conflates a request message that includes its unencrypted outer packet as a part of the

request message (such as in Ishiyama) with a request message that does not (e.g., a request message that is contained wholly within the encrypted encapsulated packet), and Petitioner does not account for the latter. *E.g.*, Tr. 27:9–16, 30:12–16. Nor does Petitioner provide any argument or evidence to show that an example request message (i.e., "a registration request (RREQ)") disclosed in the '581 patent is not wholly within the encrypted encapsulated packet. *See generally* Pet.; Pet. Reply; *see also* Ex. 1001, 7:43–62.

Accordingly, Petitioner has not demonstrated by a preponderance of the evidence that claim 4 of the '581 patent would have been obvious to one of ordinary skill in the art in view of Ishiyama and Murakawa.

### F. Challenged Claims 6 and 7

Claims 6 and 7 depend from claim 5. Ex. 1001, 11:15–21. Claim 5 recites "[t]he method of claim 1 wherein the method further comprises the security gateway sending back *a reply message* to the mobile terminal at the second address to confirm the address change." Ex. 1001, 11:11–14 (emphasis added). The Petition does not address claim 5's reply message in its showing for claims 6 and 7. *See* Pet. 50–54. Nor does the Petition allege that this asserted ground (Ishiyama and Murakawa) renders claim 5 unpatentable. Instead, the Petition challenges claim 5 based on another ground (Ishiyama, Murakawa, and Ahonen), and relies on Ahonen to teach claim 5's reply message. Pet. 54–61; *see also infra* Section VII(B) (discussing Petitioner's challenge of claim 5 as obvious over Ishiyama, Murakawa, and Ahonen). The Petition does not contend that claims 6 and 7 are obvious over Ishiyama, Murakawa, and Ahonen. *See* Pet. 54–61.

49

IPR2019-00820
Patent 7,937,581 B2

We agree with Patent Owner that "Petitioner's assertion that claims 6–7 are unpatentable under [Ishiyama and Murakawa] . . . fails because it does not account for the limitations of intervening claim 5." PO Resp. 63–64 (citing Pet. 50–54). Moreover, we disagree with Petitioner that Patent Owner makes a "form-over-substance argument" and "improperly tak[es] too stringent of a reading of the Petition." Pet. Reply 22–23.

The Petition guides the proceeding. *See Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1335–36 (Fed. Cir. 2020). The Federal Circuit explained that "Congress chose to structure a process in which it's the petitioner . . . who gets to define the contours of the proceeding," and that "the statute envisions that a petitioner will seek an *inter partes* review of a particular kind—one guided by a petition describing 'each claim challenged' and '*the grounds on which the challenge to each claim is based*.'" *Id.* at 1335 (quoting *SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018) (quoting 35 U.S.C. § 312(a)(3))) (emphasis added). "Although the Board is not limited by the exact language of the petition, . . . the Board does not 'enjoy[] a license to depart from the petition and institute a *different* inter partes review of his own design.'" *Id.* at 1336 (quoting *SAS*, 138 S. Ct. at 1356) (citing *Sirona Dental Sys. GmbH v. Institut Straumann AG*, 892 F.3d 1349, 1356 (Fed. Cir. 2018)).

Here, the Petition alleges that claims 6 and 7 are obvious in view of Ishiyama and Murakawa. Pet. 4, 50–54. In other words, the combination of Ishiyama and Murakawa is "the grounds on which the challenge to [these] . . . claim[s] is based.'" *Koninklijke Philips*, 948 F.3d at 1335. In view of how the Petition is worded and the analysis provided for claims 6 and 7, we

50

do not consider one of the challenged grounds to be whether claims 6 and 7 would have been obvious in view of Ishiyama, Murakawa, *and Ahonen*.

We are not persuaded by Petitioner's argument that "*inter partes* reviews are notice based proceedings," and that Patent Owner "had notice of [Petitioner's] arguments since the beginning of this proceeding." Pet. Reply 25 (citing *Sirona Dental*, 892 F.3d at 1356; Pet. 50–54, 61–64). Nor are we persuaded by Petitioner's argument that if Patent Owner "believe[s] there is a deficiency in the art relating to the limitations of claims 6-8 . . ., [Patent Owner] ha[d] sufficient opportunity to address any purported deficiencies in its sur-reply." *Id.* (citing *Sirona Dental*, 892 F.3d at 1356). Again, it is the Petition that guides the proceeding. *See Koninklijke Philips*, 948 F.3d at 1335–36. Furthermore, any statements in the Decision on Institution regarding the sufficiency of Petitioner's showings for claims 6 and 7 were preliminary. *See Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016) ("At th[e Institution] point, the Board is considering the matter preliminarily without the benefit of a full record. The Board is free to change its view of the merits after further development of the record . . . ."). Upon a review of the full record, and in light of *Koninklijke Philips*, we find that Petitioner's showings for claims 6 and 7 are insufficient for the reasons we provide herein.

We also are not persuaded by Petitioner's argument that "Ahonen is not needed to show the unpatentability of the limitations recited in claims 6[ and 7] because claims 6[ and 7] do not further limit the elements recited in claim 5 and instead only limit elements that appear in claim 1." Pet. Reply 23. Rather, "[c]laims in dependent form shall be construed to include all the limitations of the claim incorporated by reference into the dependent claim."

51

IPR2019-00820
Patent 7,937,581 B2

37 C.F.R. § 1.75(c).  In other words, claims 6 and 7 include claim 5's requirements regarding the reply message.  *Id.*  The Petition fails to account for the claimed reply message in its analysis of claims 6 and 7, and thus, does not demonstrate their unpatentability.  Pet. 50–54.

We also are not persuaded that the Petition presents, "as an alternative theory, [that claim 5 is] . . . unpatentable over the combination of Ishiyama and Murakawa due to the well-known 'ACK' functionality used in the TCP/IP protocol taught by Ishiyama."  Pet. Reply 22 (citing Pet. 54–55; Ex. 1022 ¶¶ 63–65).  Rather, the Petition provides that "in the TCP/IP protocol, destination computers receiving data packets are required to transmit positive acknowledgments (ACK) to source computers to provide a reliable and secure IP connection."  Pet. 55.  More specifically, Petitioner argues that "[t]he TCP must recover from data that is damaged, lost, duplicated, or delivered out of order by the internet communication system[, and that t]his is achieved by assigning a sequence number to each octet transmitted, and requiring a positive acknowledgment (ACK) from the receiving TCP."  *Id.* at n.8 (quoting Ex. 1012, 4; citing Ex. 1002 ¶ 120).

This argument — which appears in a separate ground (Ishiyama, Murakawa, and Ahonen) — fails to show that Ishiyama teaches an ACK that is sent to a mobile terminal's second address to confirm an address change, as required by claim 5.  Nor does Petitioner tether this argument to any specific portions of Ishiyama or Murakawa.  Pet. 55.  To the contrary, Petitioner admits that "Ishiyama and Murakawa . . . do not explicitly describe this reply message."  *Id.*  Petitioner further admits that "after an address update request message has been sent from a mobile terminal, Ishiyama and Murakawa do not describe how a mobile terminal would be

52

IPR2019-00820
Patent 7,937,581 B2

informed that the address was successfully updated before initiating communications from the new address." *Id.* at 55–56 (citing Ex. 1002 ¶ 123). Petitioner's analysis of claim 5 under this ground addresses what Ahonen adds to the combination of Ishiyama and Murakawa. *Id.* at 55–61. Petitioner does not assert that claim 5 is obvious over Ishiyama, Murakawa, and the knowledge of ACK functionality in the TCP/IP protocol. *Id.* at 4 (summarizing ground as obviousness over Ishiyama, Murakawa, and Ahonen), 54–61 (analyzing ground as including Ahonen).

Nevertheless, even if we consider the Petition to include an assertion that claim 5 is unpatentable as obvious over Ishiyama and Murakawa (without adding Ahonen), we are not persuaded that Petitioner made such a showing. Specifically, we are not persuaded by Petitioner's argument that in light of the TCP's ACK that "the reply message as recited in claim[] . . . 5 was obvious as a concept in the prior art and would have been obvious in view of Ishiyama and Murakawa." *Id.* at 55; *see also* Ex. 1002 ¶ 122. Although "[a] person of ordinary skill in the art is also a person of ordinary creativity, not an automaton," *KSR*, 550 U.S. at 421, there may be limits in a particular case as to how much gap-filling may be based on such creativity. *See Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1361–63 (Fed. Cir. 2016); *DSS Tech. Mgmt., Inc. v. Apple Inc.*, 885 F.3d 1367, 1374–75 (Fed. Cir. 2018) (reliance on ordinary creativity to supply a missing limitation requires the same "searching" inquiry as reliance on common sense). We find that Petitioner fails to provide persuasive evidence that one of ordinary skill in the art would have found it obvious to send a reply message to a mobile terminal's second address to confirm an address change in view of TCP's ACK.

IPR2019-00820
Patent 7,937,581 B2

We do not credit Dr. Goldschlag's declaration testimony that claim 5's reply message "would be an obvious concept to confirm the successful updating of the address at the security gateway," and that "in view of the well-known TCP/IP protocol, . . . [one of ordinary skill in the art] would have understood that a reply message would be an obvious implementation detail in view of Ishiyama and Murakawa." Ex. 1002 ¶ 122. Dr. Goldschlag's discussion of TCP using ACKs to address data that is damaged, lost, duplicated, or delivered out of order does not provide sufficient factual corroboration for these opinions concerning using ACKs in the context of address updating. Ex. 1002 ¶ 120 (citing Ex. 1012, 4); *see also In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d 1359, 1368 (Fed. Cir. 2004) ("[T]he Board is entitled to weigh the declarations and conclude that the lack of factual corroboration warrants discounting the opinions expressed in the declarations."); 37 C.F.R § 42.65(a). Dr. Goldschlag also opines that "a mobile terminal that moves to a new address would expect to receive an acknowledgment or confirmation message before transmitting packets from its new address," and that "[a] mobile terminal would likely not blindly transmit data packets from its new address without first receiving confirmation that the security gateway is ready to accept data packets from the new address." Ex. 1002 ¶ 120. We likewise do not credit this testimony, as it too lacks sufficient factual corroboration, and is contrary to the '581 patent's teaching that a reply message is "optional." *See* Ex. 1001, 9:66–10:1, 10:6.

We also disagree with Petitioner that Patent Owner's Response "explicitly recognized" Petitioner's "alternative theory" that claim 5 was obvious "due to the well-known 'ACK' functionality used in the TCP/IP

IPR2019-00820
Patent 7,937,581 B2

protocol taught by Ishiyama." Pet. Reply 22. Rather, the alternative theory Patent Owner responds to is based on Ishiyama's "message (7) from the correspondent host to the mobile terminal in Ishiyama's Figure 7." PO Resp. 72 (citing Pet. 59–61; Ex. 1004, Fig. 7). For this theory, Petitioner argues that in operation 7 "the destination of the message is 'CoA2' and confirms the updated address of the mobile computer." Pet. 60 (citing Ex. 1004, 12:66–13:5). Petitioner argues that "[u]sing CoA2, the correspondent host 3 may originate communications sent to the mobile computer 2 at the updated Care-of address." *Id.* (citing Ex. 1004, 13:6–9). We are not persuaded by Petitioner's arguments. Rather, we agree with Patent Owner and find that "the message in step (7) is simply an encapsulated message using the new care-of address CoA2 in the outer packet[, and] . . . is not a [confirmatory] reply to a request for an address change from the mobile terminal." PO Resp. 72; *see also* Ex. 1004, Fig. 7, 12:66–13:5. Moreover, Ishiyama does not teach that operation 7's message is recognized as a confirmation of the address change. Ex. 1004, Fig. 7, 12:66–13:9. Instead, Ishiyama simply sends and receives messages at the second address (e.g., correspondent host sends a secure message to the mobile computer). *Id.* at Fig. 7, 12:66–13:5; *see also id.* at 13:3–5 ("Consequently the session is guaranteed even when the mobile computer 2 moves (the operations (6) and (7) of FIG. 7)."); *infra* Section VI(G) (discussing Ishiyama teaching claim 9's security gateway forwarding the message as an encrypted secure message to the second address).

Accordingly, Petitioner has not demonstrated by a preponderance of the evidence that claims 6 and 7 of the '581 patent would have been obvious to one of ordinary skill in the art in view of Ishiyama and Murakawa.

55

IPR2019-00820
Patent 7,937,581 B2

*G. Challenged Claim 9*

Claim 9 is an independent claim and shares some nearly identical limitations with independent claim 1.  Namely, claim 9's preamble and first four elements are nearly identical to those recited in claim 1.  *Compare* Ex. 1001, 12:1–17, *with id.* at 10:50–67.  As such, the parties rely on their arguments from claim 1 for these limitations.  Pet. 41–42; PO Resp. 65.  As these limitations are the same, and the parties rely on their same arguments, our findings as to claim 1's preamble and first four limitations apply equally here.  *See supra* Section VI(C)(1)–(5).  Accordingly, we find that Petitioner has demonstrated by a preponderance of the evidence that the combination of Ishiyama and Murakawa teaches claim 9's preamble and first four limitations.

In addition, claim 9 further recites "the other terminal sending a message to the second address of the mobile terminal via the security gateway, and the security gateway receiving the message from the other terminal and forwarding the message as an encrypted secure message to the second address."  Ex. 1001, 12:18–22.  We agree with Petitioner and find that the combination of Ishiyama and Murakawa teaches these limitations. Pet. 41–47.

We find that Ishiyama teaches sending a secure message from Ishiyama's correspondent host to the mobile computer's second location, as shown below in Figure 7's operation (7), as annotated by Petitioner.  *See* Pet. 41–42 (annotating Ex. 1004, Fig. 7).

56

IPR2019-00820
Patent 7,937,581 B2



Annotated Figure 7 "is a sequence chart showing an exemplary processing sequence in the case where the mobile computer initiates communications at a visited site and then changes . . . location" with a green box around the correspondent node ("CN") identifier and a red box around the mobile computer identifier ("MN").  Ex. 1004, 5:20–23; Pet. 42 (annotating Ex. 1004, Fig. 7).  Ishiyama teaches that as a result of its CoA update operations, "at the correspondent [host] currently communicating with the mobile computer 2, the endpoint of the IPSEC tunnel is changed from 'CoA1' to 'CoA2' as the destination of all the security associations,'" and "[c]onsequently, the session is guaranteed even when the mobile computer 2 moves . . . ."  Ex. 1004, 12:66–13:5; Pet. 41–42.  Put differently, as Figure 7 illustrates, the secure message is sent to the second address of the mobile terminal from Ishiyama's correspondent host.  Ex. 1004, Fig. 7

57

IPR2019-00820
Patent 7,937,581 B2

(illustrating for operation (7) that the outer packet's Src: has the value "CN" and Dst: has the value "CoA2").

As to Murakawa, we agree with Petitioner and find that Murakawa teaches an "other terminal" sending a secure message in a secure connection to an address of a terminal via the security gateway, and that the security gateway receives the message from the "other terminal" and forwards it as an encrypted secure message to the terminal's address. *E.g.*, Ex. 1005, Fig. 5; Pet. 44–46. This is shown in Murakawa's Figure 5, shown below as annotated in the Petition. *See* Pet. 44 (providing annotated Figure 5).



FIG. 5   PRIOR ART

Murakawa's Figure 5, as annotated by Petitioner, shows a "prior art typical network system" with (i) a red box around PC 101 and labeled "Mobile Terminal," (ii) a green box around security gateway 103 and labeled "Security Gateway," and (iii) a blue box around each of PC 106 and

58

IPR2019-00820
Patent 7,937,581 B2

PC 107, and labeled "Other Terminals." Ex. 1005, 4:32–33; Pet. 44
(annotating Ex. 1005, Fig. 5). As illustrated in Figure 5, Murakawa teaches
that an "other terminal" (PC 106) sends a secure message in the secure
connection (VPN 108) to the mobile terminal (PC 101) via security gateway
103. *Id.* at 1:61–2:4, 2:62–65, Fig. 5; *see also supra* Section VI(C)(1)
(discussing our findings regarding Figure 5's teachings). Furthermore,
Figure 8, shown below as annotated in the Petition, also illustrates the
addressing of the secure message sent from PC 106 (other terminal) to the
PC 101 (mobile terminal) by security gateway 103.

FIG. 8    PRIOR ART



Annotated Figure 8 "illustrates diagrammatically . . . prior art IPsec
communication in the tunnel mode" with (i) a red box around PC 101 and
labeled "Mobile Terminal," (ii) a green box around security gateway 103
and labeled "Security Gateway," and (iii) a blue box around PC 106, and
labeled "Other Terminal." Ex. 1005, 4:41–42; Pet. 45 (annotating Ex. 1005,
Fig. 8). As illustrated, "IP addresses 'A', 'B', and 'C' are assigned to PC

59

IPR2019-00820
Patent 7,937,581 B2

101, security gateway 103, and client PC 106, respectively." Ex. 1005, Fig.

8, 3:4–6; Pet. 45. Murakawa teaches the following:

> When client PC 106 on LAN 104 transmits an IP packet
> to PC 101, which has established connection with PC 106 via
> VPN 108,
>
>> 1) client PC 106 generates IP packet 100 in which the
>> sender's IP address is "C" and the receiver's IP address is
>> "A", then sends it to security gateway 103;
>> 2) received packet 100, gateway 103 identifies that the
>> packet is the one to be sent to PC 101 which has established
>> VPN 108;
>> 3) gateway 103 encapsulates IP packet 100 according to
>> exchanged information during the IKE communication;
>> 4) the IP header including the sender's IP address B and
>> the receiver's IP address "A" is added to outside the
>> originally set IP address;
>> 5) authentication information is added to the encapsulated
>> IP packet based on the exchanged information, then the IP
>> packet is encrypted;
>> 6) received the encapsulated packet via VPN 108, PC 101
>> retrieves encapsulated original IP packet 100 from the
>> received packet, according to the exchanged information,
>> then process[es] it.

Ex. 1005, 3:8–28; Pet. 45–46. In other words, Murakawa teaches an "other

terminal" (PC 106) sending a secure message in a secure connection to an

address of a mobile terminal via the security gateway. Ex. 1005, 3:8–28.

Furthermore, we credit Dr. Goldschlag's testimony that one of ordinary skill

in the art would have understood that Murakawa teaches a well-known

IPSec tunnel mode configuration with a security gateway facilitating

communication between a mobile terminal and other terminals because this

testimony is consistent with our findings of Murakawa's teachings. *See* Ex.

1002 ¶ 99.

60

IPR2019-00820
Patent 7,937,581 B2

Accordingly, we find that the combination of Ishiyama and Murakawa teaches the "other terminal" (PC 106) sending a secure message in the secure connection (VPN 108) to the second address (CoA2) of the mobile terminal via security gateway 103, and that the security gateway 103 receives the message from other terminal (PC 106) and forwards the message as an encrypted secure message (via VPN 108) to the second address of the mobile terminal.

We are not persuaded by Patent Owner's arguments that Ishiyama's "operation (7) is an end-to-end, two-component secure communication from correspondent terminal CN to mobile terminal MN," and does not teach "[t]he three-component communication called for by the claim (other terminal-security gateway-first terminal)." PO Resp. 66–67 (citing Ex. 2009 ¶¶ 157–159). Patent Owner focuses on Ishiyama's teachings individually, rather than the combined teachings of Ishiyama and Murakawa. *See In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) ("Non-obviousness cannot be established by attacking references individually where the rejection is based upon the teachings of a combination of references"). Again, as to the second way Petitioner combines Ishiyama and Murakawa, Ishiyama's mobile address changing functionality is combined with Murakawa's security gateway configuration (e.g., security gateway 103 and other terminal 106). *See* Pet. 11–53; Dec. on Inst. 25, 38–39 (noting the two alternative ways). Hence, a mobile terminal securely communicates with another terminal via Murakawa's security gateway 103 rather than Ishiyama's correspondent host 3. *See* Pet. 11–53.

In summary, we find combining Ishiyama's mobile address changing functionality with Murakawa's security gateway and another terminal

61

IPR2019-00820
Patent 7,937,581 B2

teaches "the other terminal sending a message to the second address of the mobile terminal via the security gateway, and the security gateway receiving the message from the other terminal and forwarding the message as an encrypted secure message to the second address."

Lastly, we find that the parties' arguments and our findings concerning a rationale to combine Ishiyama and Murakawa discussed above in the context of claim 1 apply equally here. *See supra* Section VI(C)(7) (finding that one of ordinary skill in the art would have combined the references). Accordingly, we find by a preponderance of the evidence that Petitioner has provided persuasive reasoning showing that one of ordinary skill in the art would have had reason to combine Ishiyama and Murakawa in the manner claimed.

Accordingly, based on a review of the entire record, we find that Petitioner has demonstrated by a preponderance of the evidence that claim 9 would have been obvious over the combined teachings of Ishiyama and Murakawa.

## VII.    ALLEGED OBVIOUSNESS OVER ISHIYAMA, MURAKAWA, AND AHONEN

Petitioner argues that the combination of Ishiyama, Murakawa, and Ahonen renders claims 3 and 5 of the '581 patent obvious under 35 U.S.C. § 103(a). Pet. 54–61. We have reviewed the parties' arguments and the evidence of record. For the reasons that follow, we determine that Petitioner shows by a preponderance of the evidence that claims 3 and 5 would have been obvious to one of ordinary skill in the art in view of Ishiyama, Murakawa, and Ahonen.

62

IPR2019-00820
Patent 7,937,581 B2

### A. Summary of Ahonen

Ahonen relates to a VPN "in which a mobile terminal establishes a secure connection with a correspondent host located in an intranet, via a [s]ecurity [g]ateway." Ex. 1006, 1:5–7. Figure 1, shown below, illustrates this network topology, in accordance with Ahonen's invention. *Id.* at 3:30–31, 3:57–61.



<u>Figure 1</u>

Figure 1 illustrates mobile host 1 connected to correspondent host 4 via access network 6, Internet 2, firewall 3, and intranet 5. *Id.* at 3:57–63. A secure connection is established between mobile host 1 and correspondent host 4 over this path. *Id.* at 3:65–4:1.

### B. Challenged Claims 3 and 5

Claims 3 and 5 depend from independent claim 1. Claim 3 recites "[t]he method of claim 1, wherein in step c) a reply back to the mobile terminal is sent from the security gateway after the request from the mobile terminal to change the address." Ex. 1001, 11:6–8. Claim 5 recites "[t]he

63

method of claim 1 wherein the method further comprises the security gateway sending back a reply message to the mobile terminal at the second address to confirm the address change." *Id.* at 11:11–14. We agree with Petitioner and find that the combination of Ishiyama, Murakawa, and Ahonen teaches the subject matter of claims 3 and 5. Pet. 54–61.

First, for the reasons we explain above, we agree that the combination of Ishiyama and Murakawa teaches the subject matter of claim 1, from which claims 3 and 5 depend.

Second, we agree with Petitioner and find that Ahonen teaches that a mobile host moves to another address and sends a certificate to a security gateway (also referred to as a firewall) using an IPsec protocol. Ex. 1006, 3:58–59, 9:29–30, 9:40; Pet. 57. Ahonen teaches that the certificate sent from the mobile host may contain "the cryptographic identity of the mobile host" and "the (New) Source and Destination IP addresses (if changed)." Ex. 1006, 9:33–35; Pet. 57. The firewall then determines whether a corresponding database includes a record matching the identification of the mobile host. Ex. 1006, 9:52–61. Ahonen teaches that if a match is found, the database is updated (e.g., "the Source and Destination IP addresses are updated if they are changed"), and the firewall "send[s] an 'ACK' (acknowledgement) message back to the mobile host." *Id.* at 9:62–65, 10:4–6; Pet. 57. Ahonen teaches that after the mobile host has received the "ACK" message from the firewall, the mobile host can begin to send application traffic. Ex. 1006, 10:21–25.

Third, we agree with Petitioner and find that one of ordinary skill in the art would have found it obvious to implement Ahonen's reply ACK message with Ishiyama's address changing functionality to aid in

64

IPR2019-00820
Patent 7,937,581 B2

maintaining "mobility without interrupting the session" as in Ishiyama. Pet. 58 (citing Ex. 1006, 6:54–60).  We also agree with Petitioner that one of ordinary skill in the art would have found it obvious to incorporate Ahonen's teachings to "inform the mobile computer whether the records stored at the security gateway were successfully updated to allow the mobile computer to begin transmitting data packets," as taught in Ahonen.  *Id*., Ex. 1006, 10:4– 7, 10:21–25.  *See PGS Geophysical*, 891 F.3d at 1365 ("[T]he motivation to modify a reference can come from the knowledge of those skilled in the art, from the prior art reference itself, or from the nature of the problem to be solved.").

We are not persuaded by Patent Owner's argument that "Ahonen cannot satisfy the 'reply' limitation" because Ahonen's underlying request is "for a **new secure connection with a new SA** that can accommodate an address change," rather than "for an **existing secure connection with the same SA** to be modified to accommodate the change in the IP address of the mobile terminal."  PO Resp. 71 (citing Ex. 2009 ¶¶ 181–183).  Nor are we persuaded by Patent Owner's argument that Ahonen's reply message follows a request for changing a secure connection between a mobile terminal and a correspondent host, rather than a secure connection between a mobile terminal and a gateway.  PO Resp. 71–72 (citing Ex. 1006, 8:33–36; Ex. 2009 ¶ 183).  For both of these arguments, Patent Owner incorrectly focuses on Ahonen's teachings individually, rather than the combined teachings of Ishiyama, Murakawa, and Ahonen.  *See Merck*, 800 F.2d at 1097 ("Non-obviousness cannot be established by attacking references individually where the rejection is based upon the teachings of a combination of references").  Again, Petitioner combines Ishiyama's mobile

65

IPR2019-00820
Patent 7,937,581 B2

address changing functionality with Murakawa's security gateway configuration (*e.g.*, security gateway 103 and other terminal 106). *See* Pet. 12–54; Dec. on Inst. 24–25, 37–38 (noting the two alternative ways). And, Ahonen's reply message is incorporated into this combination where (i) Ishiyama's address changing functionality combined with Murakawa's security gateway configuration relates to an existing secure connection with the same SA, and (ii) Murakawa's security gateway sends the reply message to the mobile terminal. Pet. 17–47, 54–58.

Accordingly, Petitioner has demonstrated by a preponderance of the evidence that claims 3 and 5 of the '581 patent would have been obvious to one of ordinary skill in the art in view of Ishiyama, Murakawa, and Ahonen.

## VIII. ALLEGED OBVIOUSNESS OVER ISHIYAMA, MURAKAWA, AND FORSLÖW

Petitioner argues that the combination of Ishiyama, Murakawa, and Forslöw renders claim 8 of the '581 patent obvious under 35 U.S.C. § 103(a). Pet. 61–64. Claim 8 is a dependent claim and depends from claim 5. Ex. 1001, 11:22–23. As we discuss above, claim 5 recites, *inter alia*, "a reply message," which the Petition does not address in its showing for claim 8. *See supra* Pet. 61–64. Again, the Petition alleges that claim 5 is obvious in light of Ishiyama, Murakawa, and Ahonen, and relies on Ahonen to teach claim 5's reply message. Pet. 54–61; *see also supra* Section VII(B) (discussing Petitioner's challenge of claim 5 as obvious over Ishiyama, Murakawa, and Ahonen). But this asserted ground for claim 8 does not include Ahonen.

As explained above, the Petition guides the proceeding. *See Koninklijke Philips*, 948 F.3d at 1335–36. Here, the Petition alleges that

66

claim 8 is obvious in view of Ishiyama, Murakawa, and Forslöw.  Pet. 4, 61–64.  In other words, the combination of Ishiyama, Murakawa, and Forslöw is "the ground[] on which the challenge to [the] . . . claim is based.'"  *Koninklijke Philips*, 948 F.3d at 1335.  In view of how the Petition is worded and the analysis provided for claim 8, we do not consider one of the challenged grounds to be whether claim 8 would have been obvious in view of Ishiyama, Murakawa, Forslöw, *and Ahonen*.

Accordingly, as the Petition does not address claim 5's requirements regarding the "reply message" for this asserted ground, we find that Petitioner has not demonstrated by a preponderance of the evidence that claim 8 of the '581 patent would have been obvious to one of ordinary skill in the art in view of Ishiyama, Murakawa, and Forslöw.

IX.    CONCLUSION[17]

Based on the full record before us, we determine that Petitioner has demonstrated by a preponderance of the evidence that (i) claims 1, 2, and 9 of the '581 patent are unpatentable under 35 U.S.C. § 103(a) in view of Ishiyama and Murakawa; and (ii) claims 3 and 5 are unpatentable under 35 U.S.C. § 103(a) in view of Ishiyama, Murakawa, and Ahonen.  We also determine that Petitioner has not demonstrated by a preponderance of the

---

[17] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices.  *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2019-00820
Patent 7,937,581 B2

evidence that (i) claims 4, 6, and 7 of the '581 patent are unpatentable under
35 U.S.C. § 103(a) in view of Ishiyama and Murakawa; or (ii) claim 8 is
unpatentable under 35 U.S.C. § 103(a) in view of Ishiyama, Murakawa, and
Forslöw.

| Claim(s) | 35 U.S.C § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 4, 6, 7, 9 | 103(a) | Ishiyama, Murakawa | 1, 2, 9 | 4, 6, 7 |
| 3, 5 | 103(a) | Ishiyama, Murakawa, Ahonen | 3, 5 | |
| 8 | 103(a) | Ishiyama, Murakawa, Forslöw | | 8 |
| **Overall Outcome** | | | 1–3, 5, 9 | 4, 6–8 |

X.     ORDER

In consideration of the foregoing, it is hereby

ORDERED that, pursuant to 35 U.S.C. § 314(a), Petitioner has
shown by a preponderance of the evidence that claims 1–3, 5, and 9 of the
'581 patent are unpatentable;

FURTHER ORDERED that Petitioner has not shown by a
preponderance of the evidence that claims 4 and 6–8 of the '581 patent are
unpatentable; and

FURTHER ORDERED that parties to the proceeding seeking judicial
review of this Final Written Decision must comply with the notice and
service requirements of 37 C.F.R. § 90.2.

IPR2019-00820
Patent 7,937,581 B2

PETITIONER:

Michael D. Specht
Daniel S. Block
Timothy L. Tang
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
mspecht-ptab@sternekessler.com
dblock-ptab@sternekessler.com
ttang-ptab@sternekessler.com

PATENT OWNER:

James T. Carmichael
Stephen Schreiner
CARMICHAEL IP LAW, PLLC
jim@carmichaelip.com
schreiner@carmichaelip.com

Christopher J. Lee
Richard B. Megley
Brian E. Haan
Ashley E. LaValley
LEE SHEIKH MEGLEY & HAAN LLC
clee@leesheikh.com
rmegley@leesheikh.com
bhaan@leesheikh.com
alavalley@leesheikh.com

Kenneth J. Weatherwax
Patrick Maloney
Jason C. Linger
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com
linger@lowensteinweatherwax.com

69

US007620810B2

(12) **United States Patent**       (10) **Patent No.:**     **US 7,620,810 B2**
Vaarala et al.                                           (45) **Date of Patent:**          **Nov. 17, 2009**

(54) **METHOD AND NETWORK FOR ENSURING SECURE FORWARDING OF MESSAGES**

(75) Inventors: **Sami Vaarala**, Helsinki (FI); **Antti Nuopponen**, Espoo (FI)

(73) Assignee: **Mobility Patent Holding MPH Oy**, Espoo (FI)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 536 days.

(21) Appl. No.: **10/490,932**

(22) PCT Filed: **Sep. 27, 2002**

(86) PCT No.: **PCT/FI02/00770**

§ 371 (c)(1),
(2), (4) Date: **Nov. 22, 2004**

(87) PCT Pub. No.: **WO03/030487**

PCT Pub. Date: **Apr. 10, 2003**

(65) **Prior Publication Data**

US 2005/0083947 A1     Apr. 21, 2005

(30) **Foreign Application Priority Data**

Sep. 28, 2001    (FI)    .................................. 20011910

(51) **Int. Cl.**
*H04L 9/00*        (2006.01)
(52) **U.S. Cl.** ...................... **713/161**; 713/151; 380/247; 455/432.1; 455/436; 370/401
(58) **Field of Classification Search** ................. 713/161; 380/247
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,170,057 B1 * | 1/2001 | Inoue et al. .................. | 713/153 |
| 6,418,130 B1 * | 7/2002 | Cheng et al. ................. | 370/331 |
| 6,587,680 B1 * | 7/2003 | Ala-Laurila et al. ......... | 455/411 |
| 6,839,338 B1 * | 1/2005 | Amara et al. ............... | 370/338 |
| 6,839,770 B1 | 1/2005 | Dillon | |
| 6,904,466 B1 * | 6/2005 | Ishiyama et al. ............ | 709/245 |
| 6,976,177 B2 * | 12/2005 | Ahonen ....................... | 726/3 |
| 7,146,428 B2 * | 12/2006 | Luo ........................... | 709/237 |
| 7,174,018 B1 * | 2/2007 | Patil et al. .................. | 380/258 |
| 7,245,405 B2 | 7/2007 | Friedman | |
| 7,325,063 B2 | 1/2008 | Dillon | |
| 2002/0066036 A1 * | 5/2002 | Makineni et al. ............ | 713/201 |

(Continued)

OTHER PUBLICATIONS

IBM, "IP Mobility Support," Memo: Oct. 1996.

(Continued)

*Primary Examiner*—Nasser G Moazzami
*Assistant Examiner*—Fikremariam Yalew
(74) *Attorney, Agent, or Firm*—Fasth Law Offices; Rolf Fasth

(57)            **ABSTRACT**

The method and network ensure secure forwarding of a message in a telecommunication network that has at least one first terminal and another terminal. The first terminal moves from a first address to a second address. A secure connection between the first address of the first terminal and the other terminal defining at least the addresses of the two terminals is established. When the first terminal moves from the first address to a second address, the connection is changed to be between the second address and to the other terminal by means of a request from the first terminal and preferably a reply back to the first terminal.

**7 Claims, 5 Drawing Sheets**



Ex. 1001
Apple v. MPH Techs. Oy
IPR2019-00819

**US 7,620,810 B2**

Page 2

U.S. PATENT DOCUMENTS

2003/0166397 A1* 9/2003 Aura ......................... 455/410

OTHER PUBLICATIONS

The Internet Society, "Securing L2TP using IPsec," Memo: Nov. 2001.

The Internet Society, "IP Mobility Support for IPv4," Memo: Aug. 2002.

The Internet Society, "Layer Two Tunneling Protocol—Version 3 (L2TPv3)," Memo: Mar. 2005.

* cited by examiner



**FIG. 1**



**FIG. 2**



**FIG. 3**



PRIOR ART

FIG. 4



**FIG. 5**

US 7,620,810 B2

**1**

## METHOD AND NETWORK FOR ENSURING SECURE FORWARDING OF MESSAGES

### PRIOR APPLICATIONS

This is a US national phase patent application that claims priority from PCT/FI02/00770, filed 27 Sep. 2002, that claims priority from Finnish Patent Application No. 20011910, filed 28 Sep. 2001.

### TECHNICAL FIELD

The method and network of the invention is intended to secure mobile connections in telecommunication networks. Especially, it is meant for IPSec connections.

The invention provides a method for ensuring secure forwarding of a message in a telecommunication network comprising at least one mobile terminal and another terminal, when the mobile terminal moves from a first address to a second address and there is a secure connection established between the first address of the mobile terminal and the other terminal, which secure connection defines at least the addresses of the two terminals. The invention also provides a network for performing such a method.

### TECHNICAL BACKGROUND

An internetwork is a collection of individual networks connected with intermediate networking devices and functions as a single large network. Different networks can be interconnected by routers and other networking devices to create an internetwork.

A local area network (LAN) is a data network that covers a relatively small geographic area. It typically connects workstations, personal computers, printers and other devices A wide area network (WAN) is a data communication network that covers a relatively broad geographic area. Wide area networks (WANs) interconnect U-Ns across normal telephone lines and, for instance, optical networks; thereby interconnecting geographically disposed users.

There is a need to protect data and resources from disclosure, to guarantee the authenticity of data, and to protect systems from network based attacks. In more detail, there is a need for confidentiality (protecting the contents of data from being read), integrity (protecting the data from being modified, which is a property that is independent of confidentiality), authentication (obtaining assurance about the actual sender of data), replay protection (guaranteeing that data is fresh, and not a copy of previously sent data), identity protection (keeping the identities of parties exchanging data secret from outsiders), high availability, i.e. denial-of-service protection (ensuring that the system functions even when under attack) and access control. IPSec is a technology providing most of these, but not all of them. (In particular, identity protection is not completely handled by IPSec, and neither is denial-of-service protection.)

The IP security protocols (IPSec) provides the capability to secure communications between arbitrary hosts, e.g. across a LAN, across private and public wide area networks (WANs) and across the internet IPSec can be used in different ways, such as for building secure virtual private networks, to gain a secure access to a company network, or to secure communication with other organisations, ensuring authentication and confidentiality and providing a key exchange mechanism. IPSec ensures confidentiality integrity, authentication, replay protection, limited traffic flow confidentiality, limited identity protection, and access control based on authenticated identi-

**2**

ties. Even if some applications already have built in security protocols, the use of IPSec further enhances the security.

IPSec can encrypt and/or authenticate traffic at IP level. Traffic going in to a WAN is typically compressed and encrypted and traffic coming from a WAN is decrypted and decompressed. IPSec is defined by certain documents, which contain rules for the IPSec architecture. The documents that define IPSec, are, for the time being, the Request For Comments (RFC) series of the Internet Engineering Task Force (IETF), in particular, RFCs 2401-2412.

Two protocols are used to provide security at the IP layer; an authentication protocol designated by the header of the protocol, Authentication Header (AH), and a combined encryption/authentication protocol designated by the format of the packet for that protocol, Encapsulating Security Payload (ESP). AH and ESP are however similar protocols, both operating by adding a protocol header. Both AH and ESP are vehicles for access control based on the distribution of cryptographic keys and the management of traffic flows related to these security protocols.

Security association (SA) is a key concept in the authentication and the confidentiality mechanisms for IP. A security association is a one-way relationship between a sender and a receiver that offers security services to the traffic carried on it if a secure two way relationship is needed, then two security associations are required. If ESP and AH are combined, or if ESP and/or AH are applied more than once, the term SA bundle is used, meaning that two or more SAs are used. Thus, SA bundle refers to one or more SAs applied in sequence, e.g. by first performing an ESP protection, and then an AH protection. The SA bundle is the combination of all SAs used to secure a packet.

The term IPsec connection is used in what follows in place of an IPSec bundle of one or more security associations, or a pair of IPSec bundles—one bundle for each direction—of one or more security associations. This term thus covers both unidirectional and bidirectional traffic protection. There is no implication of symmetry of the directions, i.e., the algorithms and IPSec transforms used for each direction may be different.

A security association is uniquely identified by three parameters. The first one, the Security Parameters Index (SPI), is a bit string assigned to this St The SPI is carried in AH and ESP headers to enable the receiving system to select the SA under which a received packet will be processed. IP destination address is the second parameter, which is the address of the destination end point of the SA, which may be an end user system or a network system such as a firewall or a router. The third parameter, the security protocol identifier indicates whether the association is an AH or ESP security association.

In each IPSec implementation, there is a nominal security association data base (SADB) that defines the parameters associated with each SA. A security association is normally defined by the following parameters. The Sequence Number Counter is a 32-bit value used to generate the sequence number field in AH or ESP-headers. The Sequence Counter Overflow is a flag indicating whether overflow of the sequence number counter should generate an auditable event and prevent further transmission of packets on this SA. An Anti-Replay Window is used to determine whether an inbound AH or ESP packet is a replay. AH information involves information about the authentication algorithm, keys and related parameters being used with AH. ESP information involves information of encryption and authentication algorithms, keys, initialisation vectors, and related parameters being used with IPSec. The sixth parameter, Lifetime of this Security

US 7,620,810 B2

3 4

Association, is a time-interval and/or byte-count after which a SA must be replaced with a new SA (and: new SPI) or terminated plus an indication of which of these actions should occur. IPSec Protocol Mode is either tunnel or transport mode. Path MTU, which is an optional feature, defines the maximum size of a packet that can be transmitted without fragmentation.

Both AH and ESP support two modes used, transport and tunnel mode.

Transport mode provides protection primarily for upper layer protocols and extends to the payload of an IP packet. Typically, transport mode is used for end-to-end communication between two hosts. Transport mode may be used in conjunction with a tunnelling protocol (other that IPSec tunnelling).

Tunnel mode provides protection to the entire IP packet and is generally used for sending messages through more than two components, although tunnel mode may also be used for end-to-end communication between two hosts. Tunnel mode is often used when one or both ends of a SA is a security gateway, such as a firewall or a router that implements IPSec. With tunnel mode, a number of hosts on networks behind firewalls may engage in secure communications without implementing IPSec. The unprotected packets generated by such hosts are tunnelled through external networks by tunnel mode SAs set up by the IPSec software in the firewall or secure router at boundary of the local network.

To achieve this, after the AH or ESP fields are added to the IP packet, the entire packet plus security fields are treated as the payload of a new outer IP packet with a new outer IP header. The entire original, or inner, packet travels through a tunnel from one point of an IP network to another no routers along the way are able to examine the inner IP packet. Because the original packet is encapsulated, the new larger packet may have totally different source and destination addresses, adding to the security. In other words, the first step in protecting the packet using tunnel mode is to add a new IP header to the packet; thus the "IP|payload" packet becomes "IP|IP|payload". The next step is to secure the packet using ESP and/or AH. In case of ESP, the resulting packet is "IP|ESP|IP|payload". The whole inner packet is covered by the ESP and/or AH protection. AH also protects parts of the outer header, in addition to the whole inner packet.

The IPSec tunnel mode operates e.g. in such a way that if a host on a network generates an IP packet with a destination address of another host on another network, the packet is routed from the originating host to a security gateway (SGW), firewall or other secure router at the boundary of the first network. The SGW or the like filters all outgoing packets to determine the need for IPSec processing. If this packet from the first host to another host requires IPSec, the firewall performs IPSec processing and encapsulates the packet in an outer IP header. The source IP address of this outer IP header is this firewall and the destination address may be a firewall that forms the boundary to the other local network. This packet is now routed to the other hosts firewall with intermediate routers examining only the outer IP header. At the other host firewall, the outer IP header is stripped off and the inner packet is delivered to the other host.

ESP in tunnel mode encrypts and optionally authenticates the entire inner IP packet, including the inner IP header. AH in tunnel mode authenticates the entire inner IP packet including the inner IP header, and selected portions of the outer IP header.

The key management portion of IPSec involves the determination and distribution of secret keys. The default automated key management protocol for IPSec is referred to as ISAKMP/Oakley and consists of the Oakley key determination protocol and Internet Security Association and Key Management Protocol (ISAKMP). Internet key exchange (IKE) is a newer name for the ISAKMP/Oakley protocol. IKE is based on the Diffie-Hellman algorithm and supports RSA signature authentication among other modes. IKE is an extensible protocol, and allows future and vendor-specific features to be added without compromising functionality.

IPSec has been designed to provide confidentiality, integrity, and replay protection for IP packets. However, IPSec is intended to work with static network topology, where hosts are fixed to certain subnetworks. For instance, when an IPSec tunnel has been formed by using Internet Key Exchange (IKE) protocol, the tunnel endpoints are fixed and remain constant If IPSec is used with a mobile host the IKE key exchange will have to be redone from every new visited network. This is problematic, because IKE key exchanges involve computationally expensive Diffie-Hellman key exchange algorithm calculations and possibly RSA calculations. Furthermore, the key exchange requires at least three round trips (six messages) if using the IKE aggressive mode followed, by IKE quick mode, and nine messages if using IKE main mode followed by IKE quick mode. This may be a big problem in high latency networks, such as General Packet Radio Service (GPRS) regardless of the computational expenses.

In this text, the term mobility and mobile terminal does not only mean physical mobility, instead the term mobility is in the first hand meant moving from one network to another, which can be performed by a physically fixed terminal as well.

The problem with standard IPSec tunnel end points are that they are fixed. A SA is bound to a certain IP address, and if it is changed, the existing IPSec SA becomes useless because it has been established by using different endpoint addresses. The problem has been discussed in the IETF standardisation forum, www.IETF.org, wherein an idea to support mobility for IPSec ESP tunnels by means of signalling to update the address of one end after a movement was mentioned by Francis Dupont. No solutions have however been presented until this date.

The standard Mobile IP protocol provides a mobile terminal with a mobile connection, and defines mechanisms for performing efficient handovers from one network to another. However, Mobile IP has several disadvantages. The security of Mobile IP is very limited. The mobility signalling messages are authenticated, but not encrypted, and user data traffic is completely unprotected. Also, there is no key, exchange mechanism for establishing the cryptographic keys required for authenticating the mobility signalling. Such keys need to be typically distributed manually. Finally, the current Mobile IP protocol does not define a method for working through Network Address Translation (NAT) devices.

A way to solve this problem is to use e.g. Mobile IP to handle the mobility of the host, and use IPSec on top of the static IP address provided by the Mobile IP. Thus, the IPSec SAs are bound to static addresses, and the IPSec SAs can survive mobility of the host. However, this approach suffers from packet size overhead of both Mobile IP and IPSec tunnels, which can affect performance considerably when using links with small throughput.

The documents that define IP in general are the RFC standards RFC 768, RFC 791, RFC 7933, RFC 826 and RFC 2460. RFC 2002, RFC 2003, RFC 2131, RFC 3115, MOBILE lpv4 and IPv6, and DHCPV6 define Mobile IP, IP-IP and DHCP.

US 7,620,810 B2

**5**

Prior art solutions in this technical area are presented in WO 01 39538, WO 00 41427, WO 01 24560, US 2001/009025 and EP 1 24 397.

In WO 01 39538, WO 00 41427, WO 01 24560 and EP 1 24 397, a secure connection, which in the two first emntioned ones is an IPSec SA connection, is transferred from one access point to another in a hand-over situation of a mobile terminal. US 2001/009025 generally presents a secure communication method by means of an IP Sec SA connection.

REFERENCES

The following is a list of useful references of standards mentioned.

IP in general, TCP and UDP:

[RFC768]

J. Postel, *User Datagram Protocol*, RFC 768, August 1980. ftp://ftp.isi.edu/in-notes/rfc7688.txt

[RFC791]

J. Postel, *Internet Protocol*, RFC 791, September 1981. ftp.isi.edu/in-notes/rfc791.text

[RFC792]

J. Postel, *Internet Control Message Protocol*, RFC 792, September 1981. ftp://ftp.isi.edu/in-notes/rfc792.txt

[RFC793]

J. Postel, *Transmission Control Protocol*, RFC 793, september 1981. ftp://ftp.isi.edu/in-notes/rfc793.txt

[RFC826]

D. C. Plummer, An Ethernet Address Resoluffon Protocol, RFC 826, November 1982. ftp://ftp.isi.edu/in-notes/rfc826.txt

[RFC2460]

S. Deering, R. Hinden, *Internet Protocol, Version 6 (IPv6) Specification*, RFC **2460**, December 1998.

Mobile IP; IP-IP; DHCP:

[RFC2002]

C. Perkins, *IP Mobility Support*, RFC 2002, October 1996. ftp://ftp.isi.edu/in-notes/rfc2002.txt

[RFC2003]

C. Perkins, *IP Encapsulation Within IP*, RFC 2003, October 1996. ftp.isi.edu/in-notes/rfc2003.txt

[RFC2131]

R. Droms, *Dynamic Host Configuration Protocol*, RFC 2131, March 1997. ftp://ftp.isi.edu/in-notes/rfc2131.txt

[RFC3115]

G. Dommety, and K. Leung, *Mobile IP Vendor/Organization-specific Extensions*, RFC 3115, April 2001. ftp://ftp.isi.edu/in-notes/rfc3115.txt

[MOBILEIPv6]

D. B. Johnson, C. Perkins, *Mobility Support in IPv6*, Work in progress (Internet-Draft is available), July 2000.

[DHCPV6]

J. Bound, M. Carney, C. Perking, R. Droms, *Dynamic Host Configuration Protocol for IPv6 (DHCPv6)*, Work in progress (Internet-Draft is available), June 2001.

IPsec Standards:

[RFC2401]

S. Kent, and R. Atkinson, Security Architecture for the Internet Protocol, RFC 2401, November 1998. ftp://ftp.isi.edu/in-notes/rfc2401.txt

[RFC2402]

S. Kent, and R. Atkinson, *IP Authentication Header*, RFC 2402, November. 1998. ftp://ftp.isi.edu/in-notes/rfc2402.txt

[RFC2403]

**6**

C. Madson, R. Glenn, The Use of HMAC-MD596 within ESP and AH, RFC 2403, November 1998.

[RFC2404]

C. Madson, R. Glenn, The Use of HMAC-SHA-1-96 win ESP and AH, RFC 2404, November 1998.

[RFC2405]

C. Madson, N. Doraswamy, The ESP DES-CBC Cipher Algorithm With Explicit IV, RFC 2405, November 1998.

[RFC2406]

S. Kent, and R. Atkinson, *IP Encapsulating Security Payload (ESP)*, RFC 2406, November 1998. ftp://ftp.isi.edu/in-notes/rfc2406.txt

[RFC2407]

D. Piper, *The internet IP Security Domain of Interpretation for ISAKMP*, RFC 2407, November 1998. ftp://ftp.isi.edu/in-notes/rfc2407.txt

[RFC2408]

D. Maughan, M. Schneider, M. Scheater, and J. Turner, *Internet Security Association and Key Management Protocol (ISAKMP)*, RFC 2408, November 1998. ftp://ftp.isi.edu/in-notes/rfc2408.txt

[RFC2409]

D. Harkins, and D. Carrel, *The Internet Key Exchange (IKE)*, RFC 2409, November 1998. ftp://ftp.isi.edu/in-notes/rfc2409.txt

[RFC2410]

R. Glenn, S. Kent, *The NULL Encryption Algorithm and Its Use With IPsec*, RFC 2410, November 1998.

[RFC2411]

R. Thayer, N. Doraswamy, R. Glenn, *IP Security Document Roadmap*, RFC 2411, November 1998.

[RFC2412]

H. Orman, *The OAKLEY Key Determination Protocol*, RFC 2412, November 1998.

NAT:

[RFC2694]

P. Srisuresh, G. Tsirtsis, P. Akkiraju, and A Heffeman, *DNS Extensions to Network Address Translators (DNS_ALG)*, RFC 2694, September 1999.

[RFC3022]

P. Shisuresh, K. Egevang, *Traditional IP Network Address Translator (Traditional NAT)*, RFC 3022, January 2001 ftp://ftp.isi.edu/in-notes/rfc3022.txt

THE OBJECT OF THE INVENTION

The object of the invention is to ensure secure forwarding of messages from and to mobile terminals by avoiding the problems of prior art.

SUMMARY OF THE INVENTION

The method and network of the invention is to ensure secure forwarding of a message in a telecommunication network, comprising at least one first terminal and another terminal. In the method, the first terminal moves from a first address to a second address. A secure connection between the first address of the first terminal and the other terminal defining at least the addresses of the two terminals is established. The first terminal moves from the first address to a second address. The connection is changed to be between the second address and the other terminal by means of a request from the first terminal and preferably, a reply back to the first terminal.

In the invention, the first terminal is movable from one network to another. Such a terminal can physically be a mobile terminal or a fixed terminal.

US 7,620,810 B2

7

The secure connection is an IPSec connection established by forming one or more Security Associations (SAs) using the IPSec protocols. The request and/or the reply message can be protected e.g. by IPSec encryption and/or authentication, possibly using the same IPSec SA that is used for traffic protection purposes.

In general, registration request and registration reply are Mobile IP terms while the invention is not bound to Mobile IP. In the invention, the terms request and reply are used in the generic sense, and may or may not be related to Mobile IP.

The method of the invention can be used in different kinds of networks. If the first terminal and the other terminal form an end-to-end connection, the secure connection may be an IPSec tunnel mode or transport mode connection. Furthermore, one of or both of the first terminal and the other terminal can be a security gateway protecting one or more computers, whereby IPSec tunnel mode, or IPSec transport mode together with a tunnelling protocol (such as Layer 2 Tunnelling Protocol, L2TP), is used for the secure connection between the first terminal and the other terminal.

If both terminals are mobile, a special solution is required for the situation when both terminals move simultaneously in case of a so called "double jump" situation. This solution can be implemented e.g. by using a centralised registry of current locations of hosts, although other solutions exist for the problem. However, the "changeable" IPSec tunnel or transport mode SAs of the invention could be used in that case, too.

The applicant has solved the above problems of prior art by defining a signalling mechanism that allows an existing IPSec security association, that is, the symmetric encryption and authentication algorithms used for packet processing, along with their keys and other parameters, to be moved from one network to another. To be more precise, an existing IPSec tunnel endpoint can be moved in the invention from one point of attachment to another. For instance, an IPSec tunnel established between addresses A and X tunnel can be changed by using the defined signalling to be between addresses B and X using only a single round trip for signalling (2 messages), or half a round trip (1 message, if a reply message is not used) for signalling. The solution requires minimal computational overhead compared to Diffie-Helman or strong authentication calculations.

The signalling mechanism is preferably similar to the one in Mobile IP, i.e. a registration request (RREQ) is sent to the other end of the SA followed by a registration reply (RREP) back to the sender of the RREQ message, both of which are extensible for future features and optional attributes. The RREQ/RREP message pair is sent from the new network, and once properly authenticated, the sender IPSec tunnel endpoint is updated from the old network to the now network.

In case the security association used for protecting user traffic is also used for signalling purposes, the reception of the RREQ message by the other end of the SA requires a change in a normal IPSec implementation to accept a packet that appears to belong to a certain IPSec tunnel, but comes from a wrong address (i.e. the tunnel is currently between A and X, and the RREQ comes from address B). This is only necessary for the RREQ message. Such an implementation is provided by the invention; it is necessary to modify IPSec if IPSec is used for the RREQ/RREP signalling. In that case, it is required specifically for processing of the RREQ and RREP messages, if the reply message is to be used.

The request message may update a set of security associations, for instance, a single security association, a security association bundle, an IPSec connection, a group of IPSec connections, or any combinations of these. In practice, it is useful to update either a single IPSec connection or a group of

8

IPSec connections. The latter may be important if separate IPSec connections are used for different kinds of traffic. A single request message can then update all (or a certain set) of such connections to a new address, instead of requiring separate requests for each IPSec connection. In the following, the case of updating a single IPSec connection is discussed, without limiting the invention to this behaviour.

Another method of performing the signalling is to use a separate protocol. The protocol should preferably provide encryption and/or authentication of the signalling messages. The IKE protocol already has messages defined for e.g. deleting IPSec SAs. One method of providing the necessary signalling would be by adding a new IKE notification message type that requests a change in an existing IPSec SA Such a message should provide its own encryption and/or authentication to avoid requiring an IKE connection set up from the new address, which would require extra messaging.

IP version 4 (IPv4) is the currently widely deployed Internet Protocol version. Its major disadvantage is the small number of unique, public IP addresses. IP version 6 (IPv6) has a much larger address space, which fixes the most important IPv4 problem known today. IPv6 also changes some other things in the Internet Protocol, for example, how fragmentation of packets is done, but these changes are quite small. Most protocols have separate definitions on how they are used within the IPv4 and the IPv6 context.

For instance, there are separate versions of IPSec and Mobile IP for use with IPv4 and IPv6. However, such modifications to protocols are quite small, and do not usually change the essentials of the protocols significantly. The invention can be applied to both IPv4 and IPv6.

In the following, the invention is further described by means of figures and some examples. The intention is not to restrict the invention to the details of the following description or to the details of protocols such as the IPSec and IKE protocols which might be changed in the future.

FIGURES

FIG. 1 illustrates an example of a telecommunication network to be used in the invention.

FIG. 2 illustrates a second example of a telecommunication network to be used in the invention.

FIG. 3 illustrates a third example of a telecommunication network to be used in the invention.

FIG. 4 describes the prior art solution to enable mobility for IPSec connections.

FIG. 5 describes the method of the invention to enable mobility for IPSec connections.

DETAILED DESCRIPTION

FIG. 1 illustrates an example of a telecommunication network to be used in the invention. Thus, in FIG. 1, computer 1 may be a client computer and computer 2 a destination computer, to which the secure messages are sent in the invention by means of an IPSec tunnel established between computer 1 and computer 2. Computer 2 might be a security gateway for a third computer 3. Then, the messages sent from computer 2 to computer 3 are sent in plaintext. The security gateway can be a common security gateway for e.g. a company LAN, whereby there are several computers in the LAN protected by computer 2. The other protected computers are not shown in FIG. 1, but naturally, the invention covers also such networks.

The network of FIG. 2 otherwise corresponds to that of FIG. 1, but in FIG. 2 also computer 1 is a security gateway, e.g. for computer 4. Also here, the security gateway 1 can be

Appx137

**9**

a common security gateway for e.g. a company LAN, whereby there are several computers in the LAN protected by computer **1**. The other protected computers are not shown in FIG. **2** But naturally, the invention covers also such networks. The messages between security gateway **1** and the computers it protects are sent in plaintext as the IPSec tunnel only exist between computers **1** and **2**.

The network of FIG. **3** is a network wherein the IPSec messages are sent between an end-to-end connection between two computers **1**, **2** only whereby IPSec transport mode can be used instead of tunnel mode.

FIG. **4** describes the prior art solution to enable mobility for IPSec connections. As a diagram, this is the standard IPSec procedure when establishing a tunnel between addresses A and X, and then B and X.

The protocol begins with the IKE main mode requiring 6 messages in total, see steps **1a-6a** in FIG. **4**. The protocol involves strong user authentication, policy negotiation and the use of the Diffie-Hellman algorithm. Any other IKE phase 1 mode might of course be used as an alternative. Another approach to minimise the number of message exchanges would be to avoid IKE phase 1 and perform only the IKE quick mode (3 messages). However, IKE phase 1 is associated with IP addresses (along with other identifying information). A modified implementation might ignore IP addresses when processing IKE messages, and thus be able to maintain IKE phase 1 state between connection points.

The protocol then continues with IKE quick mode requiring 3 messages in total (steps **7a-9a** in FIG. **4**). Quick mode includes IPSec policy negotiation and optionally the use of the Diffie-Helman algorithm. An alternative IKE phase 2 exchange could of course be used instead of quick mode.

At this point the tunnel has been established between addresses A and X. 9 messages have been used along with the computational expense (each Diffie-Hellman computation may take hundreds of milliseconds, for instance, depending on the host), also the roundtrip times being considerable (9/2=4.5 roundtrips, with a roundtrip time of 500 ms this is 2.25 seconds for latency alone).

The movement of the mobile terminal to address B causes full re-negotiation and again IKE main mode requires 6 messages in total (steps **1b-6b** in FIG. **4**), strong user authentication, policy negotiation, and optionally the use of the Diffie-Helman algorithm.

The use of the protocol continues with IKE quick mode requiring 3 messages total (steps **7b-9b**).

The tunnel between addresses B and X is now complete.

FIG. **5** describes the method of the invention. To establish the tunnel been address A and host X, IKE main mode is again used requiring 6 messages in total (steps **1a-6a** in FIG. **5**) as in FIG. **4** including strong user authentication, policy negotiation and the use of the Diffie-Hellman algorithm.

Then IKE quick mode is again used requiring 3 messages in total (steps **7a-9** in FIG. **5**). The quick mode includes IPSec policy negotiation, and optionally the use of the Diffie-Hellman algorithm.

Again, IKE main mode may be replaced by any other IKE phase 1 mode, and IKE quick mode by any other IKE phase 2 mode.

At this point the tunnel has been established between addresses A and X. 9 messages have been used along with the computational expense.

In the invention, movement to address B requires only a single round trip, when using registration request messages to be sent from the mobile terminal, when it moves from address A to address B. In signal **10a** of FIG. **5**, which is sent from the mobile terminal to the other end of the established IPSec

**10**

tunnel when it has moved to address B, a request for registration (RREQ) of the new address is sent. Preferably, a reply message (RREP) is sent (step **11a**) from the host to confirm the address change. Both signals **10a** and **11a** can be encrypted and/or authenticated. The encryption and/or authentication is preferably performed by using IPSec, in which case it is preferable to use the same IPSec SA for protecting both data and registration traffic.

**11a** is optional in the invention. The preferable encryption method is IPSec, preferably with the modified reception processing described previously. However, the exact method of signalling is not important, the essence is to carry over the IPSec SA to the new connection point.

The SA that existed between addresses A and X has now been changed to be between addresses B and X and is now complete. The next time the mobile terminal sends a message, host **2** in FIG. **1-3** is able to properly handle IPSec packets that come from address B and vice versa. Traffic can now flow inside the tunnel as normal with IPSec.

Any further movement from network to another can be accomplished with a similar exchange of signalling message(s). The IPSec SA does not need to be re-established until the lifetime of the SA has been exhausted.

The invention requires half a roundtrip if only a request message is used without a reply, and one roundtrip of the reply message is used.

The example describes the tunnel mode of IPSec, but transport mode can also be used. IPSec transport mode connections in examples can be replaced with IPSec tunnel mode connections and vice versa. IPSec transport mode combined with an external tunnelling protocol, such as the Layer 2 Tunnelling Protocol (L2TP), is a replacement for IPSec tunnel mode with regards to functionality.

The implementation may optimise the start of traffic flows with regard to message **10a** (and optionally **11a**); e.g. after sending **10a**, the client may directly send IPSec-protected traffic. This essentially makes the handover latency zero, although it requires more complicated processing if the message **10a** is lost while being delivered. However, the essential part of the invention is that it is possible to make the invention provide essentially zero-latency handover for client-to-server traffic, and half a roundtrip latency for server-to client traffic.

Different network topologies can, of course, be used in the invention. For instance in FIG. **1**, the connection between hosts **2** and **3** may use IPSec transport or tunnel mode, instead of being plaintext, etc.

The invention claimed is:

**1**. A method for ensuring secure forwarding of a message in a telecommunication network, having at least one mobile terminal and another terminal and a security gateway therebetween, the method comprising:

  a) establishing a secure connection between a first address of the mobile terminal and an address of the security gateway, the secure connection defined by at least the addresses of the mobile terminal and the security gateway,

  b) the mobile terminal changing from the first address to a second address,

  c) while at the second address, the mobile terminal sending a request message to the address of the security gateway to request the security gateway to change the secure connection to be defined between the second address and the address of the security gateway,

  in response to the request message from the mobile terminal, the security gateway changing an address definition of the secure connection from the first address to the second address, the mobile terminal sending a secure

US 7,620,810 B2

11

message in the secure connection from the second address of the mobile terminal to the other terminal via the security gateway,

the secure connection being established by forming a Security Association (SA) using IPSec protocols, and the request message and/or a reply message being encrypted and/or authenticated by using the same SA already established.

**2**. The method of claim **1**, wherein in step c) a reply back to the mobile terminal is sent from the security gateway after the request from the mobile terminal to change the address.

**3**. The method of claim **1** wherein the method further comprises the security gateway sending back a reply message to the mobile terminal at the second address to confirm the address change.

**4**. The method of claim **3**, wherein the mobile terminal and the other terminal form an end-to-end connection whereby the secure connection is an IPSec transport connection or IPSec tunnel connection.

**5**. The method of claim **3**, wherein a tunneling protocol is used for the secure connection between the mobile terminal and the security gateway.

**6**. The method of claim **3**, wherein the other terminal is a mobile terminal.

12

**7**. A method for ensuring secure forwarding of a message in a telecommunication network, having at least one mobile terminal and another terminal and a security gateway therebetween, the method comprising:

a) establishing a secure connection between a first address of the mobile terminal and an address of the security gateway,

the secure connection defined by at least the addresses of the mobile terminal and the security gateway,

b) the mobile terminal moving from the first address to a second address,

c) while at the second address, the mobile terminal sending a request message to the address of the security gateway to request the security gateway to change the secure connection to be defined between the second address and the address of the security gateway,

the security gateway changing an address definition of the secure connection from the first address to the second address, and

the other terminal sending a secure message in the secure connection to the second address of the mobile terminal via the security gateway.

* * * * *

US007937581B2

## (12) United States Patent
### Vaarala et al.

(10) Patent No.: **US 7,937,581 B2**
(45) Date of Patent: ***May 3, 2011**

(54) **METHOD AND NETWORK FOR ENSURING SECURE FORWARDING OF MESSAGES**

(75) Inventors: **Sami Vaarala**, Helsinki (FI); **Antti Nuopponen**, Espoo (FI)

(73) Assignee: **MPH Technologies OY**, Espoo (FI)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/560,481**

(22) Filed: **Sep. 16, 2009**

(65) **Prior Publication Data**

US 2010/0049967 A1     Feb. 25, 2010

**Related U.S. Application Data**

(63) Continuation of application No. 10/490,932, filed as application No. PCT/FI02/00770 on Sep. 27, 2002, now Pat. No. 7,620,810.

(30) **Foreign Application Priority Data**

Sep. 28, 2001     (FI) ..................................... 20011910

(51) **Int. Cl.**
*H04L 9/00*     (2006.01)

(52) **U.S. Cl.** ........ **713/153**; 713/151; 713/161; 380/247; 709/228; 370/401; 370/338; 455/436

(58) **Field of Classification Search** ................... 713/161
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,170,057 B1 *     1/2001     Inoue et al. ................... 713/153
6,976,177 B2 *     12/2005     Ahonen ............................ 726/3

* cited by examiner

*Primary Examiner* — Nasser Moazzami
*Assistant Examiner* — Fikremariam Yalew
(74) *Attorney, Agent, or Firm* — Fasth Law Offices; Rolf Fasth

(57)     **ABSTRACT**

The method and network ensure secure forwarding of a message in a telecommunication network that has at least one first terminal and another terminal. The first terminal moves from a first address to a second address. A secure connection between the first address of the first terminal and the other terminal defining at least the addresses of the two terminals is established. When the first terminal moves from the first address to a second address, the connection is changed to be between the second address and to the other terminal by means of a request from the first terminal and preferably a reply back to the first terminal.

**9 Claims, 5 Drawing Sheets**



Ex. 1001
Apple v. MPH Techs. Oy
IPR2019-00820



**FIG. 1**



FIG. 2



IPsec transport mode

**FIG. 3**



PRIOR ART

**FIG. 4**

0005



**FIG. 5**

US 7,937,581 B2

**1**

## METHOD AND NETWORK FOR ENSURING SECURE FORWARDING OF MESSAGES

### PRIOR APPLICATIONS

This is a continuation patent application that claims priority from U.S. patent application Ser. No. 10/490,932, filed 22 Nov. 2004, now U.S. Pat. No. 7,620,810 that claims priority from PCT/FI02/00770, filed 27 Sep. 2002, that claims priority from Finnish Patent Application No. 20011910, filed 28 Sep. 2001.

### TECHNICAL FIELD

The method and network of the invention is intended to secure mobile connections in telecommunication networks. Especially, it is meant for IPSec connections.

The invention provides a method for ensuring secure forwarding of a message in a telecommunication network comprising at least one mobile terminal and another terminal, when the mobile terminal moves from a first address to a second address and there is a secure connection established between the first address of the mobile terminal and the other terminal, which secure connection defines at least the addresses of the two terminals. The invention also provides a network for performing such a method.

### TECHNICAL BACKGROUND

An internetwork is a collection of individual networks connected with intermediate networking devices and functions as a single large network. Different networks can be interconnected by routers and other networking devices to create an internetwork.

A local area network (LAN) is a data network that covers a relatively small geographic area. It typically connects workstations, personal computers, printers and other devices. A wide area network (WAN) is a data communication network that covers a relatively broad geographic area. Wide area networks (WANs) interconnect LANs across normal telephone lines and, for instance, optical networks; thereby interconnecting geographically disposed users.

There is a need to protect data and resources from disclosure, to guarantee the authenticity of data, and to protect systems from network based attacks. More in detail, there is a need for confidentiality (protecting the contents of data from being read), integrity (protecting the data from being modified, which is a property that is independent of confidentiality), authentication (obtaining assurance about the actual sender of data), replay protection (guaranteeing that data is fresh, and not a copy of previously sent data), identity protection (keeping the identities of parties exchanging data secret from outsiders), high availability, i.e. denial-of-service protection (ensuring that the system functions even when under attack) and access control. IPSec is a technology providing most of these, but not all of them. (In particular, identity protection is not completely handled by IPSec, and neither is denial-of-service protection.)

The IP security protocols (IPSec) provides the capability to secure communications between arbitrary hosts, e.g. across a LAN, across private and public wide area networks (WANs) and across the internet. IPSec can be used in different ways, such as for building secure virtual private networks, to gain a secure access to a company network, or to secure communication with other organisations, ensuring authentication and confidentiality and providing a key exchange mechanism. IPSec ensures confidentiality integrity, authentication, replay

**2**

protection, limited traffic flow confidentiality, limited identity protection, and access control based on authenticated identities. Even if some applications already have built in security protocols, the use of IPSec further enhances the security.

IPSec can encrypt and/or authenticate traffic at IP level. Traffic going in to a WAN is typically compressed and encrypted and traffic coming from a WAN is decrypted and decompressed. IPSec is defined by certain documents, which contain rules for the IPSec architecture. The documents that define IPSec, are, for the time being, the Request For Comments (RFC) series of the Internet Engineering Task Force (IETF), in particular, RFCs 2401-2412.

Two protocols are used to provide security at the IP layer; an authentication protocol designated by the header of the protocol, Authentication Header (AH), and a combined encryption/authentication protocol designated by the format of the packet for that protocol, Encapsulating Security Payload (ESP). AH and ESP are however similar protocols, both operating by adding a protocol header. Both AH and ESP are vehicles for access control based on the distribution of cryptographic keys and the management of traffic flows related to these security protocols.

Security association (SA) is a key concept in the authentication and the confidentiality mechanisms for IP. A security association is a one-way relationship between a sender and a receiver that offers security services to the traffic carried on it. If a secure two-way relationship is needed, then two security associations are required. If ESP and AH are combined, or if ESP and/or AH are applied more than once, the term SA bundle is used, meaning that two or more SAs are used. Thus, SA bundle refers to one or more SAs applied in sequence, e.g. by first performing an ESP protection, and then an AH protection. The SA bundle is the combination of all SAs used to secure a packet.

The term IPsec connection is used in what follows in place of an IPSec bundle of one or more security associations, or a pair of IPSec bundles—one bundle for each direction—of one or more security associations. This term thus covers both unidirectional and bi-directional traffic protection. There is no implication of symmetry of the directions, i.e., the algorithms and IPSec transforms used for each direction may be different.

A security association is uniquely identified by three parameters. The first one, the Security Parameters Index (SPI), is a bit string assigned to this SA. The SPI is carried in AH and ESP headers to enable the receiving system to select the SA under which a received packet will be processed. IP destination address is the second parameter, which is the address of the destination end point of the SA, which may be an end user system or a network system such as a firewall or a router. The third parameter, the security protocol identifier indicates whether the association is an AH or ESP security association.

In each IPSec implementation, there is a nominal security association data base (SADB) that defines the parameters associated with each SA. A security association is normally defined by the following parameters. The Sequence Number Counter is a 32-bit value used to generate the sequence number field in AH or ESP headers. The Sequence Counter Overflow is a flag indicating whether overflow of the sequence number counter should generate an auditable event and prevent further transmission of packets on this SA. An Anti-Replay Window is used to determine whether an inbound AH or ESP packet is a replay. AH information involves information about the authentication algorithm, keys and related parameters being used with AH. ESP information involves information of encryption and authentication algorithms,

3

keys, initialisation vectors, and related parameters being used with IPSec. The sixth parameter, Lifetime of this Security Association, is a time-interval and/or byte-count after which a SA must be replaced with a new SA (and new SPI) or terminated plus an indication of which of these actions should occur. IPSec Protocol Mode is either tunnel or transport mode. Path MTU, which is an optional feature, defines the maximum size of a packet that can be transmitted without fragmentation.

Both AH and ESP support two modes used, transport and tunnel mode.

Transport mode provides protection primarily for upper layer protocols and extends to the payload of an IP packet. Typically, transport mode is used for end-to-end communication between two hosts. Transport mode may be used in conjunction with a tunnelling protocol (other that IPSec tunnelling).

Tunnel mode provides protection to the entire IP packet and is generally used for sending messages through more than two components, although tunnel mode may also be used for end-to-end communication between two hosts. Tunnel mode is often used when one or both ends of a SA is a security gateway, such as a firewall or a router that implements IPSec. With tunnel mode, a number of hosts on networks behind firewalls may engage in secure communications without implementing IPSec. The unprotected packets generated by such hosts are tunnelled through external networks by tunnel mode SAs set up by the IPSec software in the firewall or secure router at boundary of the local network.

To achieve this, after the AH or ESP fields are added to the IP packet, the entire packet plus security fields are treated as the payload of a new outer IP packet with a new outer IP header. The entire original, or inner, packet travels through a tunnel from one point of an IP network to another: no routers along the way are able to examine the inner IP packet. Because the original packet is encapsulated, the new larger packet may have totally different source and destination addresses, adding to the security. In other words, the first step in protecting the packet using tunnel mode is to add a new IP header to the packet; thus the "IP|payload" packet becomes "IP|IP|payload". The next step is to secure the packet using ESP and/or AH. In case of ESP, the resulting packet is "IP|ESP|IP|payload". The whole inner packet is covered by the ESP and/or AH protection. AH also protects parts of the outer header, in addition to the whole inner packet.

The IPSec tunnel mode operates e.g. in such a way that if a host on a network generates an IP packet with a destination address of another host on another network, the packet is routed from the originating host to a security gateway (SGW), firewall or other secure router at the boundary of the first network. The SGW or the like filters all outgoing packets to determine the need for IPSec processing. If this packet from the first host to another host requires IPSec, the firewall performs IPSec processing and encapsulates the packet in an outer IP header. The source IP address of this outer IP header is this firewall and the destination address may be a firewall that forms the boundary to the other local network. This packet is now routed to the other host's firewall with intermediate routers examining only the outer IP header. At the other host firewall, the outer IP header is stripped off and the inner packet is delivered to the other host.

ESP in tunnel mode encrypts and optionally authenticates the entire inner IP packet, including the inner IP header. AH in tunnel mode authenticates the entire inner IP packet, including the inner IP header, and selected portions of the outer IP header.

4

The key management portion of IPSec involves the determination and distribution of secret keys. The default automated key management protocol for IPSec is referred to as ISAKMP/Oakley and consists of the Oakley key determination protocol and Internet Security Association and Key Management Protocol (ISAKMP). Internet key exchange (IKE) is a newer name for the ISAKMP/Oakley protocol. IKE is based on the Diffie-Hellman algorithm and supports RSA signature authentication among other modes. IKE is an extensible protocol, and allows future and vendor-specific features to be added without compromising functionality.

IPSec has been designed to provide confidentiality, integrity, and replay protection for IP packets. However, IPSec is intended to work with static network topology, where hosts are fixed to certain subnetworks. For instance, when an IPSec tunnel has been formed by using Internet Key Exchange (IKE) protocol, the tunnel endpoints are fixed and remain constant. If IPSec is used with a mobile host, the IKE key exchange will have to be redone from every new visited network. This is problematic, because IKE key exchanges involve computationally expensive Diffie-Hellman key exchange algorithm calculations and possibly RSA calculations. Furthermore, the key exchange requires at least three round trips (six messages) if using the IKE aggressive mode followed by IKE quick mode, and nine messages if using IKE main mode followed by IKE quick mode. This may be a big problem in high latency networks, such as General Packet Radio Service (GPRS) regardless of the computational expenses.

In this text, the term mobility and mobile terminal does not only mean physical mobility, instead the term mobility is in the first hand meant moving from one network to another, which can be performed by a physically fixed terminal as well.

The problem with standard IPSec tunnel end points are that they are fixed. A SA is bound to a certain IP address, and if it is changed, the existing IPSec SA becomes useless because it has been established by using different endpoint addresses. The problem has been discussed in the IETF standardisation forum, www.IETF.org, wherein an idea to support mobility for IPSec ESP tunnels by means of signalling to update the address of one end after a movement was mentioned by Francis Dupont. No solutions have however been presented until this date.

The standard Mobile IP protocol provides a mobile terminal with a mobile connection, and defines mechanisms for performing efficient handovers from one network to another. However, Mobile IP has several disadvantages. The security of Mobile IP is very limited. The mobility signalling messages are authenticated, but not encrypted, and user data traffic is completely unprotected. Also, there is no key exchange mechanism for establishing the cryptographic keys required for authenticating the mobility signalling. Such keys need to be typically distributed manually. Finally, the current Mobile IP protocol does not define a method for working through Network Address Translation (NAT) devices.

A way to solve this problem is to use e.g. Mobile IP to handle the mobility of the host, and use IPSec on top of the static IP address provided by the Mobile IP. Thus, the IPSec SAs are bound to static addresses, and the IPSec SAs can survive mobility of the host. However, this approach suffers from packet size overhead of both Mobile IP and IPSec tunnels, which can affect performance considerably when using links with small throughput.

The documents that define IP in general are the RFC standards RFC 768, RFC 791, RFC 793, RFC 826 and RFC 2460.

**5**

RFC 2002, RFC 2003, RFC 2131, RFC 3115, MOBILE Ipv4 and IPv6, and DHCPv6 define Mobile IP, IP-IP and DHCP.

## REFERENCES

The following is a list of useful references of standards mentioned.

IP in General, TCP and UDP:

[RFC768]
J. Postel, User Datagram Protocol, RFC 768, August 1980.
ftp://ftp.isi.edu/in-notes/rfc768.txt
[RFC791]
J. Postel, Internet Protocol, RFC 791, September 1981.
ftp://ftp.isi.edu/in-notes/rfc791.txt
[RFC792]
J. Postel, Internet Control Message Protocol, RFC 792, September 1981.
ftp://ftp.isi.edu/in-notes/rfc792.txt
[RFC793]
J. Postel, Transmission Control Protocol, RFC 793, September 1981.
ftp://ftp.isi.edu/in-notes/rfc793.txt
[RFC826]
D. C. Plummer, An Ethernet Address Resolution Protocol, RFC 826, November 1982.
ftp://ftp.isi.edu/in-notes/rfc826.txt
[RFC2460]
S. Deering, R. Hinden, Internet Protocol, Version 6 (IPv6) Specification, RFC 2460, December 1998.
Mobile IP; IP-IP; DHCP:
[RFC2002]
C. Perkins, IP Mobility Support, RFC 2002, October 1996.
ftp://ftp.isi.edu/in-notes/rfc2002.txt
[RFC2003]
C. Perkins, IP Encapsulation Within IP, RFC 2003, October 1996.
ftp://ftp.isi.edu/in-notes/rfc2003.txt
[RFC2131]
R. Droms, Dynamic Host Configuration Protocol, RFC 2131, March 1997.
ftp://ftp.isi.edu/in-notes/rfc2131.txt
[RFC3115]
G. Dommety, and K. Leung, Mobile IP Vendor/Organization-specific Extensions, RFC 3115, April 2001.
ftp://ftp.isi.edu/in-notes/rfc3115.txt
[MOBILEIPv6]
D. B. Johnson, C. Perkins, Mobility Support in IPv6, Work in progress (Internet-Draft is available), July 2000.
[DHCPV6]
J. Bound, M. Carney, C. Perking, R. Droms, Dynamic Host Configuration Protocol for IPv6 (DHCPv6), Work in progress (Internet-Draft is available), June 2001.
IPsec Standards:
[RFC2401]
S. Kent, and R. Atkinson, Security Architecture for the Internet Protocol, RFC 2401, November 1998.
ftp://ftp.isi.edu/in-notes/rfc2401.txt
[RFC2402]
S. Kent, and R. Atkinson, IP Authentication Header, RFC 2402, November 1998.
ftp://ftp.isi.edu/in-notes/rfc2402.txt
[RFC2403]
C. Madson, R. Glenn, The Use of HMAC-MD5-96 within ESP and AH, RFC 2403, November 1998.
[RFC2404]
C. Madson, R. Glenn, The Use of HMAC-SHA-1-96 within ESP and AH, RFC 2404, November 1998.

**6**

[RFC2405]
C. Madson, N. Doraswamy, The ESP DES-CBC Cipher Algorithm With Explicit IV, RFC 2405, November 1998.
[RFC2406]
S. Kent, and R. Atkinson, IP Encapsulating Security Payload (ESP), RFC 2406, November 1998.
ftp://ftp.isi.edu/in-notes/rfc2406.txt
[RFC2407]
D. Piper, The internet IP Security Domain of Interpretation for ISAKMP, RFC 2407, November 1998.
ftp://ftp.isi.edu/in-notes/rfc2407.txt
[RFC2408]
D. Maughan, M. Schneider, M. Schertler, and J. Turner, Internet Security Association and Key Management Protocol (ISAKMP), RFC 2408, November 1998.
ftp://ftp.isi.edu/in-notes/rfc2408.txt
[RFC2409]
D. Harkins, and D. Carrel, The Internet Key Exchange (IKE), RFC 2409, November 1998.
ftp://ftp.isi.edu/in-notes/rfc2409.txt
[RFC2410]
R. Glenn, S. Kent, The NULL Encryption Algorithm and Its Use With IPsec, RFC 2410, November 1998.
[RFC2411]
R. Thayer, N. Doraswamy, R. Glenn, IP Security Document Roadmap, RFC 2411, November 1998.
[RFC2412]
H. Orman, The OAKLEY Key Determination Protocol, RFC 2412, November 1998.
NAT:
[RFC2694]
P. Srisuresh, G. Tsirtsis, P. Akkiraju, and A. Heffernan, DNS extensions to Network Address Translators (DNS_ALG), RFC 2694, September 1999.
[RFC3022]
P. Shisuresh, K. Egevang, Traditional IP Network Address Translator (Traditional NAT), RFC 3022, January 2001.
ftp://ftp.isi.edu/in-notes/rfc3022.txt

## THE OBJECT OF THE INVENTION

The object of the invention is to ensure secure forwarding of messages from and to mobile terminals by avoiding the problems of prior art.

## SUMMARY OF THE INVENTION

The method and network of the invention is to ensure secure forwarding of a message in a telecommunication network, comprising at least one first terminal and another terminal. In the method, the first terminal moves from a first address to a second address. A secure connection between the first address of the first terminal and the other terminal defining at least the addresses of the two terminals is established. The first terminal moves from the first address to a second address. The connection is changed to be between the second address and the other terminal by means of a request from the first terminal and preferably, a reply back to the first terminal.

In the invention, the first terminal is movable from one network to another. Such a terminal can physically be a mobile terminal or a fixed terminal.

The secure connection is an IPSec connection established by forming one or more Security Associations (SAs) using the IPSec protocols. The request and/or the reply message can be protected e.g. by IPSec encryption and/or authentication, possibly using the same IPSec SA that is used for traffic protection purposes.

US 7,937,581 B2

7        8

In general, registration request and registration reply are Mobile IP terms while the invention is not bound to Mobile IP. In the invention, the terms request and reply are used in the generic sense, and may or may not be related to Mobile IP.

The method of the invention can be used in different kinds of networks. If the first terminal and the other terminal form an end-to-end connection, the secure connection may be an IPSec tunnel mode or transport mode connection. Furthermore, one of or both of the first terminal and the other terminal can be a security gateway protecting one or more computers, whereby IPSec tunnel mode, or IPSec transport mode together with a tunnelling protocol (such as Layer 2 Tunnelling Protocol, L2TP), is used for the secure connection between the first terminal and the other terminal.

If both terminals are mobile, a special solution is required for the situation when both terminals move simultaneously in case of a so called "double jump" situation. This solution can be implemented e.g. by using a centralised registry of current locations of hosts, although other solutions exist for the problem. However, the "changeable" IPSec tunnel or transport mode SAs of the invention could be used in that case, too.

The applicant has solved the above problems of prior art by defining a signalling mechanism that allows an existing IPSec security association, that is, the symmetric encryption and authentication algorithms used for packet processing, along with their keys and other parameters, to be moved from one network to another. To be more precise, an existing IPSec tunnel endpoint can be moved in the invention from one point of attachment to another. For instance, an IPSec tunnel established between addresses A and X tunnel can be changed by using the defined signalling to be between addresses B and X, using only a single round trip for signalling (2 messages), or half a round trip (1 message, if a reply message is not used) for signalling. The solution requires minimal computational overhead compared to Diffie-Hellman or strong authentication calculations.

The signalling mechanism is preferably similar to the one in Mobile IP, i.e. a registration request (RREQ) is sent to the other end of the SA followed by a registration reply (RREP) back to the sender of the RREP message, both of which are extensible for future features and optional attributes. The RREQ/RREP message pair is sent from the new network, and once properly authenticated, the sender IPSec tunnel endpoint is updated from the old network to the new network.

In case the security association used for protecting user traffic is also used for signalling purposes, the reception of the RREQ message by the other end of the SA requires a change in a normal IPSec implementation to accept a packet that appears to belong to a certain IPSec tunnel, but comes from a wrong address (i.e. the tunnel is currently between A and X, and the RREQ comes from address B). This is only necessary for the RREQ message. Such an implementation is provided by the invention; it is necessary to modify IPSec if IPSec is used for the RREQ/RREP signalling. In that case, it is required specifically for processing of the RREQ and RREP messages, if the reply message is to be used.

The request message may update a set of security associations, for instance, a single security association, a security association bundle, an IPSec connection, a group of IPSec connections, or any combinations of these. In practice, it is useful to update either a single IPSec connection or a group of IPSec connections. The latter may be important if separate IPSec connections are used for different kinds of traffic. A single request message can then update all (or a certain set) of such connections to a new address, instead of requiring separate requests for each IPSec connection. In the following, the case of updating a single IPSec connection is discussed, without limiting the invention to this behaviour.

Another method of performing the signalling is to use a separate protocol. The protocol should preferably provide encryption and/or authentication of the signalling messages. The IKE protocol already has messages defined for e.g. deleting IPSec SAs. One method of providing the necessary signalling would be by adding a new IKE notification message type that requests a change in an existing IPSec SA. Such a message should provide its own encryption and/or authentication to avoid requiring an IKE connection set up from the new address, which would require extra messaging.

IP version 4 (IPv4) is the currently widely deployed Internet Protocol version. Its major disadvantage is the small number of unique, public IP addresses. IP version 6 (IPv6) has a much larger address space, which fixes the most important IPv4 problem known today. IPv6 also changes some other things in the Internet Protocol, for example, how fragmentation of packets is done, but these changes are quite small. Most protocols have separate definitions on how they are used within the IPv4 and the IPv6 context. For instance, there are separate versions of IPSec and Mobile IP for use with IPv4 and IPv6. However, such modifications to protocols are quite small, and do not usually change the essentials of the protocols significantly. The invention can be applied to both IPv4 and IPv6.

In the following, the invention is further described by means of figures and some examples. The intention is not to restrict the invention to the details of the following description or to the details of protocols such as the IPSec and IKE protocols which might be changed in the future.

FIGURES

FIG. 1 illustrates an example of a telecommunication network to be used in the invention.

FIG. 2 illustrates a second example of a telecommunication network to be used in the invention.

FIG. 3 illustrates a third example of a telecommunication network to be used in the invention.

FIG. 4 describes the prior art solution to enable mobility for IPSec connections.

FIG. 5 describes the method of the invention to enable mobility for IPSec connections.

DETAILED DESCRIPTION

FIG. 1 illustrates an example of a telecommunication network to be used in the invention. Thus, in FIG. 1, computer 1 may be a client computer and computer 2 a destination computer, to which the secure messages are sent in the invention by means of an IPSec tunnel established between computer 1 and computer 2. Computer 2 might be a security gateway for a third computer 3. Then, the messages sent from computer 2 to computer 3 are sent in plaintext. The security gateway can be a common security gateway for e.g. a company LAN, whereby there are several computers in the LAN protected by computer 2. The other protected computers are not shown in FIG. 1, but naturally, the invention covers also such networks.

sent in plaintext as the IPSec tunnel only exist between computers 1 and 2.

The network of FIG. 3 is a network, wherein the IPSec messages are sent between an end-to-end connection between two computers 1, 2 only whereby IPSec transport mode can be used instead of tunnel mode.

9

FIG. 4 describes the prior art solution to enable mobility for IPSec connections. As a diagram, this is the standard IPSec procedure when establishing a tunnel between addresses A and X, and then B and X.

The protocol begins with the IKE main mode requiring 6 messages in total, see steps 1a-6a in FIG. 4. The protocol involves strong user authentication, policy negotiation and the use of the Diffie-Hellman algorithm. Any other IKE phase 1 mode might of course be used as an alternative. Another approach to minimise the number of message exchanges would be to avoid IKE phase 1 and perform only the IKE quick mode (3 messages). However, IKE phase 1 is associated with IP addresses (along with other identifying information). A modified implementation might ignore IP addresses when processing IKE messages, and thus be able to maintain IKE phase 1 state between connection points.

The protocol then continues with IKE quick mode requiring 3 messages in total (steps 7a-9a in FIG. 4). Quick mode includes IPSec policy negotiation and optionally the use of the Diffie-Hellman algorithm. An alternative IKE phase 2 exchange could of course be used instead of quick mode.

At this point the tunnel has been established between addresses A and X. 9 messages have been used along with the computational expense (each Diffie-Hellman computation may take hundreds of milliseconds, for instance, depending on the host), also the roundtrip times being considerable (9/2=4.5 roundtrips, with a roundtrip time of 500 ms this is 2.25 seconds for latency alone).

The movement of the mobile terminal to address B causes full re-negotiation and again IKE main mode requires 6 messages in total (steps 1b-6b in FIG. 4), strong user authentication, policy negotiation, and optionally the use of the Diffie-Hellman algorithm.

The use of the protocol continues with IKE quick mode requiring 3 messages total (steps 7b-9b). The network of FIG. 2 otherwise corresponds to that of FIG. 1, but in FIG. 2 also computer 1 is a security gateway, e.g. for computer 4. Also here, the security gateway 1 can be a common security gateway for e.g. a company LAN, whereby there are several computers in the LAN protected by computer 1. The other protected computers are not shown in FIG. 2. But naturally, the invention covers also such networks. The messages between security gateway 1 and the computers it protects are

The tunnel between addresses B and X is now complete.

FIG. 5 describes the method of the invention. To establish the tunnel between address A and host X, IKE main mode is again used requiring 6 messages in total (steps 1a-6a in FIG. 5) as in FIG. 4 including strong user authentication, policy negotiation and the use of the Diffie-Hellman algorithm.

Then IKE quick mode is again used requiring 3 messages in total (steps 7a-9a in FIG. 5). The quick mode includes IPSec policy negotiation, and optionally the use of the Diffie-Hellman algorithm.

Again, IKE main mode may be replaced by any other IKE phase 1 mode, and IKE quick mode by any other IKE phase 2 mode.

At this point the tunnel has been established between addresses A and X. 9 messages have been used along with the computational expense.

In the invention, movement to address B requires only a single round trip, when using registration request messages to be sent from the mobile terminal, when it moves from address A to address B. In signal 10a of FIG. 5, which is sent from the mobile terminal to the other end of the established IPSec tunnel when it has moved to address B, a request for registration (RREQ) of the new address is sent. Preferably, a reply message (RREP) is sent (step 11a) from the host to confirm

10

the address change. Both signals 10a and 11a can be encrypted and/or authenticated. The encryption and/or authentication is preferably performed by using IPSec, in which case it is preferable to use the same IPSec SA for protecting both data and registration traffic.

11a is optional in the invention. The preferable encryption method is IPSec, preferably with the modified reception processing described previously. However, the exact method of signalling is not important, the essence is to carry over the IPSec SA to the new connection point.

The SA that existed between addresses A and X has now been changed to be between addresses B and X and is now complete. The next time the mobile terminal sends a message, host 2 in FIG. 1-3 is able to properly handle IPSec packets that come from address B and vice versa. Traffic can now flow inside the tunnel as normal with IPSec.

Any further movement from network to another can be accomplished with a similar exchange of signalling message (s). The IPSec SA does not need to be re-established until the lifetime of the SA has been exhausted.

The invention requires half a roundtrip if only a request message is used without a reply, and one roundtrip of the reply message is used.

The example describes the tunnel mode of IPSec, but transport mode can also be used. IPSec transport mode connections in examples can be replaced with IPSec tunnel mode connections and vice versa. IPSec transport mode combined with an external tunnelling protocol, such as the Layer 2 Tunnelling Protocol (L2TP), is a replacement for IPSec tunnel mode with regards to functionality.

The implementation may optimise the start of traffic flows with regard to message 10a (and optionally 11a); e.g. after sending 10a, the client may directly send IPSec-protected traffic. This essentially makes the handover latency zero, although it requires more complicated processing if the message 10a is lost while being delivered. However, the essential part of the invention is that it is possible to make the invention provide essentially zero-latency handover for client-to-server traffic, and half a roundtrip latency for server-to-client traffic.

Different network topologies can, of course, be used in the invention. For instance in FIG. 1, the connection between hosts 2 and 3 may use IPSec transport or tunnel mode, instead of being plaintext, etc.

While the present invention has been described in accordance with preferred compositions and embodiments, it is to be understood that certain substitutions and alterations may be made thereto without departing from the spirit and scope of the following claims.

We claim:

1. A method for ensuring secure forwarding of a message in a telecommunication network, having at least one mobile terminal and another terminal and a security gateway thereebtween, the method comprising:

a) establishing a secure connection having a first address of the mobile terminal as a first end-point and a gateway address of the security gateway as a second end-point,

b) the mobile terminal changing from the first address to a second address,

c) while at the second address, the mobile terminal sending a request message to the gateway address of the security gateway to request the security gateway to change the secure connection to be defined between the second address and the gateway address of the security gateway, in response to the request message from the mobile terminal, the security gateway changing an address definition of the secure connection from the first address to the second address, and

US 7,937,581 B2

**11**  **12**

the mobile terminal sending a secure message in the secure connection from the second address of the mobile terminal to the other terminal via the security gateway.

**2**. The method of claim **1**, wherein the secure connection is established in step a) by forming a Security Association (SA).

**3**. The method of claim **1**, wherein in step c) a reply back to the mobile terminal is sent from the security gateway after the request from the mobile terminal to change the address.

**4**. The method of claim **1**, wherein the request message and/or a reply message is encrypted and/or authenticated.

**5**. The method of claim **1** wherein the method further comprises the security gateway sending back a reply message to the mobile terminal at the second address to confirm the address change.

**6**. The method of claim **5**, wherein the mobile terminal and the other terminal form an end-to-end connection whereby the secure connection is an IPSec transport connection or IPSec tunnel connection.

**7**. The method of claim **5**, wherein a tunneling protocol is used for the secure connection between the mobile terminal and the security gateway.

**8**. The method of claim **5**, wherein the other terminal is a mobile terminal.

**9**. A method for ensuring secure forwarding of a message in a telecommunication network, having at least one mobile terminal and another terminal and a security gateway therebetween, the method comprising:

a) establishing a secure connection having a first address of the mobile terminal as a first end-point and a gateway address of the security gateway as a second end-point,

b) the mobile terminal moving from the first address to a second address,

c) while at the second address, the mobile terminal sending a request message to the gateway address of the security gateway to request the security gateway to change the secure connection to be defined between the second address and the gateway address of the security gateway,

the security gateway changing an address definition of the secure connection from the first address to the second address,

the other terminal sending a message to the second address of the mobile terminal via the security gateway, and

the security gateway receiving the message from the other terminal and forwarding the message as an encrypted secure message to the second address.

\* \* \* \* \*

Appx151

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Federal Circuit Rules 28.1(b) and 32(b) because it contains 10,024 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Federal Circuit Rule 32(b)(2), as determined by the word-counting feature of Microsoft Word.

This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface, including serifs, using Microsoft Word 2016 in Times New Roman 14-point font.

Dated:  May 21, 2021                      _____/s/ Joseph R. Palmore_____

ny-2095733